No. 24-4542

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

CASCADIA WILDLANDS and OREGON WILD,
*Plaintiffs/Appellants*,

v.

U.S. BUREAU OF LAND MANAGEMENT,
*Defendant/Appellee.*

———————————————

Appeal from the United States District Court for the District of Oregon
No. 6:23-cv-1358 (Hon. Michael J. McShane)

———————————————

**APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 of 2 (SER 1–201)**

———————————————

TODD KIM
*Assistant Attorney General*

JOAN PEPIN
Of Counsel:                           SHANNON BOYLAN
                                      KYLE GLYNN
BRIAN PERRON                          *Attorneys*
*Attorney*                            Environment and Natural Resources Division
U.S. Department of the Interior       U.S. Department of Justice
                                      Post Office Box 7415
                                      Washington, D.C. 20044
                                      (202) 514-4786
                                      kyle.glynn@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; and OREGON WILD, an Oregon non-profit corporation, | ) ) ) No. 6:23-CV-01358-MC ) ) May 16, 2024 |
| Plaintiffs, | ) ) Eugene, Oregon |
| v. | ) ) |
| BUREAU OF LAND MANAGEMENT, a federal agency, | ) ) ) |
| Defendant. | ) |

**TRANSCRIPT OF PROCEEDINGS**

(Oral Argument)

BEFORE THE HONORABLE MICHAEL J. MCSHANE

UNITED STATES DISTRICT COURT CHIEF JUDGE

**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

2

# A P P E A R A N C E S

FOR THE PLAINTIFFS:

CASCADIA WILDLANDS
By:  Nicholas Stanton Cady
P.O. Box 10455
Eugene, OR 97440

FOR THE PLAINTIFFS:

CASCADIA WILDLANDS
By:  Peter Jensen
P.O. Box 10455
Eugene, OR 97440

FOR THE PLAINTIFFS:

OREGON WILD
By:  John Persell
5825 N. Greeley Avenue
Portland, OR 97217

FOR THE DEFENDANT:

U.S. DEPARTMENT OF JUSTICE
By:  Shannon Boylan
150 M Street, NE
Washington, DC 20002

FOR THE DEFENDANT:

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE REGIONAL SOLICITOR
By:  Brian Perron
601 SW Second Avenue
Suite 1950
Portland, OR 97204

11

five-acre circle that contains that habitat under the RMP, you have to survey.  The RMP does not mention or create exceptions for these areas.  It treats all marbled murrelet nesting habitat the same.  If you're going to modify forests in a five-acre circle containing it, you have to survey.

Instead of surveying, BLM is presuming these sites continue to be occupied, but it is not applying any of the RMP protections for occupied sites.

What BLM is doing is the functional equivalent of just presuming they're not occupied, right?  It would have the same substantive outcome.

BLM in its reply argues its approach is somehow more protective because in theory, BLM could try and log these previously occupied sites, but that is not the case.  BLM is treating this as an either-or situation:  either you protect these occupied murrelet old growth areas or you survey and then deal with the survey results as they come out.

It's required to do both.  So you can't log occupied murrelet habitat, because of the LSR standards, right.  They say you have to maintain occupied habitat and you also have to protect old forest stands.  You can't log in that anyway, because we're in the reserves.  That's at AR10875.

And if the BLM proposes to log right next to occupied suitable -- or any suitable nesting habitat, it has to survey. And given that murrelets have high nest site fidelity, meaning

12

they're returning to the same stand or same forest area year after year to attempt to breed, it's likely these surveys will get occupied detections, resulting in these large quarter-mile, roughly 200-acre, blocks of habitat that would be off limits to logging. And this is exactly how the RMP was expected and intended to work. This is from the -- the biological opinion to the RMP. It's at 11793. It says, the RMP will, quote, work more effectively to block up habitat in fragmented high-quality habitat and in low-quality habitat where nesting structure may be unevenly distributed throughout younger stands.

This is, compared to the approach -- it's better than the approach in the Northwest Forest Plan, because it would block these areas up.

The Fish & Wildlife Service goes on to explain these patches of habitat will be connected by the quarter acre occupied sites that BLM will get by surveying and protecting. So these previously documented occupied sites, they don't encompass all of the murrelet nesting habitat that's in the project area.

We also have a lot of unsurveyed suitable nesting habitat for the marbled murrelet that's also being logged next to. And so BLM is logging within a five-acre circle containing unsurveyed suitable nesting habitat, and the BLM is not implementing Option 1 here either. It's not surveying.

To justify this, BLM attempts to add some qualifiers to the RMP language. So recall the marbled murrelet management

**SER005**

13

directions, they start with the phrase "before modifying nesting habitat or removing nesting structure".  So the term "modify nesting habitat" is defined by the biological opinion that accompanied the Resource Management Plan.  It includes -- it specifically includes -- this is AR11759.  It includes effects to adjacent stands that creates edge effects, and this is expected from treatments that are within 300 to 600 feet from nesting structure.

The BLM also defines "modify nesting habitat" to include effects to adjacent stands as well in its biological assessment.  That's at AR2323.

So BLM is arguing that the RMP's use of "modifying nesting habitat" -- excuse me.  I'm going to get a drink of water.  We walked over here, and it was hotter than expected.

THE COURT:  That's okay.

MR. CADY:  So the RMP's use of "modifying nesting habitat" is really only directly modifying nesting habitat.  They attempt to add this qualifier into the language, directly modifying nesting habitat would be direct logging in nesting habitat, removal of nesting structure, right?

So in other words, the BLM is only concerned about what's inside the logging unit, and they don't have to worry about edge effects.  This interpretation would permit the BLM, as it is doing here, to log directly adjacent to marbled murrelet nesting habitat without doing any of the RMP protective measures.

**SER006**

14

And the major glaring deficiency with this interpretation is that it completely -- is completely unworkable and contradicts all of that surrounding RMP language that we just walked through.  The analysis here --

THE COURT:  Is it your position that's non-ambiguous?

MR. CADY:  Yes.  Yes, Your Honor.

THE COURT:  Okay.

MR. CADY:  I think the surrounding language in the RMP, the context explaining it, I think the various exceptions that BLM is trying to employ are confusing.  And it took us, honestly, a while to work through what exactly was going on.  I think the RMP itself is very prescriptive and quantifiable and direct.

THE COURT:  Okay.

MR. CADY:  So, sorry.  I forget what I was just talking about.

But the major glaring deficiency with this interpretation is that it completely undermines all that RMP language that we just walked through.  So the analysis area, the five-acre circle, habitat buffers around murrelet occupied sites, none -- all of this is rendered meaningless if all you're concerned about is what's directly in the logging unit, right, like those provisions never come into play.  They're rendered meaningless.

And so BLM's kind of response to this is that it receives deference.  It says, "We can interpret our RMP how we

**SER007**

15

want to."  And the Supreme Court has recently explained that deference has been applied way too liberally, and it's really the exception to the rule instead of the rule itself.  So the Supreme Court in *Kisor* recently explained that deference is only due if the regulation is ambiguous, as you mentioned.  BLM never argues that it is.  And the regulation is, our perspective, very clear and prescriptive and has specific numbers to operate off of.

The second reason why deference shouldn't apply is that *Kisor* explained that the court can only defer to, quote unquote, reasonable interpretations, right?  So that means that the interpretation has to fit within the surrounding language and structure and context, and so BLM's reading renders important portions of the RMP superfluous, it undermines the stated intent of those provisions, it undermines the biological provision that accompanied the RMP.  This is elaborated on in our reply at pages 7 to 11 kind of at length.

But, finally, I think this is the most glaring reason, is BLM is not entitled to deference because this is a new interpretation and a change in agency position.  It conflicts with prior agency interpretations of this language.

So when the RMP was developed and approved by the Fish & Wildlife Service, the only definition of "modifying nesting habitat" included effects to adjacent stands explicitly. The whole RMP BiOp is premised on this assumption.

So BLM argues in response that this is just

16

Fish & Wildlife Service's interpretation and not BLM's. We have explored the case law around *Kisor* and some of these cases, and I can't -- I did not find anything, and maybe BLM has information that I do not -- they did not site anything in their briefs -- I couldn't find anything that says that it matters which federal agency is interpreting the language at issue. I will note that Fish & Wildlife Service is the agency with the expertise in endangered species, so this kind of falls within their bailiwick, so to say.

THE COURT: So you'd agree to some degree they have changed their view in terms of how much of a buffer is required?

MR. CADY: That Fish & Wildlife Service has?

THE COURT: Yeah. Over time.

MR. CADY: No, I would not agree with that. So I think -- are you referring to the kind of new suite of protections that BLM proposes, like 150 feet if the stand is a certain age?

THE COURT: Yes.

MR. CADY: So I think Fish & Wildlife Service was told by the Bureau of Land Management that they wouldn't be employing any surveys, and that their new interpretation is just if we directly modify, that's the only way we're going to apply modifications.

And so BLM proposed this new suite of protections that is well outside of what the RMP requires and asked Fish

**SER009**

17

& Wildlife Service to weigh in on it.  What is that -- that document is in the record.  I think it explains the whole process pretty well.  It's 4492, I believe, beginning at 4492.

So I think Fish & Wildlife Service in essence was kind of bullied into saying, you know, these -- these -- this -- in saying that this new interpretation of their plan won't lead to jeopardy for the whole species, but Fish & Wildlife Service in the Big Weekly -- Big Weekly Elk BiOp explains they -- what is the quote?  They say it -- I'm going to butcher this.  I do have it written down somewhere.  Oh, okay.  It's right here.  It's at AR2140.  They say in relation -- in specific relation to those -- that new suite of protections, they say it will be, quote, difficult to confidently say adverse impacts will be fully avoided.

So that's kind of the wishy-washy conclusion that they draw from that new protections.

THE COURT:  Okay.

MR. CADY:  I think one way to say -- instead of saying "difficult to confidently say adverse impacts," you could just say, "adverse impacts will not be" -- and I think the RMP itself states that the analysis area, right, that is the area where if you're modifying forests, you're going to impact nesting, right, or may impact nesting.  So (pause) -- okay.  Where did I leave off here?

So the -- we were talking about kind of case law around

**SER010**

18

*Kisor* and whether or not deference would apply here. And so -- and whether or not it matters whether Fish & Wildlife Service or BLM is interpreting this. And so the case law just discusses whether the new interpretation would create, quote, unfair surprise to the parties at issue.

And that is certainly the case here. Plaintiffs had no idea this new interpretation was in play until they received the administrative record for this lawsuit. This official interpretation never went through public comment or notice, and those are like a formal rule-making of any sort, and those are the types of ways in which an agency can change interpretation of regulations and get rid of unfair surprise.

In any case, I think it's very disingenuous for BLM to try to argue the Fish & Wildlife Service definition doesn't -- doesn't apply or doesn't make sense or shouldn't be considered, because BLM and Fish & Wildlife Service work together to develop a biological opinion.

The Fish & Wildlife Service in its BiOp here describes the processes in negotiation, and the BiOp is developed from info provided by the BLM to the Fish & Wildlife Service. Also, the BLM's RMP doesn't go into effect without a valid biological opinion either.

And so assuming that BLM even legitimately had this mischaracterization, as it labels it, at the time when it was finalizing the RMP, it made no effort to correct this

**SER011**

19

misunderstanding until Fish & Wildlife Service approved the RMP, right, which I think displays it's disingenuous.

So I think for these three reasons independently, BLM is not afforded deference to its "directly" addition to the "modify" language, but even if we were to operate under that definition that you have to directly log in stands deemed nesting habitat by the BLM, we have that here and BLM is still not surveying, right?  And so the AR at 573, this is an EA "LSR Commercial Section", says, quote, The proposed project includes acres that are mapped as suitable murrelet habitat.

In the "Riparian Reserve" at 574, the EA states, quote, 25 acres of commercial thinning are in stands with portions that have been identified as suitable for murrelet nesting.

And at AR575, it says, quote, Construction of roads and yarding corridors will remove patches or individual trees in murrelet habitat.

So any one of these situations under BLM's "directly modify" definition would require surveys and the full suite of protections under Option 1.

For the road construction and yarding, BLM argues in its reply brief that it did comply with Option 1 and it was availing itself to an exception in Option 1 that would permit -- permit it to remove old growth in the murrelet nesting structure. The problem with this argument is that Option 1 unambiguously requires surveys.  BLM's attempt to justify its lack of surveys

20

in the EA is as follows, it says, quote -- this is at AR575. It says, stands would have been surveyed as probable absence through protocol surveys.

So BLM is predicting the outcomes of surveys it did not conduct as justification for skipping those surveys, right? Am I making sense?

THE COURT: Yes.

MR. CADY: So this is the definition of, I would say, arbitrary reasoning.

And finally, even in the areas BLM did survey those Harvest Land Base units, BLM is playing games to get around the occupied detections there. So in the exhibit BLM provided with its response brief, it shows that BLM got numerous occupied survey detections in those Harvest Land Base units.

Under the Resource Management Plan, this means the entire occupied site needs to be designated. This is a quarter-mile circle, including all forests regardless of age or structure, and an additional 300-foot buffer. In this entire area, no activities are allowed. And the biological opinion for the Big Weekly Elk Project does not cover logging, thinning, or regeneration harvest in occupied habitat, because this would be additional take that wasn't enumerated in their biological opinion.

There is Ninth Circuit case law, *Marbled Murrelet v. Babbitt* that says thinning and occupied habitat is take.

**SER013**

21

So this exhibit states BLM, despite getting occupied detections, is only designating part of the survey site as occupied and continuing surveys. The only reason you would continue surveys is to facilitate further logging. And a survey site under the PST protocol isn't to exceed 150 acres.

Again, a fully designated occupied site is, I think, 189 -- 189 acres, and so it should eclipse the entire -- the entire survey site. We don't know, because none of this is disclosed or analyzed in the EA, and I think that turns to my next point.

The other major murrelet legal violation is NEPA. And so none of this discussion over surveys, the Resource Management Plan, the various exceptions at play, none of this is in the EA. The EA deceptively glosses over this issue in a several-page appendix. The surveys for murrelets, they began in 2019, that's AR428, not disclosed. But NEPA requires a hard look at potential environmental impacts both to inform the question of potential significance and to weigh the pros and cons of differing alternatives. It also provide an opportunity for the public to weigh in on that analysis.

So BLM's approach with murrelets undermines all of this. There's no comparison between alternatives. Murrelets are not even mentioned in the finding of No Significant Impact.

BLM here is surveying, interpreting those survey results, deciding whether or not to apply those flexible

22

100-foot -- 150-foot buffers as it goes and as it lays out individual timber sales. This is after the finding of No Significant Impact, after the conclusion of the NEPA process, after all public comment opportunities have expired.

This is -- none of these murrelet decisions on how they're handling surveys or how they're handling protections are informed by a weighing of alternatives. BLM's wildlife biologist us just making, quote unquote, recommendations. This is at AR329 to 34, 335 to 38, 1728 to 36. And it's unclear whether these recommendations are being accepted or not or for what reasons. Like, none of this is disclosed or analyzed.

And the Ninth Circuit has explained that this approach of survey and mitigate later is not sufficient to meet NEPA's obligations to determine the projected extent of environmental harm before a project is approved. That's the *North Plains Resource Council* case from 2011.

The public also has no ability to weigh in on those judgment calls. As an example, AR1734, BLM rationalizes numerous times that it does not need to buffer adjacent murrelet habitat because the canopies do not interact, like -- so the murrelet stand is taller. This is found repeatedly in the record in examples at AR1734.

So if plaintiffs would have had opportunity to comment, we would have pointed out that the murrelet literature does not support this rationalization. In fact, numerous murrelet studies

23

have documented that young plantations with lower canopies are extremely effective buffers to adjoining suitable habitat because they have such low numbers of predators. I think they're so devoid of wildlife, they're also devoid of murrelet predators. This is from the Marzluff study at -- there's a summary, a table of studies at AR7601, in the five-year status review that kind of walks through this.

And I'll make one final point before passing this to Mr. Persell. Murrelet habitat takes a minimum of 150 to 200 years to develop from a plantation. BLM's proposed logging here would produce trees with, this is a quote from the EA, slightly larger DBH's over the unthinned stand within 20 to 60 years.

That's the benefit we're getting from all of this risk to existing functioning occupied murrelet nesting habitat. There's just no way any rational decision-maker is going to compromise existing successful nesting for these slight long-term benefits that may accrue in 200 years. We believe an honest, hard look here is going to render such a decision irrational. And --

THE COURT: Could you address, though -- the Government's differentiating between newly discovered stands. Could you address that issue where they're saying the 2016 RMP only applies to newly discovered stands?

MR. CADY: So I -- I think they're correct in that the

**SER016**

24

marbled murrelet management directions, the provisions that are -- that we have here up on the screen, those only apply to newly discovered stands.  That is a survey process.

The existing stands that are in the Northwest Forest Plan occupied sites, those cannot be logged under the LSR standards, because all of those areas, even in the Harvest Land Base, their land allocation was changed to LSR, so those areas can't be logged under the LSR standards, both for the protections for old forests and the protections for occupied marbled murrelet habitat.

THE COURT:  Okay.

MR. CADY:  So -- go ahead.  I'm sorry.

THE COURT:  No.  Go ahead.  I think understand you.

MR. CADY:  And so what BLM is -- so BLM implicates the wildlife management directions because it's logging directly adjacent to that occupied habitat, meaning they have to survey. And then if they get occupied detections, they have to delineate that 200-acre circle, which is going to connect those isolated patches of murrelet habitat and block it up, which is the stated intention of the RMP.  That was the design.  That's how this thing was going to benefit murrelets better than the Northwest Forest Plan.

THE COURT:  Okay.  Thank you.  Handing over to Mr. Persell?

MR. CADY:  Yes.

SER017

25

THE COURT: All right. Mr. Persell, thank you.

MR. PERSELL: Thank you, Your Honor. May it please the Court. I'm John Persell for plaintiffs, and I'm going to pick up on our NEPA claims.

I want to focus attention on two main points: first, that the BLM failed to consider past, present, and reasonably foreseeable actions in its cumulative effects analysis here, and second, that the combination and degree of intensity factors at issue warrant preparation of an EIS.

So with regard to my first point about cumulative impacts, it's important to both our NEPA hard look and NEPA significance claims when individual actions might result in cumulatively significant impacts, that warrants preparation of an EIS under NEPA intensity factor 40 CFR Section 1508.27(b)(7). And cumulative effects, including reasonable foreseeable actions, must be considered as part of NEPA's hard look requirement laid out in 40 CFR Section 1508.7. But here, BLM failed to meet the two critical features of a cumulative effects analysis. First, an enumeration of the environmental effects of past, present, and reasonably foreseeable projects, and second, consideration of the interactions of those projects with each other and the Big Weekly Elk Project. And that comes from *Oregon Natural Resources Council v. Brong*, 492 F.3d 1120 at 1133.

I want to just remind the Court of a few key facts from the record. Most of these are on AR2105 and 2107. We know that

26

the Big Weekly Elk Project will remove or downgrade some 760 acres of spotted owl habitat. And within LSRs, logging is going to render currently suitable habitat non-functional for decades, over 18 football fields worth, and almost 200 acres of suitable habitat will be totally removed by logging in the HLB and for road construction. Another 543 acres of dispersal habitat will also be totally removed. So these impacts ultimately will negatively influence spotted owl viability in this area within the Coquille River watershed.

Now, with those facts in mind, regarding the impacts of just the Big Weekly Elk Project alone, we also have the BLM really digging in its heels that it can ignore cumulative effects from the nearby Catching and Upper Rock Creek Projects in the exact same Coquille River watershed as Big Weekly Elk. And those other two projects are just five and six miles from the Big Weekly Elk Project area, well within the known dispersal range of spotted owls, which can extend up to 17 miles. That's in the record at AR18273. Those two projects each have their own adverse impacts on spotted owls. Catching Project will remove 337 acres of suitable habitat and 484 acres of dispersal habitat. Upper Rock Creek Project will also remove hundreds of acres of habitat and multiple home ranges. Those figures are in the record at AR1822 and AR4893 to 4896.

Now, in its reply brief, BLM says it looked at 15.5-mile dispersal area circles, which would encompass the

**SER019**

Catching and Upper Rock Creek Projects, but somehow still the agency says it doesn't have to actually address those two projects' impacts. And that runs directly counter to Ninth Circuit precedent, which says both that a cumulative effects analysis must provide quantified or detailed information and also that an agency's failure to engage with other projects identified by plaintiffs leaves open a possibility of significant cumulative impacts. That's from *Bark vs. U.S. Forest Service*, 958 F.3d 865 at 873.

Now, here, plaintiffs did directly ask BLM to consider these other projects in their comments on the Big Weekly Elk Project -- that's at AR965 -- but the agency refused. The BLM provided absolutely no quantified or detailed information about these projects' impacts on owls in the Big Weekly Elk EA.

So without any analysis or discussion, we're just supposed to take the BLM's word for it that there's no possibility for cumulatively significant impacts even though in sum we're now talking about many, many hundreds of acres of owl habitat in the same watershed removed or degraded within a short number of years. And that's exactly what the Ninth Circuit found fault with in the *Bark* decision: conclusory assertions of no cumulative effects without attempting to quantify the cumulative loss coordinating other projects.

And even more oddly, the BLM remains adamant that the overlapping Coos Bay District-wide LSR plan is not reasonably

foreseeable despite it being well into the official scoping process at the time BLM issued the Big Weekly Elk final EA.

The BLM issued a scoping letter for the LSR project in June 2021 and issued the Big Weekly Elk final EA in October of that year. And those dates come from AR118 and AR464.

Again, plaintiffs brought up the district-wide plan in their comments, AR974, but the final EA is silent on how this massive logging project that surrounds Big Weekly Elk in the same Coquille River basin might cumulatively impact spotted owls and their habitat.

As plaintiffs pointed out in their briefing, BLM already knew the location, the land use allocations, total acreage targeted for logging and acreage to be logged per year and stand ages to be logged in this district-wide project. That's at AR1072. So the agency's *post hoc* assertion that it lacked enough detail to meaningfully evaluate that project in a cumulative impact analysis doesn't pass the straight face test.

And it's pretty telling that BLM has to look to case law outside the Ninth Circuit for its proposition that a project may not be reasonably foreseeable despite reaching the official scoping stage. Page 28 of its reply brief, BLM cites 2010 DC Circuit decision *TRCP vs. Salazar*, but in that case, the DC Circuit merely said that those oil and gas drilling projects at issue only had notices of intent to mark their progress. There was no indication that those projects had completed scoping

comment periods or public field tours, both of which had occurred for this district-wide project before BLM issued the Big Weekly Elk final EA here.

Now, in the Ninth Circuit, it's clear that if a proposal has reached the scoping stage, it is reasonably foreseeable for a cumulative effects analysis. And in some instances, projects are reasonably foreseeable even before they reach the scoping stage. But even in the *EPIC vs. U.S. Forest Service* decision cited by the BLM, the Ninth Circuit only said that a project would need to be included in a cumulative effect analysis because its parameters were unknown at the time of the EA. That's 451 F.3d 1005 at 1015. That decision did not say whether the project had reached scoping, and regardless, the parameters of this district-wide project here are well established, locations, land use allocations, total acreage, average acres per year, and age class of stands. Notably, too, in the *EPIC* decision, the Ninth Circuit said the Forest Service remedied any error, including a discussion about the project based on parameters known at the time. But the BLM did no such thing here.

I also want to note plaintiffs' burden here is not onerous. We only need to show the potential for cumulative impact. That's from the Ninth Circuit's *Te-Moak Tribe vs. Department of Interior* decision, 608 F.3d 592 at 605. In that case, the Ninth Circuit said plaintiffs met that burden by

showing the same resources within the same area would be impacted by other projects. And that's true here, too. Spotted owl habitat in the same watershed in the owl's dispersal range will be impacted by three different logging projects in addition to Big Weekly Elk, and the district-wide plan in particular directly overlaps Big Weekly Elk and will impact some of the same owl home ranges.

There's also additional robust case law in the Ninth Circuit requiring consideration of nearby timber sales in a cumulative effects analysis. *Kern vs. BLM*, regarding logging in this very same Coos Bay District as the present case, the Ninth Circuit said BLM must analyze the cumulative impacts of a reasonably foreseeable timber sale within the same BLM district. That's 284 F.3d 1062 and 1078. You have similar holdings in the Ninth Circuit's *Blackwood* and *Neighbors of Cuddy Mountain* decisions; *Blackwood* is 161 F.3d 1208, pages 1214 to 1215, and *Cuddy Mountain* is 137 F.3d 1372 at 1380.

Now, I want to tie this back to my second main point, BLM's failure to prepare an EIS for the Big Weekly Elk Project. We've got multiple NEPA intensity factors here, including these unexamined cumulative effects, but in order to justify reliance on an EA, an agency has to provide a convincing statement of reasons why impacts will not be significant in a FONSI, or a finding of No Significant Impact. That comes from the *Blackwood* decision, 161 F.3d at 1212.

31

But what we have here is a terse statement of reasons offered in the FONSI for the Big Weekly Elk Project that's far from convincing. You can look at the FONSI AR434 to 436. That FONSI doesn't mention murrelets at all despite this novel convoluted approach that BLM's taking here regarding logging adjacent to occupied stands and despite expected incidental take and adverse impacts to 40 occupied murrelet sites. That FONSI pretends that this project won't set any sort of precedent, even though it's logical to expect that BLM will apply this same murrelet approach elsewhere if it survives this legal challenge.

That FONSI fails to make sense of the agency's non-conforming approach to RMP murrelet direction, underscoring the likelihood of a FLPMA violation that my colleague, Mr. Cady, laid out. And it also ignores expected long-term negative impacts on spotted owl viability, decades-long loss of suitable habitat in LSRs, and it ignores any potential for cumulative impacts.

So even if BLM seeks cover by pointing to other documents it incorporated by reference to make up for this cursory FONSI, the sum total of the agency's analysis still does not amount to a convincing statement of reasons why impacts will not be significant.

And if you look at BLM's biological assessment for the Big Weekly Elk Project, which the agency points to repeatedly in its briefing, even if you look there, you won't find any mention

**SER024**

32

of these other projects, the Catching, Upper Rock Creek, or the district-wide project; you won't find any acknowledgement of the Big Weekly Elk project's long-term negative influence on spotted owl viability; and you won't find any explicit mention of the number of occupied murrelet sites that will be adversely impacted or any mention at all of potential take of murrelet eggs or young.

The Fish & Wildlife Service expressly noted these outcomes in its BiOp for the Big Weekly Elk Project. You can look at AR2107, 2136, 2152 to 2153. But BLM did not incorporate that document by reference into the EA FONSI, even though that BiOp predates those documents by nearly ten months. Instead, BLM chose not to forthrightly disclose these important impacts. You can compare those BiOp sites with the EA, AR524 and 528, and also the biological assessment, AR2436 through 2477.

Now, the Ninth Circuit has said that not only is an agency statement of reasons important for NEPA significance considerations, it's also crucial to determining whether the agency took a hard look at the potential environmental impact of a project. That's, again, from *Blackwood*, 161 F.3d at 1212.

But the lack of actual disclosures in this FONSI and the BLM statement of reasons for Big Weekly Elk about expected adverse effects to spotted owls, the lack of information about cumulative impacts underscores the agency's overall failure to take a hard look at Big Weekly Elk's impacts to ESA-listed

33

species and failure to evaluate cumulative impacts in violation of NEPA.

And this relates to my second point. Without a convincing statement of reasons and because the impacts of Big Weekly Elk may well be significant, BLM's failure to prepare an EIS also violated NEPA. And on this point, I want to quickly reiterate again plaintiffs have a relatively low standard to meet in order to show that BLM must prepare an EIS. Under Ninth Circuit precedent, plaintiffs don't have to show that significant impacts will in fact occur. They just need to raise substantial questions about whether a project may have significant impacts. That's from *Blackwood*, 161 F.3d at 1212.

Plaintiffs have raised substantial questions related to multiple NEPA intensity factors under 40 CFR Section 1508.27(b). We've more than met the standard here. We have no less than five factors at issue.

Most glaringly, as my colleague, Mr. Cady, laid out, the Big Weekly Elk Project likely violates FLPMA by failing to conform to RMP murrelet direction. And that's implicating intensity factor B-10.

Further, no matter how BLM tries to minimize them, the project's adverse effects to spotted owls and murrelets will be severe and long lasting, and that's relevant to intensity factor B-9.

BLM tries to spin this project as somehow good for

34

spotted owls and murrelets in the long-run, but regardless of how small a percentage it may degrade relative to broader scales, this level of logging is going to render over 18 football fields of currently suitable habitat non-functional for decades and negatively influence long-term spotted owl viability in this action area. HLB logging is going to exacerbate these effects.

So what does this really mean? This project alone could push spotted owls closer to blinking out or becoming extirpated in this part of the coast range. And then you couple that with the unexamined cumulative effects of these other logging projects in the same watershed, same time frame, affecting some of the same home ranges, and there's a substantial question that these adverse impacts are significant.

And similarly, although the percentage of murrelet habitat may sound small relative to broader scales, it's still severe enough to negatively impact 40 occupied sites and resulting in incidental take of eggs or young at four sites. That's at AR2152.

And as Mr. Cady pointed out, the most we should expect from thinning here is slightly larger diameter trees in upwards of 60 years. That's AR572. That's a pretty small benefit relative to the degree of adverse impacts.

And just to reiterate, the standard for ESA jeopardy is far higher than the standard for NEPA significance. In order to show that an EIS is warranted, plaintiffs don't need to show that

Big Weekly Elk -- the Big Weekly Elk Project will jeopardize the continued existence of spotted owls or murrelets. They just need to raise substantial questions about the potential significance of adverse effects.

Plaintiffs also don't need to show that impacts will resonate at the range-wide scale in order for this intensity factor to prompt a need for an EIS. Even for projects of relatively small size, like the White Castle Project, this Court has found that combined with other factors, adverse effects to spotted owls require an EIS. That's from *Oregon Wild vs. BLM*, 2015 WL 1190131. And the habitat -- number of habitat acres adversely affected here is on par with this Court's decisions in the White Castle and Goose Project cases, which concerned approximately 187 and 454 acres of spotted owl habitat, each respectively, but the degree of adverse effects is even greater because we have a long-term negative impact on spotted owl viability in this action area, plus we have two ESA-listed species adversely impacted, spotted owls and murrelets, in their habitat.

I just want to add that this Court's approach of assessing NEPA intensity factors both individually and collectively is the direct progeny of Ninth Circuit precedent. In the Goose Project decision, the Court cited *Ocean Advocates vs. U.S. Army Corps of Engineers*. That's 402 F.3d 846 at 855. And that decision said just one intensity factor may be

sufficient to require preparation of an EIS.

Logically, then, when multiple intensity factors are implicated and together raise questions of potential significance, collectively those factors can warrant preparation of an EIS.

And just recently, Magistrate Judge Kasubhai recognized this approach again in his F&R for the *Adcock* case that plaintiffs recently provided to the Court with a notice of supplemental authority. Judge Kasubhai said, individually, and certainly cumulatively, the Court finds that several intensity factors raise substantial questions over whether the project at issue in that case may have significant impacts, and that BLM must prepare an EIS.

Notably, several of the same factors at issue in that *Adcock* case are at issue here.

So I just want to sum up. We've got a likely FLPMA violation here, we've got serious adverse effects to both spotted owls and murrelets, we've got unexpected cumulative effects on top of other intensity factors we touched on in our briefing, but what we don't have is a convincing statement of reasons from the BLM why the Big Weekly Elk Project won't have significant impacts. We've got the opposite: a cursory, conclusory FONSI that doesn't even mention murrelets at all and that doesn't satisfy NEPA.

So we ask the Court to find that BLM failed to take a

37

hard look at impacts, and must prepare an EIS for the Big Weekly Elk project. Thank you.

THE COURT: All right. Thank you, Mr. Persell.

Okay. Let's hear from the defense. Ms. Boylan.

MS. BOYLAN: Good afternoon, Your Honor. Shannon Boylan for federal defendants.

So this case is really about plaintiffs' substantive disagreements with how the 2016 Resource Management Plan directs BLM to manage its forest lands in Oregon. I'm going to (pause) --

THE COURT: Well, I mean, it's a little more than that. I mean, they're really saying that you're simply reading into the 2016 RMP language that just simply isn't there and you've actually changed your interpretation. It's not a matter of interpretation. They're saying that you -- especially surrounding the language of, you know, modifying, that this is a complete change in agency interpretation, not just a disagreement on how to interpret.

MS. BOYLAN: Well, Your Honor, BLM hasn't changed its interpretation since issuance of the RMP.

THE COURT: What exactly is your interpretation of that single phrase?

MS. BOYLAN: Which phrase, Your Honor?

THE COURT: Let me find it. "Modifying nesting habitat."

**SER030**

38

MS. BOYLAN: BLM's interpretation is that "modify nesting habitat" only encompasses direct modification of nesting habitat, not indirect modification.

THE COURT: What does that mean exactly?

MS. BOYLAN: So you have to be doing work in the actual nesting habitat, not just in adjacent stands that could have indirect edge effects on nesting habitat. That wouldn't count as modifying nesting habitat. It's only when you're working within the nesting habitat or you're removing nesting structure.

THE COURT: What if you're doing something in the adjacent stands, say, you know, less than 300 feet that are in fact impacting wind, predation, and microclimate? Is that not modifying the -- the habitat?

MS. BOYLAN: Not for the purpose of the management direction in the RMP. It will have indirect effects, and those are fully analyzed for the purposes of NEPA and the ESA. And that's why when plaintiffs say that BLM and the Fish & Wildlife Service are using a different definition of "modify nesting habitat" in the biological assessment and the biological opinion, that's because they are assessing those indirect effects to --

THE COURT: What's the whole point of the 300-foot buffer, then?

MS. BOYLAN: That is to mitigate for edge effects around occupied stands, and specifically newly discovered occupied stands. And that's under the marbled murrelet

**SER031**

management direction.

THE COURT: So if they're occupied stands, they're not newly discovered, how close can you get to them in terms of not modifying?

MS. BOYLAN: So I want to take a step back, because I think this will help explain our interpretation here --

THE COURT: Okay.

MS. BOYLAN: -- if you wouldn't mind, and then we can address that more explicitly.

So under the 2016 RMP, it attempted to balance the agency's sometimes competing obligations between, one, providing a predictable quantity of sustained yield timber harvest as required under the Oregon & California Lands Act, or the O&C Act, and, two, not jeopardizing and also contributing to the recovery of ESA-listed species. And in this case, that would be the northern spotted owl and the marbled murrelet.

So the RMP in doing these -- in balancing these competing obligations, it assigned its lands in northwestern and central Oregon to a variety of land use allocations, each with its own management direction. And so as you can see from this map here, it assigned a little over 80 percent of its lands to what are called reserves. And in this case, the two reserves at issue are the Late-Successional Reserve, which is in green --

THE COURT: Right.

MS. BOYLAN: -- and the Riparian Reserve. And this all

40

represents about 1.3 million acres of land.

As for the less than 20 percent of lands that were set aside in the Harvest Land Base, or HLB, to allow BLM to meet the annual sale quantity under the O&C Act, you can see those in yellow and orange, but you have to zoom in, because there's not that much of it, but they're interspersed throughout BLM's managed lands.

Now, notably the Harvest Land Base is not intended to contribute to recovery of the species. The only requirement in the Harvest Land Base is for the BLM to avoid take of the northern spotted owl and to protect occupied sites or newly discovered sites, because under the prior RMP, the Northwest Forest Plan, BLM had already protected occupied sites, as it explains -- as the RMP explains at AR9678, the FEIS for the RMP, that the RMP would provide some level of continued protection for the 351 existing known occupied sites.

And I'll just zoom out and I'll go to another page so you can see what that looks like.

So under the Northwest Forest Plan's definition of "occupied site," which is the precursor to the 2016 RMP, the all suitable habitat and recruitment habitat, which is habitat that could develop into suitable habitat within 25 years, is delineated in a half-mile circle around the detection of occupied behavior, which is this red triangle. And that -- and you can see all the land that's protected in this example, which is a

**SER033**

41

real life example.

Under the RMP, the 2016 RMP, this would be the same example. It's only protecting a quarter mile around the occupying behavior and then it's also adding this 300-foot buffer around.

So in terms of occupied sites under the prior plan that were already assigned to LSR and already protected, the BLM determined that those were already adequately protected based on the delineation under the Northwest Forest Plan and that any newly protected or newly discovered sites would receive this definition of "protection."

So to answer your question, for Northwest Forest Plan area sites that are already in LSR, and in this case there's four of them that border regeneration harvest units in HLB, those don't need to be buffered any further.

If the RMP had intended that, it would have said to go back and retroactively apply this additional 300-foot buffer to these known existing occupied sites. It didn't do that. And plaintiffs have conceded that the management direction only applies to newly discovered sites.

THE COURT: All right.

MS. BOYLAN: Oh, and just some -- also some context that might be helpful here. This is the Big Weekly Elk Project area. And you can see all the green is the treatments in the LSR and the Riparian Reserves, and the blue is the treatments in the

42

Harvest Land Base.  And plaintiffs mis-cite the number of acres here.  It's slightly less than 3,000 acres, and actually about half of those acres have since been dropped from the project.

Give me one moment.  I also want to provide some context that might be unclear from plaintiffs' presentation.  So in the Harvest Land Base for murrelets, BLM is not authorizing logging in any occupied habitat.  And this accords with the RMP, because the HLB is not designed to protect suitable murrelet habit in the HLB.  It's not contributing to recovery of the species.  So it's only protecting any newly discovered occupied sites.  And BLM surveyed the HLB for occupied sites in accordance with the management direction.

In the LSR, BLM is also not logging in any occupied sites, nor is it logging in any -- or thinning for restoration treatments in any suitable murrelet habitat.  Instead, it's implementing restoration projects or thinning to speed the development of suitable murrelet habit over the lifetime of the RMP and in accordance with the RMP directive to do so.

And then as for northern spotted habitat, in the Harvest Land Base, regeneration harvesting will occur in some of the high-quality habitat, also known as nesting-roosting-foraging habitat, or NRF habitat, as well as lower quality habitat, in line with projections in the RMP FEIS.  But, again, here under the RMP, the HLB is not designed to protect NSO habitat.

But nonetheless, through implementation of project

**SER035**

43

design features, BLM will avoid any take of NSO, which is its only requirement in the Harvest Land Base under the RMP.

In LSR, BLM is not proposing any treatments in this high-quality NRF habitat, and that makes sense, because the whole purpose of its -- of the objectives of the RMP and the LSR is to develop that type of habitat, to develop NRF habitat.  So it's choosing this lower quality habitat, generally younger plantations with, like, dense -- densely -- dense tree structure.  And the reason why this happens is because even in the reserve treatments, a lot of these areas have been previously logged, and so you have these areas that are often right next to old, more complex forest stands that are suitable for habitat.  You have these new young plantations that are growing up very close together.  It doesn't allow for the large-diameter trees with the complex structure that's necessary for nesting both for the spotted owl and for murrelet.  So that's why these thinning treatments are prescribed.

So while plaintiffs seem to concede that this management direction for the murrelet does not apply to these old sites, they're still focusing on impacts that they say were not properly buffered for these old sites in the LSR.  So I'm not sure what their argument is anymore, because as they've just conceded, this 300-foot buffer would not be required around these old sites, and that's the only impacts that they're focusing on.

THE COURT:  Well, I was maybe surprised to hear that

44

they were conceding that. That wasn't my understanding going into arguments today.

MS. BOYLAN: So that actually kind of removes a lot of argument I was going to make, so give me one minute, please.

I do want to talk about the roads and yarding argument briefly. Option 1 under the management direction specifically exempts construction of linear and non-linear rights of way, spur roads, yarding corridors, or other facilities as long as the stand continues to support nesting. The LSR management has the same exemption, and so the roads and yarding corridors that were constructed here fully comply with that direction.

Also, for treatments in LSR, the LSR management direction explicitly exempts from its direction to protect occupied stands the felling and removal of trees for habitat restoration. So in terms of buffering occupied sites in LSR, that wouldn't make sense, because if it's authorizing as an exemption habitat restoration within the stand itself, it wouldn't make sense to then exclude it from the buffer around the stand.

And the whole purpose of these active management restoration treatments in LSR is to build up larger contiguous blocks of habitat. And as I was describing earlier, you have a lot of stands that are old growth and complex next to young, non-complex stands that don't support habitat and will likely never support habitat without some sort of active management.

John S. Persell, OSB # 084400
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Nicholas S. Cady, OSB # 113463
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434-1463
nick@cascwild.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation, | |
| | Case No. 6:23-cv-1358-MC |
| Plaintiffs, | |
| | |
| | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| | Oral Argument Requested |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency, | |
| | |
| Defendant. | |

**SER038**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ....................................................................................................... i

**TABLE OF AUTHORITIES** ............................................................................................... iii

**GLOSSARY OF TERMS** ................................................................................................... vii

**INTRODUCTION** ................................................................................................................ 1

**ARGUMENT** ........................................................................................................................ 2

I.  BLM Violated FLPMA by Failing to Apply Mandatory Marbled Murrelet Management Direction to the BWE Project. ............................................................... 2

   A.  The Plain Text of the RMP's Murrelet Management Direction Requires BLM to Apply Protections When Logging Adjacent to Murrelet Nesting Habitat. ................................... 3

   B.  The Structure, History, and Purpose of RMP Murrelet Management Direction Support the Consideration of Impacts to Adjacent Lands. ................................................ 7

   C.  BLM Failed to Protect Previously Documented Occupied Murrelet Sites in the BWE Project. ........................................................................................................ 12

   D.  The BWE Project Will Unlawfully Remove Murrelet Nesting Structure. ......................... 15

   E.  BLM Is Mismanaging Occupied Murrelet Sites in HLB. .................................................. 16

   F.  BLM Should Adjust Prescriptions and Implement Option 2 if It Wishes to Avoid RMP Survey Requirements. .................................................................................... 18

II. BLM'S EA and FONSI for the BWE Project Violate NEPA. .................................................. 19

   A.  Tiering to the 2016 RMP FEIS Does Not Relieve BLM of Its NEPA Obligations for the BWE Project. ........................................................................................ 19

   B.  BLM Violated NEPA by Failing to Prepare an EIS for the BWE Project. ......................... 21

      1.  The BWE Project's Adverse Effects to ESA-Listed Species Warrant an EIS. ............. 21

      2.  The Likelihood That the BWE Project Violates FLPMA Warrants an EIS. ................. 27

      3.  Other Intensity Factors Weigh in Favor of an EIS When All Factors Are Considered in Sum. ................................................................................................ 27

   C.  BLM Failed to Take a Hard Look at the BWE Project's Impacts, Violating NEPA. .......... 29

PLAINTIFFS' RESPONSE/REPLY - i

1.  BLM Failed to Take a Hard Look at Impacts to NSO, Marbled Murrelets, and
    Their Habitat..................................................................................................... 29

2.  BLM Failed to Evaluate Cumulative Impacts from the District-Wide LSR/RR Plan
    and Nearby Past Projects. ................................................................................ 32

**RELIEF AND CONCLUSION**.......................................................................................... 35

**CERTIFICATE OF COMPLIANCE** .................................................................................. 36

## TABLE OF AUTHORITIES

**CASES**

*350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022)................................................. 29

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001) ................................. 15

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)........................................................... 28, 35

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ................... 19, 29, 30

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................................ 12

*Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146 (D. Or. 2019) ......... 2, 16, 32

*Cascadia Wildlands v. Scott Timber Co.,* 618 F. Supp. 3d 1038 (D. Or. 2022) ........................ 9, 17

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013) ..................... passim

*Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189 (E.D. Cal. 2017) ................. 23, 24

*Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048 (9th Cir. 2013) .................................... 24

*Conservation Cong. v. U.S. Forest Serv.*, No. 2:16-cv-864-MCE-AC,
    2018 WL 2427640 (E.D. Cal. May 30, 2018).......................................................................... 24

*Envtl. Protection Info. Ctr. v. Blackwell*, No. S-04-cv-1027-WBS-GGH,
    2005 WL 8176926 (E.D. Cal. May 5, 2005).......................................................................... 27

*Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006).............. 24, 33, 34

*Great Basin Res. Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016)................................................... 33

*Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010) ........................................................................ 16

*Hibbs v. Winn*, 542 U.S. 88 (2004) ...............................................................................................11

*Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989 (9th Cir. 2013) ........................................... 33

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002)....................................... 32, 33, 35

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ............................................................ 4, 6, 7, 12

*Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) ............................. 21, 27

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, No. 1:19-cv-1810-CL,
    2021 WL 5356969 (D. Or. Aug. 24, 2021) ................................................................ 25

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069
    (E.D. Cal. 2004) ....................................................................................... 23, 24, 26

*Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156 (9th Cir. 2015) ...................................... 3

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074
    (D. Mont. 2017) ................................................................................................ 26

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) .............................. 33

*N. Cascades Conservation Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193
    (W.D. Wash. 1999) ............................................................................................ 33

*Nat'l Audubon Soc'y v. U.S. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005) ................................... 31

*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ............................................. 26

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024 (9th Cir. 2020) .............................. 12

*Or. Natural Res. Council v. Brong*, 492 F.3d 1120 (9th Cir. 2007) ...................................... 14, 16

*Or. Natural Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997) ............................................. 29

*Or. Wild v. Bureau of Land Mgmt.*, No. 6:14-cv-110-AA, 2015 WL 1190131
    (D. Or. March 15, 2015) ................................................................................ 23, 28

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) .......................................... 31

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ..................................................... 22

*Soda Mtn. Wilderness Council v. BLM*, 607 F. App'x 670 (9th Cir. 2015) ................................... 33

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592 (9th Cir. 2010) ... 32

PLAINTIFFS' RESPONSE/REPLY - iv

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930 (9th Cir. 2022).....................11

*Vincent v. Apfel,* 191 F.3d 1143 (9th Cir. 1999) ............................................................. 16

*Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214 (9th Cir. 2002) ......... 3

*W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089 (D. Nev. 2011)............. 19

*W. Watersheds Project v. Bureau of Land Mgmt.*, 443 F. App'x 278 (9th Cir. 2011) ................... 19

**STATUTES**

5 U.S.C. § 706(2) ............................................................................................... 35

43 U.S.C. § 1732(a) .................................................................................... 2, 16, 27

**REGULATIONS**

40 C.F.R. § 1502.20 .......................................................................................... 19

40 C.F.R. § 1508.7 ............................................................................................ 32

40 C.F.R. § 1508.27(b)(1)................................................................................... 26

40 C.F.R. § 1508.27(b)(3)................................................................................... 27

40 C.F.R. § 1508.27(b)(4)................................................................................... 28

40 C.F.R. § 1508.27(b)(6)................................................................................... 27

40 C.F.R. § 1508.27(b)(7)............................................................................... 28, 34

40 C.F.R. § 1508.27(b)(9)................................................................................... 21

40 C.F.R. § 1508.27(b)(10)................................................................................. 27

40 C.F.R. § 1508.28 .................................................................................... 19, 30-31

43 C.F.R. § 1601.0-5(b) .................................................................................. 2, 16

PLAINTIFFS' RESPONSE/REPLY - v

43 C.F.R. § 1610.5-3(a).................................................................................. 16, 27

**OTHER AUTHORITIES**

85 Fed. Reg. 81,144 (Dec. 15, 2020) ............................................................. 22, 24

86 Fed. Reg. 62,606 (Nov. 10, 2021) .................................................................. 25

## GLOSSARY OF TERMS

| | |
|---|---|
| BLM | Bureau of Land Management |
| BiOp | Biological Opinion |
| BWE | Big Weekly Elk |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| HLB | Harvest Land Base |
| LSR | Late-Successional Reserve |
| LUA | Land Use Allocation |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| Plaintiffs | Cascadia Wildlands and Oregon Wild |
| RMP | Resource Management Plan |
| RR | Riparian Reserve |

## INTRODUCTION

Plaintiffs respectfully submit this Response and Reply to Defendant Bureau of Land Management's ("BLM") cross-motion for summary judgment and accompanying memorandum (Dkt. No. 23). BLM's mangling of the Resource Management Plan's ("RMP") direction for marbled murrelet habitat does not withstand scrutiny. When the agency proposes to modify murrelet nesting habitat *or* remove nesting structure, as it does in the Big Weekly Elk Project ("BWE Project" or "Project"), the unambiguous, plain text of the relevant RMP direction requires BLM to surveys for murrelets, properly designate occupied stands, and buffer nesting habitat from logging "edge effects." As explained in Plaintiffs' Opening Brief (Dkt. No. 16) and below, BLM has utterly failed to conform the BWE Project to this mandatory direction, in violation of the Federal Land Policy and Management Act ("FLPMA").

In addition to this egregious substantive violation of law, BLM has also failed to fulfill its obligations under the National Environmental Policy Act ("NEPA"). The agency failed to prepare an Environmental Impact Statement ("EIS") for the BWE Project despite significant impacts on species listed under the Endangered Species Act ("ESA")—northern spotted owls ("NSO") and murrelets—and failed to take a genuine "hard look" at those impacts and fully and fairly disclose them to the public. BLM's Environmental Assessment ("EA") and Finding of No Significant Impacts ("FONSI") for the BWE Project do not satisfy these bedrock NEPA requirements. As a result, the BWE Project EA, FONSI, and associated timber sale decisions are arbitrary and capricious and must be set aside.

PLAINTIFFS' RESPONSE/REPLY - 1

## ARGUMENT

**I.      BLM Violated FLPMA by Failing to Apply Mandatory Marbled Murrelet Management Direction to the BWE Project.**

BLM must ensure that site-specific actions conform to the governing RMP. *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1153 (D. Or. 2019) (citing 43 U.S.C. § 1732(a)); 43 C.F.R. § 1601.0-5(b) (defining "conformance" as "specifically provided for in the plan" or "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment.").

Plaintiffs' FLPMA claim turns on BLM's interpretation of the RMP's marbled murrelet direction. The RMP requires BLM to implement one of three Options to protect murrelets and murrelet habitat before "modifying nesting habitat or removing nesting structure." AR10909. At the time BLM published and adopted the RMP in 2016, the definition of the term "modifying nesting habitat" included "edge effects" that would result from logging adjacent to nesting habitat. *See* AR2147. BLM "clarified this interpretation" in 2018 and now argues that "modifying nesting habitat" only includes direct removal of murrelet nesting habitat. Dkt. No. 23 at 15. Applying this interpretation, BLM argues that almost none of the BWE Project requires surveys or buffers around occupied murrelet habitat.[1] And, instead of applying the RMP's clear directions, the agency offers a hodgepodge of new, flexible rules, which it claims complies with the law and will not directly remove murrelet habitat. Both propositions are facially incorrect.

---

[1] The RMP's murrelet management direction Option 1, the survey and buffer approach, is the only relevant Option for BLM here. *See* AR10909. Under BLM's chosen logging prescriptions for the BWE Project, Option 2 cannot apply, *see* AR10910 (canopy cover restrictions) & AR2359 (resulting canopy cover levels below the Option 2 restrictions), and Option 3 does not apply because BLM is proposing to adversely impact murrelets. AR2153.

PLAINTIFFS' RESPONSE/REPLY - 2

BLM's new position is contrary to the plain language of the RMP and the murrelet regulatory scheme therein. The agency's new "protections" run directly counter to the management direction in the RMP and will result in logging within murrelet habitat to an extent and intensity never conceived of in the RMP or the U.S. Fish and Wildlife Service's ("FWS") accompanying Biological Opinion ("BiOp"). Further, despite BLM's reinterpretation, the agency here proposes to directly remove murrelet nesting habitat yet still refuses to conduct murrelet surveys or implement any of the RMP's murrelet directions. And worst of all, in the few areas where BLM did conduct surveys, it still plans to move forward with logging activities despite occupied detections, in flagrant violation of the RMP.

Through the BWE Project, BLM walks back its critical RMP murrelet commitments in a desperate attempt to maximize commercial harvest regardless of land use allocation. These murrelet habitat areas are "complex forest stands with giant remnant conifer trees," AR2325, areas that the RMP prioritized for protection. Notwithstanding, the agency created numerous exceptions and excuses for the BWE Project and relies on legal and linguistic gymnastics to open even more of the forest to high-intensity logging—this time, directly within protected marbled murrelet habitat. BLM's approach here is unreasonable, irrational, and illegal.

A.    **The Plain Text of the RMP's Murrelet Management Direction Requires BLM to Apply Protections When Logging Adjacent to Murrelet Nesting Habitat.**

In reviewing the application of regulation or plan provision, the Court must first look at the plain meaning of the text. *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002)*; see also Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015) ("Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction."). If the regulation is clear on its face, that ends the

PLAINTIFFS' RESPONSE/REPLY - 3

inquiry. If not, the court must "exhaust all the 'traditional tools' of statutory construction" and "only when that legal toolkit is empty, and the interpretative question still has no single right answer can a judge conclude that it is 'more one of policy than law.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (citation omitted) "[I]f there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id.*

Here, the RMP states that "[b]efore modifying nesting habitat or removing nesting structure," BLM must "assess the analysis area for marbled murrelet nesting structure." AR10909. "The analysis area consists of the proposed project and lands within 726 feet of the project boundary." *Id.* Thus, the plain language of the RMP requires BLM to assess the area to be logged, the "proposed project," *and* adjacent lands within 726 feet, specifically "in consideration of potential edge effects." *Id.* Then, the RMP states that if BLM will "modify forests" within 526 feet[2] of an area that contains at least six trees with nesting structure, one of three murrelet protective Options is required. *Id.* The plain language of the RMP requires murrelet protections if BLM proposes to modify forest stands within 526 feet of groups of nesting structure (*i.e.*, nesting habitat). *Id.*

This process is described in the BiOp FWS prepared for the RMP:

*To determine if protective measures apply, BLM will conduct an analysis of all activities that modify nesting habitat or remove nesting structure. Modify nesting habitat includes affecting adjacent stands that would modify the nesting structures wind firmness, microclimate and/or predation risks. In addition to identifying nesting structure outside the treatment unit that may be affected by the treatment, this analysis will also be used to determine which of four protective measures apply. Although impacts from treating adjacent stands without nesting structure (referred to as buffer habitat) is expected within 300 to 600 feet from nesting structure, the analysis of habitat goes out 726 feet from the*

---

[2] The diameter of a five-acre circle is 526 feet. AR10909 ("distance of 726 feet is derived from the diameter of a 5-acre moving circle (526 feet), plus an additional 200 feet in consideration of potential edge effects").

PLAINTIFFS' RESPONSE/REPLY - 4

*treatment boundary to properly identify low density nesting structure in younger stands[.]*

AR11759. Thus, the term "modify nesting habitat" includes activities that would affect nesting structure outside the treatment unit because impacts to murrelets are expected from any forest modification within 300 to 600 feet from nesting structure. *Id.* The RMP ultimately uses the figure of 526 feet. AR10909.

Years after the adoption of the RMP and its approval by FWS, and notably after Plaintiffs' litigation over the RMP had been resolved, BLM sought to "clarify their intent for this management direction," and posited to FWS that the term "modify nesting habitat" only includes "direct alteration of nesting habitat." AR4494; *see* Dkt. No. 23 at 15. BLM argues that defining the term in this manner permits the agency to log adjacent to occupied or unsurveyed murrelet nesting habitat without surveying for murrelets or implementing RMP murrelet management direction, as it proposes to do in the BWE Project. AR610; AR2392 (BLM "may conduct LSR and RR commercial and non-commercial thinning adjacent to occupied sites;" "[a]pproximately 64 acres of 4 previously occupied sites are within 300 feet of units proposed for regeneration harvest."). BLM admits that FWS's BiOp for the RMP contradicts this new "clarified intent." AR4493.

Nonetheless, BLM asks for deference to its new interpretation of the RMP. Dkt. No. 23 at 10–11. Its approach, however, directly conflicts with the RMP's plain language stating that any forest modification within 526 feet of six or more murrelet nesting trees triggers protective murrelet management direction. AR10909. BLM plans to log directly adjacent to murrelet-occupied habitat or in some instances within 150 feet of unsurveyed suitable habitat. AR610; AR2134. This suitable murrelet nesting habitat consists of complex older forest areas with more than six nesting trees. *See*, *e.g.*, AR337; AR353–54; AR429 (extensive documented murrelet

PLAINTIFFS' RESPONSE/REPLY - 5

SER050

nesting trees surround or are adjacent to harvest units). BLM plainly proposes to modify forests well within 526 feet of murrelet nesting habitat, AR2134, requiring surveys, delineation of occupied sites, and buffers around occupied sites under the RMP. AR10909.

Yet BLM instead proposes its own suite of flexible protections that it argues will dictate whether or not nesting habitat will be modified. For example:

> BLM agreed to apply 150-foot no harvest buffer from the occupied stand edge if the proposed harvest unit was greater than 70 years old. For ha[r]vest units 60 years or younger, the BLM will apply a 150-foot harvest buffer round individual trees containing murrelet structure. Road construction, yarding corridors, tree tipping, and snag creation, however, may occur within these 150 foot buffers.

*See* AR2134. But as explained above, the RMP already provides an explicit distance: the diameter of a five-acre circle, 526 feet. AR10909. BLM's newly created distances dramatically undercut the explicit protections provided in the RMP. No deference is afforded to interpretations of regulations that conflict with their plain language. *Kisor,* *139 S. Ct. at 2415*.

BLM's new interpretation also conflicts with the definition of "modify nesting habitat" used by *both* BLM and FWS: "Modify nesting habitat includes affecting adjacent stands that would modify the nesting structures' wind firmness, microclimate and/or predation risks" AR2392, 2323 (BLM's BWE Biological Assessment); AR838 (BWE Wildlife Specialist Report using same definition); AR11759 (RMP BiOp using same definition); AR2134 (BWE BiOp explaining the conflicting definitions).[3] BLM thus confusingly argues that "modify nesting habitat" does not include effects to adjacent stands to avoid triggering RMP murrelet management direction, but then in its negotiations with FWS over its new murrelet "protections"

---

[3] BLM argues that "Plaintiffs incorrectly cite the FWS as the source of these terms' definition," *see* Dkt. No. 23 at 15 n.5, but FWS is the source of the definition, AR11759, and BLM uses the same definition. AR2392.

PLAINTIFFS' RESPONSE/REPLY - 6

admits that "modify nesting habitat" does include effects to adjacent forests. *Compare* AR2392 to AR4494. BLM's new interpretation precluding consideration of adjacent areas is internally inconsistent and unreasonably narrow. The agency's reliance on this interpretation to avoid implementing murrelet management direction, despite logging adjacent to murrelet nesting habitat, is thus arbitrary and unreasonable. AR2392. This should end the Court's inquiry. BLM's failure to implement RMP murrelet management direction in the BWE Project violates FLPMA.

> **B.** **The Structure, History, and Purpose of RMP Murrelet Management Direction Support the Consideration of Impacts to Adjacent Lands.**

No deference is due an agency's interpretation of a regulation "unless the regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2415. Even if a provision's meaning is not clear on its face, whether or not the regulation is genuinely ambiguous turns on the surrounding language in the RMP, as well as its structure and purpose, to determine its proper interpretation and application. *Kisor*, 139 S. Ct. at 2415 (citation omitted) (no deference to an agency interpretation unless it is truly ambiguous; to make that determination, court must "carefully consider the *text, structure, history, and purpose of a regulation*") (emphasis added).

The purpose of the RMP's murrelet direction is unequivocal: It is designed to ensure that "timber harvest will not negatively impact murrelets in any LUAs within 35 miles of the Pacific Coast." AR11765. Logging next to occupied murrelet habitat, even if not directly removing murrelet nesting habitat itself, will have negative impacts on those nesting murrelets. AR4495 ("Removing or modifying buffer habitat may adversely affect murrelets by increasing predation levels, increase wind throw risks and changes to microclimate"). In the RMP analysis, negative impacts to nesting murrelets were only anticipated in Zone 2 (35 to 50 miles from the coast). *See* AR11765 ("impacts from timber harvest to individual murrelets are only expected in the harvest

PLAINTIFFS' RESPONSE/REPLY - 7

land base LUA when occurring within inland zone 2 []. The remaining acres will be subject to protection of occupied habitat under the Wildlife Resource Program's Management Direction for murrelets and will only be harvested if no adverse effects are anticipated to occupied murrelet habitat either within or adjacent to the harvest unit except when taking actions that are necessary to treat or protect stands from sudden oak death."). The RMP was therefore predicated on the assumption that adverse impacts from logging "adjacent" to occupied habitat would not occur in Zone 1 (within 35 miles of the coast), which is where the entirety of the BWE Project occurs. AR2088.

In its RMP Final EIS ("FEIS"), BLM anticipated surveying before logging in Zone 1. AR9676 ("Under the Proposed RMP, the BLM would discover and protect 377 occupied marbled murrelet sites during the first five decades where the BLM would conduct surveys (all land use allocations in Zone 1 and outside of the Harvest Land Base in Zone 2)."). BLM anticipated that sites discovered pursuant to those surveys would be buffered by 300 feet. AR9677 ("the Proposed RMP would protect lands within 300 feet (approximately 6.5 acres based on a circular radius) of forecasted, occupied site delineations"). The RMP FEIS analyzed several different alternatives concerning murrelet management; only Alternative C would limit murrelet protections to nesting habitat. *See id.* ("only Mature or Structurally-complex stands would be included in the delineation under Alternative C."). BLM ultimately did not select Alternative C, in part due to the anticipated negative impacts to murrelets. AR9678. Yet despite already analyzing and determining Alternative C's approach to be inadequately protective of murrelets, here BLM circles back in the BWE Project, functionally attempting to implement provisions analogous to those in this rejected alternative.

PLAINTIFFS' RESPONSE/REPLY - 8

FWS predicted that RMP murrelet protections for buffer habitat—habitat adjacent to occupied stands—would reduce the percentage of "edge habitat" in murrelet sites and increase nest patch size. AR11790. Thus, FWS said the 2016 RMP would "work more effectively to block up habitat in fragmented high-quality habitat and in low-quality habitat where nesting structure may be unevenly distributed throughout younger stands compared to BLM's interpretation of their [previous] RMP. More nesting habitat is expected to be included because additional patches of nest trees will be captured as long as there is a stand of any age connecting the two patches within the ¼ mile protection." AR11793.

Under the RMP, then, nesting murrelets were to be protected against any adverse impacts in Zone 1. AR11765. Such adverse effects to murrelet nesting would be "expected when removing habitat adjacent to an occupied site." AR4493; *see also* AR4495 ("Removing or modifying buffer habitat may adversely affect murrelets by increasing predation levels, increase wind throw risks and changes to microclimate"); AR2134 ("The part of an adjacent stand which lacks nesting structure but supports an adjacent stand or individual trees with murrelet nesting structure is referred to as buffer habitat. Thinning of buffer habitat may also affect murrelets by impacting the buffering habitat's ability to provide for windthrow during storms, provide a microclimate that supports moss growth, and/or provides a stand with low usage by murrelet nest predators."); *see Cascadia Wildlands v. Scott Timber Co.,* 618 F. Supp. 3d 1038, 1067–68 (D. Or. 2022) (aside from direct habitat removal, logging in the vicinity of occupied murrelet habitat "reduces the amount and heterogeneous nature of the habitat, reduces the forest patch sizes, reduces the amount of interior or core habitat, increases the amount of forest edge, isolates remaining habitat patches, and creates 'sink' habitats. The ecological consequences of these habitat changes to murrelets can include what the Court finds to be a significant disruption on

PLAINTIFFS' RESPONSE/REPLY - 9

population viability and size, local or regional extinctions, displacement, fewer nesting attempts, failure to breed, reduced fecundity, reduced nest abundance, lower nest success."). The BWE Project will adversely impact murrelets. AR2153. BLM's rationalization of the Project and its decision to proceed anyway is out of sync with the purpose of the regulation, *i.e.*, RMP management direction.

Furthermore, the text of the RMP requires BLM to buffer occupied murrelet habitat against edge effects and protect large chunks of forests, "regardless of age or structure" around murrelet-occupied sites. AR10909. By design, this includes "all forest stands, regardless of age or structure" within 300 feet of the occupied stand, *id.*, because murrelets need large blocks of unfragmented forest habitat to successfully reproduce. AR2084–85. Forest cover and buffer habitat around individual murrelet nesting trees is critical to prevent nest predation, the highest cause of murrelet nesting failure. AR2085. BLM's new RMP interpretation that murrelet surveys and protections are *not* required results in implementation—such as through the BWE Project— that plainly violates this direction: "Adjacent to occupied (either previous or current surveys) or unsurveyed nesting structures: No timber harvest will occur within 150 ft of murrelet nesting structure, unless the biologist reviews the buffer and determines that the proposed treated and occupied or unsuitable surveyed habitat do not interact[.]" AR338; AR612 (direction that applies to all Riparian Reserve ("RR") and Late-Successional Reserve ("LSR") logging). This interpretation openly violates the RMP. AR10909.

By applying murrelet protections only when proposing to directly remove nesting structure, BLM renders superfluous the entire "analysis area" and "5-acre moving circle" aspects of the RMP. *See* Dkt. No. 16 at 15. Under BLM's theory, it must only protect nesting habitat, hence it can freely log buffer habitat, as it proposes to do here. AR2299–301; AR338; AR610

PLAINTIFFS' RESPONSE/REPLY - 10

("no treatment buffers are not required"). As such, designating an analysis area and five-acre moving circle that account for "edge effects" resulting from logging adjacent to nesting habitat would never be necessary. AR10909.

This runs afoul with well-settled rules of statutory construction and interpretation. Specifically, BLM's interpretation violates the rule against superfluities. *See Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022) (citations omitted) (courts should avoid statutory interpretations that render any language superfluous); *accord Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citing "the rule against superfluities," which holds that a regulation "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

BLM's interpretation also renders superfluous the entirety of Option 2 in the RMP murrelet management direction. Option 2 excludes nesting structure from timber sale harvest units by buffering nesting habitat by 150 feet and maintaining certain canopy covers within different distances from nesting habitat. AR10910. Under BLM's interpretation, the 150-foot buffer alone prevents any potential modification of nesting habitat. *See* AR2134; AR2367–68 (arguing 150-foot buffer around individual murrelet trees prevents modification of nesting habitat). Thus, Option 2 would never come into play.

In sum, BLM's position constitutes an impermissible and illegal construction of critically relevant regulations in place in the RMP. BLM's interpretation renders clear management direction superfluous, resulting in logging authorizations that guarantee illegal removal and modification of marbled murrelet habitat, risking significant harm to the species and violating the RMP and FLPMA.

PLAINTIFFS' RESPONSE/REPLY - 11

C.     **BLM Failed to Protect Previously Documented Occupied Murrelet Sites in the BWE Project.**

BLM relatedly argues that previously documented occupied murrelet sites do not need to be accounted for or protected under the RMP, and requests deference to this interpretation. Dkt. No. 23 at 11–12. The problem with this new approach is that no language in the RMP makes this distinction or otherwise carves out any such exception for previously documented sites. Deference is afforded to agency interpretations of plan language, *see Or. Natural Desert Ass'n v. U.S. Forest Serv.,* 957 F.3d 1024, 1035 (9th Cir. 2020) (citation omitted), but BLM cannot point to any plan language that carves out such an exception. *See also Kisor,* 139 S. Ct. at 2415 (citing *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945) (deferring only "if the meaning of the words used is in doubt")).

Under the RMP, any site "determined" to be occupied requires protection of the entire occupied stand and a 300-foot buffer around the entire occupied stand. AR10909 ("If occupancy is determined, do not conduct activities within the occupied stand and all forest within 300 feet of the occupied stand."). This applies to *all* land use allocations within Zone 1. *Id.* There is no exception in the RMP for operations around previously documented occupied sites—or any discussion whatsoever of treating previously documented occupied sites differently. Rather, the RMP's habitat-protective management direction is triggered if BLM will "modify forest stands" within any five-acre moving circle that contains murrelet nesting habitat. *Id.* Given that BLM is proposing habitat modifications in and adjacent to murrelet habitat (*i.e.*, within a five-acre circle containing extensive murrelet nesting structure), AR2436, murrelet protective measures plainly apply. *See* AR11759–80 (Table 95).

BLM argues that the RMP "explicitly refers only to *newly* discovered sites." Dkt. No. 23 at 13. This is true, because any operations in and around murrelet habitat would trigger surveys

PLAINTIFFS' RESPONSE/REPLY - 12

pursuant to the direction described above. *See* AR10909; *see* AR8672 (BLM declaring that surveys are required to implement Option 1); *see* AR2147 (BLM electing to follow Option 1). The reason why there were largely no newly discovered sites for the BWE Project was because BLM did not survey. AR2383, 2390 (BLM only conducted murrelet surveys for some Harvest Land Base ("HLB") units). BLM, attempting to avoid conducting surveys, simply assumed all these previously documented sites remained occupied.[4] AR2383. However, there is no mechanism in the RMP for BLM to forgo surveys and assume occupancy. This is why the RMP only discusses newly discovered sites. Thus, BLM either violated the RMP by failing to survey[5] or, if assuming sites are occupied is permitted, violated the RMP by failing to designate and protect those occupied sites. *See* AR10909.

BLM also stresses the fact that the agency only modeled harvest restrictions resulting from newly discovered murrelet sites, Dkt. No. 23 at 14, and that all previously documented murrelet sites were allocated to the LSR allocation. *Id.* at 12 (citing AR10863). This is irrelevant. Because previously documented murrelet sites were all allocated to LSR, there would necessarily be only newly discovered murrelet sites in the HLB. This is *why* the agency only modeled harvest restrictions from newly discovered murrelet sites in the HLB—because all the existing, documented sites were already located within the LSR. In any case, LSR logging would be irrelevant to Allowable Sale Quantity HLB modeling efforts. *See id.* at 14. This situation does not prove or disprove anything related to BLM's compliance with the RMP.[6]

---

[4] Given murrelet nest-site fidelity, it is highly likely surveys in these areas would result in occupied detections. AR14036.

[5] BLM will admittedly log directly next to or within 150 feet of murrelet habitat in both the LSR and HLB, *see* AR2436, thus requiring surveys. *See* AR10909.

[6] BLM modeling explicitly does not alter management direction in the RMP. AR10943. It was only relied on for rough estimation purposes.

PLAINTIFFS' RESPONSE/REPLY - 13

While the RMP FEIS states that BLM is required to protect newly discovered occupied marbled murrelet sites in Zone 1, it never excludes existing sites from protection or states that they do not require it. *See* Dkt. No. 23 at 13 (citing AR8837). Rather, the RMP FEIS is premised on the exact opposite assumption: the RMP would protect all existing sites. AR9676; AR11765 (RMP BiOp relying on this assumption); AR2093 ("Key components for murrelet conservation in the BLM RMP include the protection of *known and newly* occupied sites and specific management limitations for sites within inland Zone 1.") (emphasis added). Otherwise the RMP's express application of protections within *all* land use allocations in Zone 1 would make no sense. AR10909. It was the unselected Alternative C considered in the RMP FEIS that carved out an exception for the treatment of previously occupied sites. *See* AR9677–78. There is simply no language in the adopted RMP that supports *not* protecting occupied murrelet sites—especially sites located in LSRs, where the objectives are to protect murrelet habitat. AR10875.

BLM cannot assume murrelet sites are occupied to avoid doing surveys, and then not protect them. This would be ridiculous in the "LSR, which has specific management direction to '[p]rotect marbled murrelet stands.' AR10876." Dkt. No. 23 at 14. BLM can either survey pursuant to the RMP's plain and unequivocal survey requirements, or it can assume the sites are occupied and provide full RMP protections rightly afforded to occupied sites. BLM's approach of forgoing surveys by assuming occupancy and then not protecting such occupied sites can be afforded no deference because it is contrary to the plain language of the RMP that requires surveys and protection of occupied murrelet sites. AR10909; *See Or. Natural Res. Council v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citation omitted) (affording no deference because "an agency's interpretation does not control, where ... it is plainly inconsistent with the regulation at issue.").

PLAINTIFFS' RESPONSE/REPLY - 14

**D.       The BWE Project Will Unlawfully Remove Murrelet Nesting Structure.**

Even operating under BLM's interpretation that only direct removal of nesting structure implicates murrelet management direction, the agency here *has* proposed to directly remove murrelet nesting structure and it *still has not* conducted surveys. *See* AR2478–2501 (numerous examples and maps of proposed road construction in occupied murrelet habitat and directly through old-growth murrelet trees); AR2393; AR2435 (BLM admitting that road construction and yarding corridors will remove nesting murrelet trees); AR335 (example of landing being located in murrelet nesting habitat). As an example, BLM proposes to remove murrelet nesting structure in yarding corridors within the Elk Creek timber sale but has not conducted murrelet surveys. AR1728; *see also* AR352 (Anderson Brown timber sale units will remove murrelet nest trees).

Plaintiffs raised this argument in their Opening Brief. *See* Dkt. No. 16 at 18 ("Road construction to facilitate this logging will occur directly within occupied habitat and remove potential nesting trees, as will yarding activities. AR2393; AR2040, 2141."). BLM never responded to this argument and therefore it is waived. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (issues that are not "specifically and distinctly argued" in a party's opening brief are waived).

In any case, BLM posits that road-building and yarding activities are exempted from murrelet survey requirements in an internally-generated document titled "Modification Clarification from the State office, June 19, 2018." AR6036. BLM admits that this new exception conflicts with BLM's previous interpretation of the murrelet survey requirements just after adoption of the RMP. *See* AR6037 ("Note that an RMP Core Team response on marbled murrelet management in Zone 2 dated November 14, 2016, did not include this exception to the survey

PLAINTIFFS' RESPONSE/REPLY - 15

requirement for Option 1[.]"). The reason why BLM previously did not previously include an exception to the survey requirement is because it does not exist in the RMP. *See* AR10909; *see Vincent v. Apfel,* 191 F.3d 1143, 1148 (9th Cir. 1999) ("There is no justification for adding limiting language to a clear and unambiguous statute and regulation.").

In short, BLM is required to discover and protect murrelet sites in Zone 1. This is "specifically provided for in the plan," and BLM's attempt to circumvent this requirement is not in conformance with the RMP, violating FLPMA. *Cascadia Wildlands v. BLM,* 410 F. Supp. 3d at 1153 ("BLM must ensure that site-specific actions conform to the governing Resource Management Plan.") (citing 43 U.S.C. § 1732(a)); 43 C.F.R. § 1601.0-5(b) (defining "conformance" as "specifically provided for in the plan" or "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment."); 43 C.F.R. § 1610.5-3(a); *Brong*, 492 F.3d at 1125; *see also Hapner v. Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010) (citations omitted) (agency actions inconsistent with plan directives not entitled to deference).

**E. BLM Is Mismanaging Occupied Murrelet Sites in HLB.**

The exhibit BLM includes with its Response Brief—the latest murrelet survey results from HLB units in the BWE Project area—reveals that the agency is also violating protections it promised in the EA. Dkt. No. 23-1. In the EA, BLM claimed that occupied sites would be designated as LSR and protected pursuant to RMP requirements. AR576–77; AR2390 ("if surveys result in occupancy, the BLM will designate the occupied murrelet site according to the RMP and modify the proposed action to fit the LSR management direction."). This is not occurring. Instead, BLM is documenting occupied sites as "partially occupied" and conducting

PLAINTIFFS' RESPONSE/REPLY - 16

further surveys to justify logging these areas.[7] *See* Dkt. No. 23-1 at 18. This approach violates the RMP, AR10909, undermines assumptions in the BiOp, AR2136, violates the Pacific Seabird Group survey protocol being utilized, *see* AR23963, and is unsupported by any murrelet literature. *See also* *Scott Timber Co.*, 618 F. Supp. 3d at 1056–57.

Once "occupancy has been determined at the survey site no additional surveys are required since the highest possible status of the site has been obtained." AR8670. According to BLM's exhibit, occupied detections occurred at Beetle Bagel and at two Beavertail survey sites. Dkt. No. 23-1 at 4–5. Under the RMP then, the entire occupied stand—"all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy"—is thus off limits for harvest, as is all forest within 300 feet of the occupied stand. AR10909. BLM must re-designate these areas as LSR. AR10863 ("The decision also requires the future allocation of marbled murrelet occupied stands … to the Late-Successional Reserve, as described in the Record of Decision."). BLM vaguely states that "part" of the sites have been dropped but is continuing survey efforts to facilitate clearcutting the remainder of the site. Dkt. No. 23-1 at 18. This is plainly illegal and underscores the need for BLM to analyze these environmental impacts up front in public-facing NEPA documents. *See infra*, Argument Part II.C.1.

---

[7] There is no such thing as a "partially occupied" murrelet site. A single occupancy detection at a survey site renders it occupied pursuant to the survey protocol used by BLM. AR23963; Dkt. No. 23-1 at 1 (BLM using Pacific Seabird Group Protocol). "[I]f a block of continuous potential habitat is divided into three contiguous survey sites, and one of those three sites yields subcanopy detections, the entire survey area is considered occupied, not just that one site, because all the sites form one large piece of continuous habitat []." AR23964.

PLAINTIFFS' RESPONSE/REPLY - 17

**F.**      **BLM Should Adjust Prescriptions and Implement Option 2 if It Wishes to Avoid RMP Survey Requirements.**

Option 2 in the RMP's murrelet management direction is specifically designed for the exact situation BLM faces here. *See* AR10910. BLM has proposed LSR logging all throughout "unsurveyed nesting habitat." AR2393; *see, e.g.*, AR1729, 1732 (logging unit Elk Ridge # 4 completely surrounded by murrelet habitat); AR2133 ("While treatments in LSRs focus on stands younger than 90 years old, often these stands are intermixed with stands of older forests, or contain remnants scattered amongst the younger trees."). Option 2 is designed for "timber harvest that occurs next to stands of an unknown occupancy status" and "will still provide protection for nesting murrelets." AR11761.

Option 2 has several requirements, including "a 150-foot un-thinned buffer around all trees with nesting structure," "an average canopy cover of at least 60 percent post-project (averaged over each 40-acre area) in the zone between 150 feet and 300 feet," and "an average canopy cover of at least 40 percent post-project (averaged over each 40-acre area) within the project area beyond 300 feet from all trees with nesting structure." AR10910. BLM is already applying a 150-foot buffer from murrelet nesting structure in some instances,[8] AR338, but the "heavy thinning" authorized is simply too aggressive from a canopy cover perspective. *See* AR2359. With a lighter logging prescription and a few other tweaks, however, BLM could readily comply with RMP management direction without having to conduct surveys. Instead, BLM is simply forcing through a maximum amount of logging.[9] *See* AR10877 (RMP LSR logging).

_____

[8] BLM frequently justifies not applying this 150-foot buffer. *See, e.g.*, AR329–31; AR352.
[9] The application of this severe logging prescription in LSR is troubling regardless of murrelet impacts. The only reason BLM selected this heavy thinning over a "thinning from below" prescription that would retain the largest trees in the stand is because thinning from below

PLAINTIFFS' RESPONSE/REPLY - 18

BLM has violated mandatory RMP direction as well as its commitments in the BWE Project EA. The agency continues to push maximum logging levels even where this conflicts with the plainest provisions of its management plan. Clearly, compliance by BLM with its own RMP will only occur with active handholding, watchdogging, and judicial intervention. BLM's chosen approach eviscerates public trust, wastes public and judicial resources, and undermines the laws and procedures designed to produce informed decision-making, protect our nation's precious natural resources and public lands, and recover imperiled species.

## II.    BLM'S EA and FONSI for the BWE Project Violate NEPA.

### A.    Tiering to the 2016 RMP FEIS Does Not Relieve BLM of Its NEPA Obligations for the BWE Project.

While NEPA regulations encourage tiering to avoid repetitive analyses, "tiering does not eliminate the EIS requirement when a proposed project significantly affects the environment." *W. Watersheds Project v. BLM*, 774 F. Supp. 2d 1089, 1095 (D. Nev. 2011) (citing 40 C.F.R. §§ 1502.20 & 1508.28, *aff'd*, 443 F. App'x 278 (9th Cir. 2011). Nothing in the plain language of applicable NEPA regulations exempts BLM from the preparation of an EIS for a project with significant impacts merely by tiering to an earlier EIS. *See* 40 C.F.R. § 1508.28[10] (contemplating "subsequent narrower statements *or* environmental analyses") (emphasis added); *see also Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (citing 40 C.F.R. § 1508.28) ("Nothing in the tiering regulations suggests that the existence of a programmatic EIS

_____

"cannot be sustained over time." AR2313. In other words, BLM is logging this heavily to encourage the growth of a new cohort of trees that it can log again in the "cutting cycle." *Id.* This rationalization for heavy logging is not appropriate in the Riparian Reserves and LSR where the objectives do not include sustainable timber harvest. AR10875, 10879.
[10] This brief refers to the applicable 1978 version of the NEPA regulations, which can be found here.

PLAINTIFFS' RESPONSE/REPLY - 19

**SER064**

for a forest plan obviates the need for any future project-specific EIS, without regard to the nature or magnitude of a project."). Nor does tiering to a programmatic NEPA analysis eliminate an agency's obligation to prepare a site-specific NEPA document that discloses significant impacts or provide a "convincing statement of reasons" why impacts are *not* significant if it does not prepare an EIS. *See W. Watersheds Project*, 774 F. Supp. 2d at 1095 (citing *Blackwood*, 161 F.3d at 1212).

BLM contends that the RMP FEIS "already considered the impacts [to ESA-listed species] that Plaintiffs complain of, [and] specifically predicted them." Dkt. No. 23 at 28. Yet BLM fails to point to anywhere in that FEIS where BLM specifically considered the BWE Project's negative consequences on long-term NSO population viability in the Coquille Basin or the loss of currently suitable NSO habitat in LSRs for decades. *See* AR2107, 2131. BLM also implies that the EA shows impacts to NSO "are of the same kind and magnitude of those already disclosed in the [RMP FEIS]," but BLM only reached that conclusion in the context of impacts on HLB, not within LSRs. *See* Dkt. No. 23 at 29. The portion of the EA that discussed impacts to NSO habitat from Project treatments in LSR never stated that the RMP FEIS already disclosed such impacts—*i.e.*, loss of currently suitable NSO habitat in LSR for decades and a negative influence on long-term NSO population viability—nor could it. *See* AR525–28.

The RMP FEIS's whole analysis is premised on LSRs maintaining existing suitable habitat to support the ESA-listed species' conservation while targeting HLB lands for aggressive and repeated logging. *See* Dkt. No. 23 at 7 ("Lands allocated to [LSR] are managed to promote habitat for species listed under the ESA," citing AR10833, 10835). FWS's NSO Recovery Plan

PLAINTIFFS' RESPONSE/REPLY - 20

and BiOp for the RMP, meanwhile, acquiesce only to *short-term* adverse impacts[11] on NSO in LSRs, not the type of long-term impacts that will result from the BWE Project. AR19343 (Recovery Plan encourages management that may result in short-term impacts to owls "where a determination is made that [] longer term goals outweigh short-term impacts."); AR12078, 12112, 12162 (FEIS BiOp anticipates "short-term impacts" to LSRs from thinning); AR2107, 2131 (describing BWE Project's long-term impacts to NSO in LSRs). Because the BWE Project's significant adverse impacts to NSO and habitat are long-term, not merely short-term, tiering to the RMP FEIS does not relieve BLM from taking the required hard look at such impacts and preparing an EIS.

**B.     BLM Violated NEPA by Failing to Prepare an EIS for the BWE Project.**

BLM's attempt to defend its FONSI for the BWE Project reinforces rather than excuses the arbitrariness and inadequacy of its determination. Far from pointing to a "convincing statement of reasons" to support its refusal to prepare an EIS, the agency talks in circles to try to paper over its paltry site-specific analysis and deflect attention from the glaring and substantial questions Plaintiffs have raised about significant impacts.

**1.     The BWE Project's Adverse Effects to ESA-Listed Species Warrant an EIS.**

BLM fails to counter the substantial questions Plaintiffs have raised about the BWE Project's adverse and potentially significant effects on ESA-listed species and their critical habitat, which must be considered when determining whether an EIS is required. 40 C.F.R. § 1508.27(b)(9); *see Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006)

---

[11] For habitat impacts, the BWE Project EA describes "short-term" as "three to ten years." AR498.

PLAINTIFFS' RESPONSE/REPLY - 21

(a "plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared … This is a low standard.") (citation omitted) (emphasis in original). As described above and in Plaintiffs' Opening Brief, tiering to the RMP FEIS does not relieve BLM of its obligation to prepare an EIS here because the BWE Project's site-specific effects exceed the FEIS's analysis. *See* AR2107 (Project will cause currently suitable NSO habitat in LSRs to be unavailable for decades); AR2131 (Project will negatively influence long-term NSO viability); AR2152–53 (Project's removal of murrelet critical habitat exceeds RMP's projections for first decade). Plus, subsequent unanalyzed information makes tiering alone insufficient to satisfy NEPA. *See* 85 Fed. Reg. 81,144 (Dec. 15, 2020) (FWS determination that accelerating population declines warrant uplisting NSO to "endangered" status); AR2052 (FWS admission that BWE Project BiOp does not account for range-wide habitat impacts from 2020 wildfires).

BLM's FONSI for the BWE Project—its "statement of reasons" that impacts are supposedly insignificant—only mentions FWS's "no jeopardy" conclusion for NSO,[12] a determination based on range-wide effects, and ignores adverse effects on long-term NSO viability, impacts to murrelet nesting sites, and the expected incidental take of murrelet eggs or young. AR435–36. Of note, Plaintiffs warned BLM not to rely on FWS's "range-wide" NSO conclusions, because the Project BiOp failed to account for multiple "range-wide" factors, *see*

_____

[12] BLM offers no defense at all for its complete failure to address adverse effects on marbled murrelets or their critical habitat in the FONSI. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation omitted) (FONSI must be "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant."). Instead, BLM quotes FWS's BiOp for the Project, a document nowhere expressly incorporated by reference into the EA (despite BLM's assertion otherwise), then pivots back to discussing NSO impacts. *See* Dkt. No. 23 at 22 & 31.

PLAINTIFFS' RESPONSE/REPLY - 22

AR964 (noting BiOp did not consider most recent NSO demographics meta-analysis or FWS finding that NSO warranted "endangered" status), and FWS itself admitted that BiOp did not factor in "[e]ffects to rangewide habitat from 2020 wildfires." AR2052.

Despite BLM's suggestion otherwise, Plaintiffs do not solely focus on the BWE Project's adverse effects to *individual* spotted owls or murrelets. *See* Dkt. No. 23 at 27. Rather, Plaintiffs have identified the Project's adverse effects on threatened species and habitat that will continue over a long duration and extend beyond the Project area, raising substantial significance questions. *See* AR2129, 2131, 2153 (Project will adversely affect NSO, murrelets, and their critical habitat); *see also* AR2048 (action area considered by FWS extends beyond Project units); AR2131 (Project will negatively impact the long-term viability of NSO beyond Project units).

Also, contrary to BLM's assertion, Plaintiffs' reliance on *Klamath-Siskiyou Wildlands Center v. U.S. Forest Service*, *Cascadia Wildlands v. U.S. Forest Service*, and *Oregon Wild v. BLM* for this proposition is well-placed. *See* Dkt. No. 23 at 28. In each of those cases, adverse effects to ESA-listed species contributed to a need to prepare an EIS. *See Cascadia Wildlands, 937 F. Supp. 2d 1271, 1282 (D. Or. 2013)* (citing *Klamath-Siskiyou Wildlands Ctr., 373 F. Supp. 2d 1069, 1080 (E.D. Cal. 2004)*) ("project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect on the environment.") *Klamath-Siskiyou Wildlands Ctr., 373 F. Supp. 2d at 1081* ("At a minimum, a [likely to adversely affect] finding is an important factor supporting the need for an EIS."); *Or. Wild v. BLM, No. 6:14-cv-110-AA, 2015 WL 1190131, at *10 (D. Or. March 15, 2015)* (logging project need not drive NSO to verge of extinction for adverse effects to contribute to need for EIS).

BLM next wrongly implies that a pair of cases it cites represent the facts of *this* case. *See* Dkt. No. 23 at 30 (citing *Conservation Cong. v. U.S. Forest Serv., 235 F. Supp. 3d 1189, 1209*

PLAINTIFFS' RESPONSE/REPLY - 23

(E.D. Cal. 2017) ("*Conservation Congress I*"); also citing *Conservation Cong. v. U.S. Forest Serv.*, No. 2:16-cv-864-MCE-AC, 2018 WL 2427640, at *15 (E.D. Cal. May 30, 2018) ("*Conservation Congress II*")). Unlike the short-term and minimal impacts in *Conservation Congress I* and *Conservation Congress II*, here the BWE Project will negatively influence the long-term viability of NSO in the action area, and adverse impacts to currently suitable roosting habitat in LSRs may render them unavailable for decades. AR2107, 2131; *see Conservation Congress I*, 235 F. Supp. 3d at 1207; *see also Conservation Congress II*, 2018 WL 2427640, at *15. Furthermore, FWS said the BWE Project's impacts were likely *not* insignificant or discountable. AR2113. Although FWS used the term "insignificant" in an ESA context rather than a NEPA analysis, *see* Dkt. No. 23 at 31 (citing *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1052 n.5 (9th Cir. 2013)), this Court has said that FWS's determinations pursuant to the ESA must be given weight and cannot be disregarded when considering whether impacts may be significant under NEPA. *See Cascadia Wildlands*, 937 F. Supp. 2d at 1283 (citing *Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1081).

Other cases where courts have upheld reliance on an EA despite effects to NSO are also easily distinguishable. In contrast to the case at hand, the adverse impacts at issue in *Environmental Protection Information Center v. U.S. Forest Service* ("*EPIC*") were outside LSRs in the "matrix," the precursor to HLB. *EPIC*, 451 F.3d 1005, 1010 (9th Cir. 2006). And unlike here, the *EPIC* court did not note any long-term impacts on NSO viability or currently suitable habitat in LSRs, the allocation meant to *support* NSO conservation. *See id.*; *see also* AR2107, 2131; AR10875. Furthermore, the Ninth Circuit decided *EPIC* long before FWS's more recent determination that accelerated population declines warrant uplisting NSO to endangered status. *See* 85 Fed. Reg. at 81,145–46.

PLAINTIFFS' RESPONSE/REPLY - 24

Finally, in *Klamath-Siskiyou Wildlands Ctr. v. BLM* ("*North Landscape*"), this Court upheld the use of an EA for a project that authorized logging solely within HLB. *North Landscape*, No. 1:19-cv-1810-CL, 2021 WL 5356969, at *7 (D. Or. Aug. 24, 2021). Only NSO were at issue in *North Landscape*, not murrelets. *Id.* at *1. Here, in contrast, the BWE Project authorized logging within both HLB and LSRs, *two* ESA-listed species (and their critical habitat)[13] will be adversely affected, and FWS expects logging to negatively influence the long-term viability of NSO in the action area and to directly impact currently suitable habitat such that it will be unavailable for decades. AR2107, 2131.

Regarding murrelets, BLM contends that the BWE Project EA properly explained that "there would not be any significant effects to nesting murrelets and their habitat beyond those evaluated in the [RMP FEIS]." Dkt. No. 23 at 23 (citing AR576). But therein lies the rub: Neither the EA nor FONSI discuss or identify murrelet impacts, occupied survey detections, or the bizarre regulatory dance BLM is attempting to pull off. The reality is that the BWE Project's impacts to 40 occupied murrelet sites and the expected incidental take of eggs or young at four sites are not *de minimis*, and the rate of murrelet critical habitat removal will clearly *exceed* the RMP's projection for the first decade of implementation. AR2142, 2152–53.[14] Further as noted

---

[13] BLM incorrectly says that "no project units intersect with 2021 critical habitat" for NSO. Dkt. No. 23 at 29 (citing 86 Fed. Reg. 62,606 (Nov. 10, 2021)); *see also* Dkt. No. 23 at 21 (asserting "there is no NSO critical habitat in the project area"). The Final Critical Habitat Rule cited by BLM replaced and withdrew the agency's previous rule that excluded 3.4 million acres of NSO critical habitat designated in 2012. 86 Fed. Reg. 62,606. The November 2021 rule only excluded 204,294 acres from the 2012 designation, and only in the HLB allocation—*not* within LSRs. *Id.* at 62,606 & 62,641. BLM's assertion that the BWE Project will not adversely affect any NSO critical habitat is inaccurate; it *will* adversely affect LSRs that are designated critical habitat. *See* AR565 (1,242 acres of NSO critical habitat in LSR within BWE Project area); AR2107 (BWE Project's removal and downgrading of roosting/foraging habitat in LSRs will render them unavailable as suitable habitat for decades).

[14] BLM contends that Plaintiffs' arguments regarding murrelet "critical habitat are moot because BLM has dropped these acres from the project." Dkt. No. 23 at 23 n.6 (citing AR52). This is

PLAINTIFFS' RESPONSE/REPLY - 25

above, adverse impacts that will result from the BWE Project were not anticipated in the RMP, which assumed that all occupied sites would be protected in Zone 1. AR11765.

In sum, BLM failed to offer a convincing statement of reasons that the degree of the BWE Project's adverse effects on NSO, murrelets, and critical habitat does not require an EIS. Even if BLM believes net effects will be beneficial,[15] the context of the BWE Project's *adverse* impacts within LSRs and the intensity of those impacts on ESA-listed species and habitat raise substantial significance questions, and require an EIS. *See Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1081 & 1086; 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."); *see also Cascadia Wildlands*, 937 F. Supp. 2d at 1280 & 1283–84. BLM's FONSI for the BWE Project, which only mentions FWS's "no jeopardy" opinion for NSO regarding this intensity factor and does not mention murrelets at all, is arbitrary and capricious, in violation of NEPA. AR435–36.

---

inaccurate. These areas were not dropped because of their critical habitat status, they were "deferred" because of the presence of too much old-growth. *See* AR52 ("deferred" due to "40-in/1850 trees"). It is alarming that BLM is even targeting stands 240 years old for logging, AR52 (New Yankee Unit 111), but in any case, the cited table post-dates the BWE Project FONSI by over two years. *See* Dkt. No. 13-2 (Jan. 19, 2024), Administrative Record Index, line 13, noting date of October 11, 2023, for AR52 (table of deferred HLB acres), & line 44, noting date of October 1, 2021, for AR464–803 (BWE Project EA). BLM cannot rely on a later deferral of these acres to support its earlier FONSI. *See Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1120 (9th Cir. 2010) (citations omitted) ("an agency's actions must be upheld, if at all, on the basis articulated by the agency itself" at the time of the decision, not based on "post hoc rationalizations" from agency counsel); *see also Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1101 (D. Mont. 2017) (court declined to consider argument not presented in either FONSI or Response to Comments).

[15] BLM's determination that beneficial effects from logging outweigh negative effects is an unanalyzed assumption. AR2439 ("While we do not discount the possibility that thinning may have some negative effects on murrelets, with an increasing population, we assume that these effects are overcome by the increase in habitat as a result of the protections under the NWFP and now the RMP will continue to support murrelet nesting.").

PLAINTIFFS' RESPONSE/REPLY - 26

### 2. The Likelihood That the BWE Project Violates FLPMA Warrants an EIS.

Plaintiffs have shown that the BWE Project's failure to abide by the plain language of the RMP's murrelet management direction—as understood by the public, FWS, and BLM itself upon the RMP's adoption in 2016—will violate FLPMA's requirement that site-specific projects must conform to the RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); *see supra*, Argument Part I. Even putting the FLPMA violation aside, the BWE Project represents the first implementation of a new murrelet regulatory scheme never discussed or analyzed in the RMP. This novel attempt to operate outside of the RMP requires an EIS for the BWE Project. *See* 40 C.F.R. § 1508.27(b)(6) & (10); *see Boody*, 468 F.3d at 562 (if a "plaintiff raises substantial questions whether a project may have a significant effect, an EIS must be prepared").

### 3. Other Intensity Factors Weigh in Favor of an EIS When All Factors Are Considered in Sum.

BLM attempts to brush aside the BWE Project's impacts on ecologically critical areas like designated critical habitat and LSRs, despite the requirement to consider this intensity factor. *See* Dkt. No. 23 at 32; 40 C.F.R. § 1508.27(b)(3). As noted earlier, heavy thinning in LSRs will result in the decades-long unavailability of designated critical habitat for NSO. AR2107. That "there are millions of acres of critical habitat overlaying BLM and Forest Service land in the range of the NSO" does not render impacts to them weightless or insignificant. Dkt. No. 23 at 32. Courts have determined precisely the opposite. *See Cascadia Wildlands*, 937 F. Supp. 2d at 1283 (weighing impacts to reserves in determining EIS was required); *see also EPIC v. Blackwell*, No. S-04-cv-1027-WBS-GGH, 2005 WL 8176926, at *5 (E.D. Cal. May 5, 2005) (logging in NSO critical habitat—an "ecologically critical area"—raised substantial questions about impacts). Regardless, BLM's FONSI does not even acknowledge that the BWE Project

PLAINTIFFS' RESPONSE/REPLY - 27

will adversely impact "ecologically critical areas," and offers no statement of reasons concerning such impacts. *See* AR434.

BLM also fails to meet its burden to show there is no legitimate controversy regarding the creation of gaps up to four acres in size within LSRs, larger than what would occur naturally. Dkt. No. 23 at 34; 40 C.F.R. § 1508.27(b)(4); *Or. Wild v. BLM*, 2015 WL 1190131, at *8 (citation omitted). Nowhere in the BWE Project EA or FONSI did BLM genuinely engage with Plaintiffs' comments citing an expert's analysis that gaps larger than a quarter-acre are contrary to the development of late-successional conditions. AR1081–82; *see also* AR446 (BLM's failure to engage with this expert opinion). Instead, the agency ignored this evidence that casts doubt on the reasonableness of four-acre gaps in LSRs. AR446. As such, Plaintiffs have shown a substantial dispute exists regarding the BWE Project's potentially significant impacts, contributing to the need for an EIS. *See Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020); *see also Cascadia Wildlands*, 937 F. Supp. 2d at 1284 (dispute about efficacy of thinning to achieve reserve objectives contributed to need for EIS).

Finally, and as described in detail below, BLM entirely failed to consider other known and reasonably foreseeable projects that may cumulatively impact NSO and the species' habitat. 40 C.F.R. § 1508.27(b)(7). An agency's failure to engage with other projects identified by commenters raises "substantial questions about whether the action will have a cumulatively significant impact." *Bark*, 958 F.3d at 873. Here, Plaintiffs flagged impacts on NSO from the Catching and Upper Rock Creek projects and the District-wide LSR/RR plan in their BWE Project comments, but BLM did not engage with those projects in the context of NSO. *See* AR965, 974; AR490, 494–95, 559. Given the combined, unaddressed adverse effects of these projects on NSO alongside expected long-term adverse effects from the BWE Project, AR2107,

PLAINTIFFS' RESPONSE/REPLY - 28

2131, Plaintiffs have raised substantial questions about cumulatively significant impacts that require an EIS.

      **C.**      **BLM Failed to Take a Hard Look at the BWE Project's Impacts, Violating NEPA.**

As explained in detail *supra*, Argument Part II.B, BLM failed to provide a convincing statement of reasons why the BWE Project's impacts are not significant. Such a "statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Blackwood*, 161 F.3d at 1212 (citation omitted). The absence of a convincing statement of reasons here underscores the inadequacy of BLM's overall analysis for the BWE Project. By glossing over or ignoring long-term and severe impacts, by siloing effects by habitat feature or land use allocation, by eliminating from detailed consideration most impacts to ESA-listed species, and by relying on tiering to avoid disclosure of significant effects, BLM has not provided a thorough, full, or fair analysis, running afoul of NEPA's "hard look" mandate. *See Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (citation omitted) ("hard look" requires thorough discussion of environmental consequences); *see also 350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (citation omitted) (analysis of impacts must be "full and fair").

      **1.**      **BLM Failed to Take a Hard Look at Impacts to NSO, Marbled Murrelets, and Their Habitat.**

BLM failed to undertake or present a full and fair analysis of the BWE Project's impacts to NSO, murrelets, or their habitat. The EA obscured the totality of the Project's adverse impacts by eliminating major issues from detailed consideration—including all murrelet concerns—and separating impacts by habitat features or land use allocation. *See* AR523, 529 (impacts to NSO

PLAINTIFFS' RESPONSE/REPLY - 29

reserve habitat and to nests, respectively); *see also* AR539–83 (Appendix A, containing cursory discussion of issues eliminated from detailed consideration, including all murrelet issues). Plaintiffs have not "cherry pick[ed] the record to highlight minor short-term impacts to the species," *see* Dkt. No. 23 at 1, but have cast light on *long-term* adverse impacts to currently suitable NSO critical habitat in LSRs, which BLM brushed over or ignored in the EA and as described *supra*, Argument Part II.B.1, extend beyond the scope of the RMP FEIS to which BLM repeatedly tiers. *See* AR2107, 2131 (BiOp noting long-term adverse impacts for NSO in critical habitat in LSRs; AR525, 528 (EA glossing over decades-long impacts to NSO habitat in LSRs). Plaintiffs have also flagged the Project's severe impacts to nesting murrelets and their eggs and young, which the EA either arbitrarily characterized as minimal or failed to mention at all. AR2141, 2152–53 (BiOp noting indirect impacts to 40 occupied murrelet sites and incidental take of eggs/young from four sites); AR572–76, 580–83 (relevant EA portions containing no mention of impacts to 40 murrelet sites or incidental take identified in BiOp).

BLM fails to counter these points in its Response Brief. Instead, BLM concedes that the BWE Project may indeed have significant impacts, but claims cover under the RMP FEIS to avoid addressing those impacts in the EA. *See* Dkt. No. 23 at 23 (citing AR576, which says "there would not be any significant effects to nesting murrelets and their habitat *beyond those evaluated* in the [RMP FEIS]" (emphasis added)); *see also* AR564 (BWE Project critical habitat impacts "not associated with significant impacts *beyond those analyzed* in the [RMP FEIS]") (emphasis added); *see also* AR581 (no indirect "significant effects *beyond those evaluated* in the [RMP FEIS]" to occupied murrelet sites or suitable nesting habitat) (emphasis added). The Ninth Circuit has definitively held that a forest plan EIS does not preclude site-specific projects from having significant effects that also necessitate an EIS. *Blackwood*, 161 F.3d at 1214 (citing 40

PLAINTIFFS' RESPONSE/REPLY - 30

C.F.R. § 1508.28). But regardless of whether an EIS is required, NEPA requires BLM to be forthright to the public and itself about which site-specific impacts could rise to the level of significant. *See Nat'l Audubon Soc'y v. U.S. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgment of potential environmental harms."). Ultimately, BLM's excuses do not relieve the agency of NEPA's requirement to disclose which of the BWE Project's impacts are, in fact, significant, and its sleight of hand runs counter to the statute's goal of fostering meaningful public participation. *See Robertson*, 490 U.S. at 349–51.

Last, nowhere in the EA did BLM clearly disclose the complicated web of murrelet "protections" it plans to implement through the BWE Project—"protections" that deviate from the plain text of RMP direction. *See supra*, Argument Part I. And as noted earlier, BLM's FONSI does not even mention murrelets. AR432–37. BLM relegated all murrelet concerns to an EA appendix rather than straightforwardly convey key information to the public. AR539–83. This appendix omits all information relevant to Plaintiffs' murrelet FLPMA claims, including BLM's decision to not buffer previously occupied habitat, its intent to designate habitat as "partially occupied," reduced buffers, adverse effects to 40 murrelet nest sites, and "take" of four murrelet eggs or young. *See id.* The public could not read the BWE Project EA and understand that occupied murrelet stands in LSRs—the areas meant to ensure murrelet survival—would *not* receive RMP protections.

Even the information BLM conveyed to FWS was not detailed enough for *that* agency to make definitive conclusions about impacts to murrelets that would result from authorized logging. AR2136. This attempt to hide negative environmental impacts from public and FWS

PLAINTIFFS' RESPONSE/REPLY - 31

scrutiny to facilitate widespread commercial logging in occupied murrelet habitat violates NEPA. See *Cascadia Wildlands v. BLM,* 410 F. Supp. 3d at 1158 (BLM violated NEPA by "fail[ing] to include crucial information" in EA, "depriv[ing] the public of meaningful participation."). For these reasons and those presented in Plaintiffs' Opening Brief, BLM has not taken the required hard look at the BWE Project's impacts, and the EA, FONSI, and associated timber sale decisions must be set aside.

**2.      BLM Failed to Evaluate Cumulative Impacts from the District-Wide LSR/RR Plan and Nearby Past Projects.**

Plaintiffs have met their burden to show a potential for cumulative impacts to NSO from the BWE Project alongside the Catching and Upper Rock Creek projects and the District-wide LSR/RR plan. See *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010) ("Plaintiffs must show only the potential for cumulative impact."). BLM has neither provided "quantified or detailed information" about these projects, nor articulated a "fully informed and well-considered" explanation for its refusal to evaluate them in the cumulative effects context. See *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002) (citations omitted).

BLM offers no legitimate defense for its complete failure to acknowledge potential cumulative effects on NSO from the agency's District-wide LSR/RR plan, a reasonably foreseeable future action under 40 C.F.R. § 1508.7 that directly overlaps the BWE Project area. See AR113 (map of LSR/RR plan area). BLM asserts that it "reasonably did not consider" the LSR/RR plan "because that project was still in the scoping process at the time the EA was completed." Dkt. No. 23 at 25. BLM further states that the LSR/RR plan "was not yet well

PLAINTIFFS' RESPONSE/REPLY - 32

enough developed to describe the proposed action." Dkt. No. 23 at 25. These arguments are meritless post hoc rationalizations.

Plaintiffs brought the LSR/RR plan to BLM's attention, but BLM never indicated a reason in the final EA or FONSI why it could not assess cumulative impacts flowing from that plan. *See* AR974, 1072–89 (Plaintiffs' comments flagging LSR/RR plan); AR438–61 (BLM Response to Comments). Furthermore, BLM's arguments directly contradict Ninth Circuit caselaw. *See Kern*, 284 F.3d at 1075 (citations omitted) ("It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now."); *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1104 (9th Cir. 2016) ("cumulative impact analysis … must take a 'hard look' at *all* actions that may combine with the action under consideration to affect the environment.") (emphasis in original) (citation omitted); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir. 1999) (summary of and press release for proposed action indicated reasonable foreseeability); *Soda Mtn. Wilderness Council v. BLM*, 607 F. App'x 670, 672 (9th Cir. 2015) (logging project reasonably foreseeable even *before* scoping notice); *N. Cascades Conservation Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193, 1197 (W.D. Wash. 1999) (some projects reasonably foreseeable even *before* scoping notice).

Unlike the unknown future mining in *Jones v. Nat'l Marine Fisheries Service*, here BLM's LSR/RR plan had been formally proposed at the time of the BWE Project EA. *See Jones*, 741 F.3d 989, 1001 (9th Cir. 2013); AR1072–89 (Plaintiffs' scoping comments on LSR/RR plan). BLM had "enough information available" about the LSR/RR plan's parameters "to permit meaningful consideration" in the cumulative impact context. *See EPIC*, 451 F.3d at 1014–15. The scoping letter and maps for the plan included details about its location, land use allocation acreage (123,000 acres of LSR and RR), the average number of acres to be treated in a given

PLAINTIFFS' RESPONSE/REPLY - 33

year (2,000), and the age classes of stands to be treated (80% in 40–60-year old age class, 20% in 70–80-year-old age class). *See* AR1072 (Plaintiffs' scoping comments on LSR/RR plan). This level of detail allowed Plaintiffs to submit substantial comments on the proposal, which they then included with their BWE Project EA comments. AR1072–89. Yet even after Plaintiffs flagged the LSR/RR plan, BLM failed to analyze the plan's effects "based on the information known about the proposed project at that time." *See* EPIC, 451 F.3d at 1014.

Regarding the Catching and Upper Rock Creek projects,[16] meanwhile, BLM states that it discussed these projects in the context of "issue[s] analyzed in detail" in the BWE Project EA, tacitly conceding that the agency excluded the projects' discussion in relation to numerous NSO issues eliminated from detailed consideration. Dkt. No. 23 at 26. BLM then asserts that "[f]or other issues, [the] projects simply were not implicated," yet another blanket and post hoc conclusion. *Id.* And again, without citing any authority for limiting consideration based on land use allocation, BLM silos impacts between HLB and reserves. *Id.* However, cumulative impacts on species and habitat do not begin or end at the borders of land use allocations or project areas that are near or overlap each other within the same watershed. *See* AR1747–48 (Catching Project location in Coquille Basin); AR4980 & 4983 (streams in Upper Rock Creek Project area flow into Coquille River that parallels Highway 42); AR113 (LSR/RR plan location in Coquille Basin)

Worse than merely offering "conclusory statements [] based on 'vague and uncertain analysis,'" BLM failed to offer *any* meaningful analysis about these other projects identified in

---

[16] The Catching Project will remove 337 acres of NSO roosting-foraging habitat and 484 acres of dispersal habitat. AR1822. The Upper Rock Creek Project will also remove or downgrade hundreds of acres of NSO habitat within multiple home ranges. *See* AR4893–96. Although the projects' respective EAs found these impacts insignificant, BLM failed to consider their potential for cumulative impacts in the BWE Project EA. *See* 40 C.F.R. § 1508.27(b)(7) (impacts can be "individually insignificant but cumulatively significant").

PLAINTIFFS' RESPONSE/REPLY - 34

Plaintiffs' comments. *See Bark, 958 F.3d at 872–73* (citation omitted). As a result, the agency ignored important aspects of the problem before it. This "clear error in judgment" violated NEPA's "hard look" requirement and rendered the BWE Project EA and FONSI arbitrary and capricious. *See Kern, 284 F.3d at 1075* (citation omitted).

## <u>RELIEF AND CONCLUSION</u>

For all the foregoing reasons and those laid out in Plaintiffs' Opening Brief, BLM's violations of FLPMA and NEPA are serious errors warranting vacatur, the presumptive remedy under the Administrative Procedure Act, 5 U.S.C. § 706(2). Plaintiffs thus respectfully ask this Court to grant their Motion for Summary Judgment (Dkt. No. 16), hold unlawful and set aside BLM's EA, FONSI, and associated timber sale decisions issued as part of the BWE Project, and remand to the agency to comply with FLPMA and NEPA.

Respectfully submitted this 11th day of April, 2024.

> */s/ John S. Persell*
> John S. Persell, OSB # 084400
> Oregon Wild
> 5825 N Greeley Ave
> Portland, OR 97217
> (503) 896-6472
> jp@oregonwild.org
>
> */s/ Nicholas S. Cady*
> Nicholas S. Cady, OSB # 113463
> Cascadia Wildlands
> P.O. Box 10455
> Eugene, OR 97440
> (541) 434-1463
> nick@cascwild.org
>
> *Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE/REPLY - 35

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,999 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, glossary of terms, signature block, and this certificate.

/s/ John S. Persell
John S. Persell

*Attorney for Plaintiffs*

PLAINTIFFS' RESPONSE/REPLY - 36

**SER081**

John S. Persell, OSB # 084400
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

Nicholas S. Cady, OSB # 113463
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434-1463
nick@cascwild.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation, | |
| | Case No. 6:23-cv-1358-MC |
| Plaintiffs, | |
| | |
| v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPENING MEMORANDUM IN SUPPORT OF MOTION** |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency, | Oral Argument Requested |
| Defendant. | |

**MOTION**

Plaintiffs Cascadia Wildlands and Oregon Wild ("Plaintiffs") hereby submit their *Motion for Summary Judgment* pursuant to Federal Rule of Civil Procedure 56(a). In accordance with Local Rule 7-1, the undersigned certify that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Plaintiffs challenge the final agency actions of the United States Bureau of Land Management ("Defendant," "BLM," or "agency") in approving the Big Weekly Elk Project ("BWE Project" or "Project") and associated timber sales, including but not limited to the Brownson Falls, Elk Creek Ridge, Jones and Elk, and Sugar Rush timber sales. In approving the BWE Project and sales, Defendant acted arbitrarily, capriciously, and contrary to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1782, and its implementing regulations, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and its implementing regulations.[1]

According to the U.S. Fish and Wildlife Service ("FWS"), the BWE Project will adversely affect both northern spotted owls ("NSO") and marbled murrelets, as well as each species' designated critical habitat. Through the Project, BLM authorized logging across 3,068

---

[1] Through NEPA, Congress established the Council on Environmental Quality ("CEQ") to develop national policies to promote environmental quality. 42 U.S.C. § 4342; *id.* § 4344(4); 40 C.F.R. § 1500.1 (2019). Until 2020, CEQ regulations adopted in 1978 remained virtually unchanged. *See Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 288 (4th Cir. 2022). CEQ modified the NEPA regulations by final rule on July 16, 2020, 85 Fed. Reg. 43,304 (July 16, 2020) (codified at 40 C.F.R. §§ 1500–1508 (2021)), but has since rescinded portions of the 2020 modifications, 87 Fed. Reg. 23,453 (April 20, 2022) (codified at 40 C.F.R. §§ 1500–1508 (2022), and issued a Notice of Proposed Rulemaking to further amend the 2020 regulations, 88 Fed. Reg. 49,924 (July 31, 2023). However, BLM developed and authorized the BWE Project under the pre-2020 version of the regulations, to which this motion and supporting memorandum refer unless otherwise noted. *See, e.g.*, AR432–36. The applicable version of the NEPA regulations can be found here.

MOTION—i

acres of public lands in Coos County, Oregon. The BWE Project includes 715 acres of "regeneration harvest"—*i.e.*, clearcut logging—within BLM's Harvest Land Base ("HLB"), and heavy thinning on over 1,400 acres of Late Successional Reserves ("LSRs")—a land designation specifically meant to support the recovery and persistence of northern spotted owls ("NSO") and marbled murrelets, two species listed under the Endangered Species Act ("ESA"). Although BLM included areas directly adjacent to occupied murrelet stands in BWE Project logging units, the agency declined to buffer occupied stands according to mandatory direction from the 2016 Northwestern and Coastal Oregon Resource Management Plan ("RMP"). BLM's failure to ensure the BWE Project conforms to the 2016 RMP was arbitrary and capricious, in violation of FLPMA.

Through scoping, the public helped BLM identify many potentially significant environmental issues associated with the BWE Project, including numerous resource issues known to be adversely impacted by commercial logging operations, such as the development of suitable NSO habitat in LSRs, known NSO nest sites, NSO use of HLB for habitat, competition between invasive barred owls and NSO, NSO and marbled murrelet critical habitat, marbled murrelet nesting habitat, and marbled murrelet occupied sites. However, the agency excluded all but nine issues from detailed consideration, and all but two wildlife concerns. BLM stated that all other issues were either not directly related to the Project's purpose and need and thus required no in-depth analysis, and/or asserted that any necessary analysis had been done previously in the Environmental Impact Statement ("EIS") for the landscape-wide 2016 RMP, and declined to conduct detailed, site-specific analysis in the Environmental Assessment ("EA") for the BWE Project.

MOTION—ii

**SER084**

Instead of preparing an EIS, as required for actions that may have significant environmental impacts, BLM approved the BWE Project through an EA and Finding of No Significant Impact ("FONSI"). Notably, BLM conducted no detailed review of the BWE Project's impacts on *any* aspect of marbled murrelet habitat and ignored numerous impacts of the Project on NSO habitat. BLM failed to take the requisite "hard look" at the BWE Project's potential effects, and its determination that the Project would have no significant impacts, its failure to prepare an EIS, and its approval of the Project and associated timber sales were arbitrary, capricious, and contrary to NEPA.

Plaintiffs respectfully ask this Court to declare that BLM violated FLPMA and its implementing regulations by failing to conform the BWE Project to the relevant 2016 RMP, specifically mandatory direction regarding marbled murrelet buffer requirements when proposing to modify nesting habitat for the species. Plaintiffs further respectfully ask this Court to declare that BLM violated NEPA and its implementing regulations by (1) failing to prepare an EIS despite the potential for significant environmental impacts; and (2) failing to take a hard look at, and adequately analyze and disclose, the BWE Project's potentially significant environmental impacts. To remedy these violations of law, Plaintiffs respectfully ask this Court to vacate the BWE Project EA and FONSI and associated timber sale decisions and remand the Project to BLM.

In support of this *Motion*, Plaintiffs respectfully refer this Court to the following *Memorandum in Support* and the declarations of Doug Heiken and David Barta filed herewith.

MOTION—iii

**SER085**

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ................................................................................................... i

**TABLE OF AUTHORITIES** ......................................................................................... iii

**GLOSSARY OF TERMS** ............................................................................................ viii

**INTRODUCTION** .......................................................................................................... 1

**LEGAL FRAMEWORK** ................................................................................................ 2

I.    Federal Land Policy and Management Act ............................................................. 2

II.   National Environmental Policy Act ....................................................................... 3

III.  Endangered Species Act ......................................................................................... 4

**FACTUAL BACKGROUND** .......................................................................................... 6

I.    Marbled Murrelets ................................................................................................. 6

II.   Northern Spotted Owls .......................................................................................... 7

III.  Northwestern and Coastal Oregon RMP ............................................................... 8

IV.   Big Weekly Elk Project ....................................................................................... 10

**STANDARD OF REVIEW** ........................................................................................... 14

**ARGUMENT** ................................................................................................................. 15

I.    Plaintiffs Have Standing and This Case Is Ripe for Review ............................... 15

II.   BLM Violated FLPMA by Failing to Conform the BWE Project to the RMP. ... 16

A.    The BWE Project Does Not Adhere to Mandatory RMP Direction, Risking Serious Harm to Murrelets. ............................................................................... 16

1.    BLM's Refusal to Adequately Buffer Occupied Murrelet Habitat Does Not Conform to the RMP. ............................................................................................ 17

2.    BLM Failed to Survey for Murrelets, in Violation of the RMP. ......................... 19

3.    BLM Failed to Designate Occupied Murrelet Habitat Properly. ........................ 20

B.    BLM's Lacks Any Lawful Basis for Its Deviation from Mandatory RMP Direction. ......... 21

III.  BLM Failed to Prepare an EIS for the BWE Project, in Violation of NEPA. ...................... 24

A.    The BWE Project's Degree of Adverse Effects on ESA-Listed Species Requires Preparation of an EIS. .............................................................................................. 25

1.    Northern Spotted Owls ........................................................................................ 25

2.    Marbled Murrelets ............................................................................................... 27

B.    The BWE Project Threatens to Violate FLPMA, Requiring an EIS. .................................. 28

C.    Other "Intensity" Factors Further Support Preparation of an EIS. ..................................... 29

1.    The BWE Project May Significantly Impact "Ecologically Critical Areas." ...................... 29

2.    The BWE Project's Effects Are Highly Uncertain and Controversial. ............................... 30

3.    BLM Failed to Consider the BWE Project's Cumulative Impacts on NSO Together with Other Projects' Impacts.................................................................................................. 32

IV.   BLM Violated NEPA by Failing to Take a Hard Look at the BWE Project's Direct, Indirect, and Cumulative Impacts. ........................................................................................... 33

A.    BLM Failed to Take a Hard Look at Impacts to Imperiled Species and Habitat.................. 35

1.    Northern Spotted Owls ............................................................................................... 35

2.    Marbled Murrelets ...................................................................................................... 35

B.    BLM Failed to Take a Hard Look at Cumulative Impacts on NSO. ................................... 36

**RELIEF**.................................................................................................................................. 38

**CONCLUSION** ..................................................................................................................... 38

MEMORANDUM IN SUPPORT—ii

## TABLE OF AUTHORITIES

**CASES**

*350 Montana v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022) ....................................................................................... 35

*Alaska Oil & Gas Ass'n v. Jewell*,
   815 F.3d 544 (9th Cir. 2016) ....................................................................................... 14

*Bark v. U.S. Forest Serv.*,
   958 F.3d 865 (9th Cir. 2020) ......................................................................... 31, 32, 33, 37

*Blue Mts. Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ....................................................................... 4, 24, 25

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Protection Agency*,
   688 F.3d 989 (9th Cir. 2012) ....................................................................................... 38

*Cascadia Wildlands v. Bureau of Land Mgmt* ("*Thurston I*"),
   410 F. Supp. 3d 1146 (D. Or. 2019) ............................................................... 21, 30, 34

*Cascadia Wildlands v. U.S. Forest Serv.*,
   937 F. Supp. 2d 1271 (D. Or. 2013) .......................................................................... passim

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ....................................................................................................... 15

*Ctr. for Cmty. Action & Envtl. Justice v. Fed. Aviation Admin.*,
   18 F.4th 592 (9th Cir. 2021) ....................................................................................... 29

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ................................................................................................... 3, 24

*Envtl. Protection Information Ctr. v. Blackwell*,
   No. S-04-cv-1027-WBS-GGH, 2005 WL 8176926, (E.D. Cal. May 5, 2005) ............... 29, 30

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ....................................................................................................... 15

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ....................................................................................... 28

*Greenpeace Action v. Franklin*,
   982 F.2d 1342 (9th Cir. 1992) ....................................................................................... 24

*In Def. of Animals v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ..................................................... 31

*Kern v. Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) ..................................................... 37

*Klamath-Siskiyou Wildlands Ctr. v. Boody*,
  468 F.3d 549 (9th Cir. 2006) ....................................................... 24

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
  No. 1:19-cv-1069-CL, 2021 WL 400137 (D. Or. Jan. 21, 2021) ............................. 34

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
  373 F. Supp. 2d 1069 (E.D. Cal. 2004) ........................................... 26, 27, 28

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ................................................. 30, 34, 37

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................... 15, 16

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1060 (9th Cir. 1996) ........................................................ 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................ 14

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ...................................................... 28

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .................................................. 30, 31

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) ..................................................... 37

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
  18 F.3d 1468 (9th Cir. 1994) ...................................................... 14

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ...................................................... 24

*Or. Natural Res. Council v. Brong*,
  492 F.3d 1120 (9th Cir. 2007) ................................................ passim

MEMORANDUM IN SUPPORT—iv

*Or. Natural Res. Council v. Goodman*,
    505 F.3d 884 (9th Cir. 2007) .................................................................. 14

*Or. Natural Res. Council v. Lowe*,
    109 F.3d 521 (9th Cir. 1997) .................................................................. 33

*Or. Wild v. Bureau of Land Mgmt.*,
    No. 6:14-cv-110-AA, 2015 WL 1190131 (D. Or. March 15, 2015)................................ 27, 31

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989).................................................................. 3, 4

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) .................................................................. 36

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009).................................................................. 16

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir. 2010) .................................................................. 37

*Thomas Jefferson Univ. v. Shahala*,
    512 U.S. 504 (1994).................................................................. 22

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*,
    40 F.4th 930 (9th Cir. 2022) .................................................................. 23

**STATUTES**

5 U.S.C. § 706(2) .................................................................. 14, 38

5 U.S.C. § 706(2)(A).................................................................. 14

5 U.S.C. § 706(2)(D).................................................................. 14

16 U.S.C. § 1531(b) .................................................................. 4

16 U.S.C. § 1532(19) .................................................................. 5

16 U.S.C. § 1532(20) .................................................................. 5

16 U.S.C. § 1532(5)(A)(i) .................................................................. 5

16 U.S.C. § 1532(6) .................................................................. 5

16 U.S.C. § 1533(a)(1)(A)–(E) .................................................................. 5

MEMORANDUM IN SUPPORT—v

16 U.S.C. § 1533(a)(3)(A)(i) ................................................................................ 5

16 U.S.C. § 1536(a)(2) ................................................................................... 5, 21

16 U.S.C. § 1536(b)(3)(A) ................................................................................. 5

16 U.S.C. § 1536(b)(4)(C)(i) ............................................................................. 6

16 U.S.C. § 1538(a) ........................................................................................... 5

42 U.S.C. § 4332(2)(C) ..................................................................................... 3

42 U.S.C. § 4332(C) ........................................................................................ 24

43 U.S.C. § 1701 ............................................................................................... 2

43 U.S.C. § 1701(a)(2) ...................................................................................... 2

43 U.S.C. § 1701(a)(8) ...................................................................................... 3

43 U.S.C. § 1712 ............................................................................................... 3

43 U.S.C. § 1732(a) ..................................................................................... 3, 16

**REGULATIONS**

40 C.F.R. § 1500.1(b) .................................................................................. 4, 34

40 C.F.R. § 1501.4(b) ....................................................................................... 3

40 C.F.R. § 1502.1 ............................................................................................ 3

40 C.F.R. § 1508.11 .......................................................................................... 3

40 C.F.R. § 1508.27 ..................................................................................... 4, 24

40 C.F.R. § 1508.27(a) .................................................................................... 24

40 C.F.R. § 1508.27(b) .................................................................................... 24

40 C.F.R. § 1508.27(b)(1) ............................................................................... 26

40 C.F.R. § 1508.27(b)(1)–(10) ........................................................................ 4

40 C.F.R. § 1508.27(b)(10) ............................................................................. 28

MEMORANDUM IN SUPPORT—vi

40 C.F.R. § 1508.27(b)(3)................................................................................... 29

40 C.F.R. § 1508.27(b)(4)................................................................................... 31

40 C.F.R. § 1508.27(b)(5)................................................................................... 30

40 C.F.R. § 1508.27(b)(7)................................................................................... 32

40 C.F.R. § 1508.27(b)(9)................................................................................... 25

40 C.F.R. § 1508.7 ........................................................................................ 4, 32

40 C.F.R. § 1508.8 ........................................................................................ 4, 32

40 C.F.R. § 1508.9 ............................................................................................... 3

43 C.F.R. § 1601.0-5(b) ..................................................................................... 16

43 C.F.R. § 1610.5-3(a) ........................................................................... 3, 16, 28

50 C.F.R. § 17.11 ................................................................................................. 5

50 C.F.R. § 17.11(h) ........................................................................................ 7, 8

50 C.F.R. § 17.12 ................................................................................................. 5

50 C.F.R. § 17.31(a).............................................................................................. 5

50 C.F.R. § 402.14(a)........................................................................................... 5

50 C.F.R. § 402.14(b) .......................................................................................... 5

50 C.F.R. § 402.14(h) .......................................................................................... 5

50 C.F.R. § 402.14(i)(1)(i).................................................................................... 6

## OTHER AUTHORITIES

55 Fed. Reg. 26,114 (June 26, 1990) ................................................................... 8

57 Fed. Reg. 45,328 (Oct. 1, 1992)...................................................................... 7

75 Fed. Reg. 3,424 (Jan. 21, 2010) ...................................................................... 7

85 Fed. Reg. 81,144 (Dec. 15, 2020) ..................................................... 8, 26, 35

### GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| BiOp | Biological Opinion |
| BWE | Big Weekly Elk |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| HLB | Harvest Land Base |
| LSR | Late-Successional Reserve |
| LUA | Land Use Allocation |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| Plaintiffs | Cascadia Wildlands and Oregon Wild |
| RMP | Resource Management Plan |
| RR | Riparian Reserve |

## INTRODUCTION

In 2016, the Bureau of Land Management ("BLM") adopted new Resource Management Plans ("RMPs") to govern the management of approximately 2.5 million acres of public lands the agency administers in Western Oregon. One RMP governs BLM lands in Southwestern Oregon, while the other governs BLM lands in Northwestern and Coastal Oregon. The adoption of the 2016 RMPs functionally removed Western Oregon BLM lands from the management scheme of the Northwest Forest Plan, which previously applied habitat protections across all federal lands in the range of the northern spotted owl ("NSO"), a species listed as "threatened" under the Endangered Species Act ("ESA").

BLM's 2016 RMPs aimed to drastically increase commercial logging from Northwest Forest Plan levels by targeting the new Harvest Land Base land use allocation for more regeneration logging (akin to clearcutting). But to secure U.S. Fish and Wildlife Service ("FWS") approval for its new RMPs, BLM increased the acreage of the Late-Successional Reserve land use allocation previously developed for the Northwest Forest Plan. Certain goals for LSR management remained the same: protect and recover complex, older forests in large, interconnected blocks for imperiled species that depend on such habitat, including the NSO and the marbled murrelet.

In the years since the adoption of the 2016 RMPs, BLM has aggressively authorized large commercial logging projects in Western Oregon, not just in HLB, but also in LSRs. Commercial logging is expressly *not* a management objective for LSRs, yet to generate as much timber volume as possible, BLM has been systematically testing limits to see where it can push the boundaries of acceptable conduct under the RMPs. These tactics range from ignoring issues that would force the agency to curtail desired logging to brazenly violating RMP restrictions.

MEMORANDUM IN SUPPORT—1

The Big Weekly Elk Project ("BWE Project" or "Project") in BLM's Coos Bay District is emblematic of the agency's gamesmanship in this regard. Not only did the agency dismiss from detailed consideration a long list of the public's environmental concerns about the Project, but BLM also deployed a novel and legally perverse interpretation of the relevant Northwestern and Coastal Oregon RMP's murrelet habitat protections. The agency authorized logging right through and directly up against stands inhabited by murrelets, in clear violation of the RMP's requirement to protect entire occupied stands and buffer them. BLM further failed to account for the cumulative effects of foreseeable and contemporaneous logging that will occur through the adjacent and overlapping District-wide LSR commercial thinning plan, as well as the previously authorized Catching and Upper Rock Creek projects, risking significant and compounding harms to ESA-listed species.

If allowed to proceed without proper NEPA analysis or adherence to mandatory RMP direction, the BWE Project will significantly and negatively affect the environment, including the NSO's long-term viability and the murrelet's reproductive success. BLM's blatant attempt to skirt its statutory obligations in order to expedite environmentally damaging logging must be struck down to prevent irreparable harm to our forests and imperiled wildlife.

## LEGAL FRAMEWORK

### I.    Federal Land Policy and Management Act

Congress enacted FLPMA to "provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579 (Oct. 21, 1976); *see* 43 U.S.C. § 1701 *et seq.* FLPMA ensures that the present and future use of public lands be "projected through a land use planning process[.]" 43 U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands "be managed in a manner that will protect the quality of scientific, scenic, historical,

MEMORANDUM IN SUPPORT—2

ecological, environmental, air and atmospheric, water resource, and archeological values[.]" 43 U.S.C. § 1701(a)(8). FLPMA requires BLM to develop resource management plans that govern the use of land the agency administers. *Id.* § 1712. Once an RMP has been developed, BLM must manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. *Id.* § 1732(a); 43 C.F.R. § 1610.5-3(a).

## II.       National Environmental Policy Act

NEPA requires federal agencies to carefully consider detailed information concerning the significant environmental impacts of proposed actions, and that relevant information be made available to the public so that it may play a role in both the decision-making process and decisions' implementation. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). To achieve these twin aims, NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure the agency takes the requisite "hard look" at the environmental consequences of the proposed action, and (2) foster meaningful public participation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–51 (1989).

NEPA requires federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). Commonly known as an Environmental Impact Statement or "EIS," the detailed statement must describe, *inter alia*, the adverse environmental impacts of the proposed action and alternatives to it. *Id.*; 40 C.F.R. §§ 1508.11, 1502.1. If an agency is uncertain whether a proposed action may have significant effects, it may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b). An EA is a more concise document that briefly describes the proposal, examines reasonable alternatives, and considers the potential significance of environmental impacts. *Id.* § 1508.9. If there is a substantial question "whether a project *may* have a significant effect on the

MEMORANDUM IN SUPPORT—3

environment," an agency must prepare an EIS. *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (emphasis added).

To determine whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. § 1508.27. In evaluating intensity, federal agencies must consider ten non-exhaustive factors, such as the degree to which the action may adversely affect a species listed under the ESA (or designated critical habitat), whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and whether the action threatens a violation of Federal, state, or local law or requirements imposed for the protection of the environment, among others. *Id.* § 1508.27(b)(1)–(10).

To support an agency's determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action. *Id.* §§ 1508.7–.8. The information must be of high quality and sufficient to allow the public to question the agency's rationale and understand the agency's decision-making process. *Id.* § 1500.1(b); *Robertson*, 490 U.S. at 349. An agency's Finding of No Significant Impacts ("FONSI") and decision not to prepare an EIS must be supported by a "convincing statement of reasons" that explains why impacts are insignificant. *Blackwood*, 161 F.3d at 1212 (citation omitted).

## III.   Endangered Species Act

Congress enacted the ESA, in part, to provide a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved," and "a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). To accomplish these purposes, the ESA directs FWS to determine whether terrestrial species are "endangered" or "threatened" based on habitat loss, overutilization, disease or predation, inadequate regulatory

MEMORANDUM IN SUPPORT—4

mechanisms, or other natural or manmade factors.16 U.S.C. § 1533(a)(1)(A)–(E); 50 C.F.R. § 402.01(b); 50 C.F.R. §§ 17.11, 17.12. Under the ESA, "endangered" means a species "is in danger of extinction throughout all or a significant portion of its range," while "threatened" means a species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6) & (20). If FWS determines a species is endangered or threatened, the agency must also "designate any habitat of such species which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A)(i). "Critical habitat" means "the specific areas … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i).

Once listed as "endangered," the ESA generally prohibits the "take" of such species. *Id.* § 1538(a). Among other things, "take" means to "harm" and "kill." *Id.* § 1532(19). FWS has extended the take prohibition to the threatened NSO and marbled murrelet. 50 C.F.R. § 17.31(a). The ESA also requires that every federal agency, in consultation with FWS for terrestrial species, "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existences of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat for such species. 16 U.S.C. § 1536(a)(2). "Formal consultation" between an action agency and FWS is required when a proposed action is likely to adversely affect a listed species or critical habitat. 50 C.F.R. § 402.14(a)–(b). After formal consultation, FWS must issue a biological opinion ("BiOp") explaining whether the proposed action is likely to result in jeopardy to the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). If FWS

MEMORANDUM IN SUPPORT—5

SER098

reaches a "no jeopardy" determination, it may exempt incidental take of a listed species in an Incidental Take Statement. 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(i)(1)(i).

## FACTUAL BACKGROUND

### I.      Marbled Murrelets

The marbled murrelet (*Brachyramphus marmoratus*) is a small seabird found along the Pacific Northwest Coast. AR7447. Murrelets spend most of their lives at sea but fly inland up to 50 miles during the spring and summer months to nest in mature and old-growth forests. AR7447; AR2260; AR14009. Murrelets do not build nests but lay their eggs on thick, flat branches—known as "platforms"—that are naturally covered with moss. AR7447; AR2260; AR19022. Murrelets have high nesting "site fidelity," often using the same forest stand and even the same tree year after year. AR14036; AR23866, 23883.

For successful reproduction, murrelets need large, unfragmented blocks of mature forest habitat with low amounts of "edge habitat." AR19022. Habitat fragmentation and increased "edges" created through logging and road construction negatively impact murrelet nesting and reproduction by exposing murrelets to greater predation and making their nests more vulnerable to weather events and windthrow. AR14120; AR19027. Canopy openings created by logging and roads also reduce moisture and increase temperature variability, which can result in a loss of moss cover at nest sites, indirectly eliminating platform function. AR14120. For these reasons, logging and other activities that occur adjacent to suitable murrelet nesting habitat can have serious and harmful implications for the species. AR14120. Buffers around suitable nesting habitat—whether occupied or not—help reduce fragmentation and associated risks and are particularly important to maintain "while larger blocks of habitat develop on reserved lands." AR14120.

MEMORANDUM IN SUPPORT—6

Much of the murrelet's older forest habitat in Oregon has been removed by logging and wildfire in the last century. *See* AR7476; AR14118. In 1992, FWS listed murrelets in Washington, Oregon, and California as "threatened" under the ESA due to the loss of older forests and associated nest sites, the "most significant factor in [murrelets'] decline." 57 Fed. Reg. 45,328, 45,330 (Oct. 1, 1992) (codified at 50 C.F.R. § 17.11(h)); *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1062 (9th Cir. 1996). In 2010, FWS reaffirmed that the murrelet "continues to be subject to a broad range of threats, such as nesting habitat loss, habitat fragmentation, and predation." 75 Fed. Reg. 3,424 (Jan. 21, 2010). In July of 2021, the Oregon Department of Fish and Wildlife reclassified the murrelet as "endangered" under the Oregon Endangered Species Act. *See* Marbled Murrelet, Oregon Department of Fish and Wildlife, available at http://tinyurl.com/3skr4yp5 (last visited Feb. 2, 2024).

## II.    Northern Spotted Owls

The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized owl that uses late-successional and old-growth forest habitat from Southern British Columbia to Northern California. AR18238, 18244, 18265. NSO rely on older, mature, and complex forest habitats to support their essential biological functions of nesting, roosting, foraging, and dispersal. AR18268–73. Combined, FWS considers nesting, roosting, and foraging ("NRF") habitat to be "suitable habitat" for the NSO. AR18346. Suitable habitat contains multi-layered and multi-species tree canopies, large overstory trees, moderate to high canopy closure, many trees with large cavities and other deformities, numerous large snags, an abundance of large, dead wood on the ground, and open space within and below the canopy for the birds to fly. AR18269–71. NSO also require dispersal habitat, which support individuals during both the "transience and colonization phase[.]" AR18361–62. Dispersal habitat may be "marginal or unsuitable," but

MEMORANDUM IN SUPPORT—7

FWS "expect[s] dispersal success is highest when dispersers move through forests that have the characteristics of" NRF habitat. AR18362.

Due to concerns over widespread habitat loss and modification, as well as the lack of regulatory mechanisms to protect the species, FWS listed NSO as "threatened" under the ESA in 1990. 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)). Commercial logging can remove or degrade NSO habitat. *See* AR2103–04. Through fragmentation of older forests, logging can also increase the competitive advantages of the barred owl, an invasive species in the NSO's range. *See* AR17813, 17841 (Figure 13). In 2020, FWS determined that reclassification of the NSO as "endangered" rather than merely "threatened" is warranted because the species "is now in danger of extinction throughout all of its range," highlighting the urgent need for immediate habitat retention. 85 Fed. Reg. 81,144, 81,145–46 (Dec. 15, 2020).

III.    **Northwestern and Coastal Oregon RMP**

The 2016 Northwestern and Coastal Oregon RMP provides overall direction for the management of approximately 1.3 million acres of BLM-administered lands, including the Coos Bay District and BWE Project area. AR10813. The 2016 RMP's purpose is to provide a sustained yield of timber, contribute to the conservation and recovery of ESA-listed species, provide clean water, and restore fire-adapted ecosystems. AR10812. The 2016 RMP divides BLM-administered land into five primary land use allocations ("LUAs"): Congressionally Reserved Lands and National Conservation Lands, District-Designated Reserves, Late-Successional Reserves ("LSRs"), Riparian Reserves ("RRs"), and Harvest Land Base ("HLB"). AR10827.

The RMP provides management objectives and direction for each LUA, as well as objectives and direction for resource programs, such as wildlife, that apply across all land

MEMORANDUM IN SUPPORT—8

allocations. AR10858, 10906. Management objectives are "[d]escriptions of desired outcomes for BLM-administered lands and resources in an RMP." AR10858. Such objectives are resource conditions that BLM envisions would eventually result from proper implementation of the plan. *Id.* "Management direction," meanwhile, "identifies where future actions may or may not be allowed and what restrictions or requirements may be placed on those future actions to achieve the objectives set for BLM-administered lands and resources." *Id.*

The 2016 RMP designated LSRs to protect and promote the development of mature forests, with a primary management objective to maintain nesting-roosting habitat for NSO and nesting habitat for murrelets. AR10875. In LSRs, the RMP directs BLM to "[p]rotect marbled murrelet occupied stands," including "adjacent stands." AR10876. Logging within such stands is generally prohibited by the RMP; only if "needed to protect the overall health of the stand or adjacent stands," and only "so long as the occupied stand continues to support marbled murrelet nesting," is logging permitted. *Id.* In HLB, meanwhile, RMP direction focuses on silviculture while recruiting snags and retaining large trees. AR10870–72.

The RMP also contains murrelet-specific direction to protect the species' habitat. AR10908–11. In all LUAs within 35 miles of the Pacific Ocean, and within reserve LUAs between 35 and 50 miles of the ocean, the RMP requires that "[b]efore modifying nesting habitat or removing nesting structure" for murrelets, BLM must "assess the analysis area for marbled murrelet nesting structure." AR10909. The RMP did not define "modifying nesting habitat," but FWS's BiOp for the RMP did: "Modify nesting habitat includes affecting adjacent stands that would modify the nesting structures['] wind firmness, microclimate and/or predation risks." AR12841. Accordingly, the analysis area includes a proposed project area and all land within 726 feet of the project boundary, thereby incorporating consideration of nesting structures within

MEMORANDUM IN SUPPORT—9

project boundaries and also those within several hundred feet that could also be affected by proposed habitat modification. AR10909.

"Before modifying forest stands in any 5-acre portion (using a 5-acre moving circle) of the analysis area that contains at least 6 trees with nesting structure," the RMP directs BLM to "implement Option 1, 2, or 3." AR10909. The diameter of a 5-acre circle is 526 feet, so this provision requires BLM to examine the edges of proposed logging units, and if potential murrelet nesting habitat is within several hundred feet, employ one of three outlined options if the agency proceeds with stand modification. *See id.*

Relevant here, Option 1 involves surveying for murrelets, and if occupancy is determined, no activities may be conducted within the occupied stand as well as within 300 feet of the occupied stand. AR10909. The RMP defines "occupied stand" as "all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy[.]" *Id.* In its BiOp, FWS stated that Option 1 "ensures that timber harvest will not remove occupied habitat." AR12843. Instead, "[i]f occupancy is detected a 125.66-acre circle of protection is applied," and "another 63.6 acres of buffer is applied based on an additional 300-foot buffer[.]" AR12843. As noted, these protections "apply for occupied stands (including stands with unknown occupancy status)" in all LUAs within 35 miles of the ocean and reserves up to 50 miles from the ocean. AR12841–42.

## IV.   Big Weekly Elk Project

BLM's Coos Bay District developed the BWE Project under the 2016 RMP. AR4802. The Project area lies within the Coquille River Watershed and includes 29,781 acres of BLM-administered land, which is interspersed with private lands, Bureau of Indian Affairs lands, and a small number of local government acres. AR4802; AR467. The entire Project area lies within 28

MEMORANDUM IN SUPPORT—10

miles of the ocean. AR2088. The Project authorizes logging on approximately 3,608 acres of BLM lands: 51% within LSRs, 36% within Riparian Reserves, and 20% within HLB. AR2035.

Plaintiffs timely submitted scoping comments on the BWE Project. *See* AR4631; AR4694; AR4696. On July 21, 2021, BLM issued a preliminary EA for the Project. AR1350. Plaintiffs submitted timely comments on the EA on August 27, 2021, expressing that the BWE Project's likely significant impacts on ESA-listed species, habitat, and other environmental aspects warranted a full EIS—including cumulative impacts from the District-wide LSR/RR plan—and flagging BLM's lack of site-specific analysis or disclosure of the Project's impacts and deviation from the 2016 RMP's provisions. *See* AR959.

BLM issued a final EA and FONSI for the BWE Project in October of 2021. AR464; AR432. In the final EA, BLM purported to fully analyze just two wildlife issues: how proposed treatments in reserves would affect NSO habitat, and how vegetation modification would affect known NSO nests in the project area. AR474. BLM did not analyze in detail the Project's impacts on murrelets or their habitat, and relegated other concerns raised by Plaintiffs in comments to cursory discussions buried in an appendix, including designated critical habitat, murrelet nesting habitat, murrelet occupied sites, and NSO use of HLB for habitat. AR539–83.

The final EA analyzed a "no action" alternative as well as two action alternatives that differed primarily in whether new road construction would be authorized. AR475–86. Under both action alternatives, BLM would authorize clearcutting and commercial thinning within HLB, including mature stands over the age of 80, and heavy commercial thinning within LSRs. AR484–85; AR479–81.

Logging in both HLB and LSRs will adversely affect NSO and their critical habitat. AR2129, 2131. The BWE Project will remove 61 acres of suitable habitat and another 255 acres

MEMORANDUM IN SUPPORT—11

of dispersal habitat within designated NSO critical habitat. AR2129. Overall, nearly 400 acres of high-quality spotted owl habitat would be removed or have reduced function as a result of the Project. AR2124. Suitable habitat in LSRs would become unavailable to NSO for decades, and the Project is "likely to negatively influence the long-term population viability of northern spotted owls in the action area[.]" AR2107, 2131.

The BWE Project will also adversely affect marbled murrelets and their critical habitat. AR2153. Clearcutting in HLB "is likely to increase [murrelet] susceptibility to predation and nest failure in adjacent stands that could be occupied in the future," and "may negatively influence reproductive success or population trends[.]" AR2147. The Project will remove 59 acres of critical habitat for the species, including 41 acres of nesting habitat. AR 2152–53. FWS expects the Project will result in the incidental take of eggs or young at up to four murrelet nest sites. AR2160. Because the BWE Project would authorize logging adjacent to over 200 acres of murrelet sites, BLM indicated to FWS it would implement Option 1 from the RMP or buffer adjacent nesting habitat. AR2147. But where occupancy is not determined in HLB stands, BLM will *not* buffer adjacent nesting habitat. AR2147.

MEMORANDUM IN SUPPORT—12



AR2365 (Project area map showing 0.25 mile murrelet buffers around all units).

Since issuing the final EA and FONSI, BLM has authorized several timber sales as part

of the BWE Project, including the Brownson Falls, Elk Creek Ridge, Jones and Elk, and Sugar

MEMORANDUM IN SUPPORT—13

Rush timber sales. AR67; AR318; AR53; AR399. All these sales include logging within 0.25 mile of occupied murrelet habitat. *See* AR2365 (Project area murrelet buffer map); AR70 (Brownson Falls units lie within 330 feet of occupied/suitable murrelet habitat); AR325 (Elk Creek Ridge map); AR60 (Jones and Elk map); AR405 (Sugar Rush map); AR38 ("The Sugar Rush Timber Sale (TS) will be harvesting up to the boundary of the NWFP occupied [murrelet] habitat.").

## STANDARD OF REVIEW

The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve claims brought pursuant to the Administrative Procedure Act ("APA"). *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Plaintiffs' FLPMA and NEPA claims are reviewed under the APA, 5 U.S.C. § 706(2). *Or. Natural Res. Council v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007). Under the APA, agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "adopted without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* 463 U.S. 29, 43 (1983). A court "must not 'rubber-stamp' administrative decisions." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016) (citation omitted). A court's review of an agency's decision is deferential but does not "shield" the agency from a "searching and careful," "thorough, probing, [and] in-depth review" to assess whether the decision was "based on a consideration of the

MEMORANDUM IN SUPPORT—14

relevant factors [or] whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).

## ARGUMENT

### I.  Plaintiffs Have Standing and This Case Is Ripe for Review.

As set forth in the declarations filed herewith, Plaintiffs are non-profit organizations whose members, supporters, and staff use and enjoy the public lands in BLM's Coos Bay District and whose interests are harmed by the approval of the BWE Project and associated timber sales but would be redressed by a favorable decision. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183 (2000) (citations omitted). The injury here is "imminent." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). BLM has actively planned and authorized timber sales implementing the Project, including the Brownson Falls, Elk Creek Ridge, Jones and Elk, and Sugar Rush timber sales. AR67; AR318; AR53; AR399.

Within the Project area, Plaintiffs' members use and enjoy the public lands for a variety of personal and professional recreational, scientific, and spiritual purposes and have firm plans to return. Doug Heiken is an employee and member of Oregon Wild, and a hiker and photographer who visits the public lands within BWE Project area. Heiken Decl. ¶¶ 1–2, 5–7. Heiken is concerned about the Project's impacts on wildlife habitat and scenery, and how such impacts will diminish his enjoyment on future visits. Heiken Decl. ¶¶ 15–20. David Barta is a member of Cascadia Wildlands who uses the BWE Project area for recreation and spiritual purposes. Barta Decl. ¶¶ 5, 10–11, 13. Barta is concerned about the Project's effects on old-growth forests and

MEMORANDUM IN SUPPORT—15

wildlife habitat, and the resulting negative impact on his interests and use of the area. Barta Decl. ¶¶ 9, 10, 13.

Because Plaintiffs' members' interests would be irreparably damaged by implementation of the BWE Project, Plaintiffs have standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (citation omitted) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Lujan*, 504 U.S. at 560–63 & 572–73 n.7.

## II.   BLM Violated FLPMA by Failing to Conform the BWE Project to the RMP.

BLM's approval of the BWE Project does not conform to RMP direction requiring the agency to buffer occupied murrelet habitat from logging activities by 300 feet. AR10909 ("If occupancy is determined, do not conduct activities within the occupied stand and all forest within 300 feet of the occupied stand."). This direction applies to all LUAs within 35 miles of the Pacific Ocean, *i.e.*, the entire BWE Project area. AR10909; AR2088. Under FLPMA, BLM must ensure that site-specific management actions are consistent with and conform to the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b), 1610.5-3(a); *Or. Natural Res. Council v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). This Project and any associated timber sales thus must comply with the RMP and its substantive direction. BLM's failure to designate and buffer occupied murrelet habitat according to RMP direction violates FLPMA.

### A.   The BWE Project Does Not Adhere to Mandatory RMP Direction, Risking Serious Harm to Murrelets.

BLM failed to abide by the RMP's safeguards for ESA-listed murrelets in the BWE Project area in blatant violation of FLPMA. An extensive network of documented, occupied murrelet forest stands occurs within the Project area. AR2141 ("a total of 55 sites known to

MEMORANDUM IN SUPPORT—16

occur prior to 2016 intersect the action area" and "40 occupied sites could be indirectly affected by thinning and/or directly affected by new road construction or heavy road renovation."). Four sites directly border proposed clearcutting units. AR2152.

Murrelets generally nest in mature and old-growth forests with large legacy trees hundreds of years old. AR2084. Approximately 40% of the federal land in the Project area has been previously clearcut, and those areas are intermixed with patches of mature and old-growth forests where murrelets nest. AR2034; AR2388 (map of murrelet habitat in Project area). BLM authorized logging throughout this nesting habitat; nearly every harvest unit is within an "analysis area" that contains suitable and occupied murrelet habitat with nesting structure. AR2365, 2388.

Under the RMP, this means the agency must apply protections for murrelets by employing one of three "Options." AR10909. For the BWE Project, BLM claimed to "implement Option 1 from the RMP [] for proposed regeneration and commercial thinning units," but is actually taking a completely different approach for areas already identified as occupied habitat. AR2147. For "[s]tands previously identified as occupied under the Northwest Forest Plan … BLM does not plan on buffering these stands when conducting timber harvest in the HLB or LSR." AR4495. Instead, "harvest activities will occur directly adjacent to stands that were designated as occupied prior to the 2016 RMP." AR2436; *see also* AR38 (Sugar Rush timber sale decision). This change in direction is inconsistent with the RMP for multiple reasons.

### 1.     BLM's Refusal to Adequately Buffer Occupied Murrelet Habitat Does Not Conform to the RMP.

BLM has openly refused to buffer occupied murrelet habitat in the BWE Project area, in violation of the RMP. When occupancy is known, the RMP says the agency must "not conduct activities within the occupied stand and all forest within 300 feet of the occupied stand."

MEMORANDUM IN SUPPORT—17

AR10909. An occupied stand consists of "all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy and not separated from the location of marbled murrelet behavior indicating occupancy by more than 328 feet of non-forest." AR10909.

> BLM stated clearly it will not adhere to this RMP direction. Specifically,

> The proposed action will ***not*** apply 300-foot buffers to occupied sites in HLB known to occur prior to 2016 (Assessment pp. 36 and 65). After discussions with the [FWS] pertaining to treatments in LSRs, the BLM agreed to apply 150-foot no harvest buffer from the occupied stand edge if the proposed harvest unit was greater than 70 years old. For harvest units 60 years or younger, the BLM will apply a 150-foot no harvest buffer round individual trees containing murrelet structure. Road construction, yarding corridors, tree tipping, and snag creation, however, may occur within these 150 foot buffers (Assessment p. 37).

AR2134 (emphasis added). In riparian areas, BLM will log directly adjacent to occupied habitat, but "within 300 feet of occupied or unsurveyed murrelet nesting structure" will retain a "minimum of 40 percent canopy cover[.]" AR2046. Road construction, yarding corridors, and other logging activity needed to facilitate authorized logging will occur within these buffers, and these activities will remove murrelet trees; in "seven cases, new road construction is proposed along the edge of a suitable murrelet stand." AR2393. In short, the agency will not buffer occupied habitat in HLB and riparian areas and will apply a **maximum** buffer of 150 feet in occupied habitat in LSRs, but this buffer could be reduced or eliminated based on a number of factors. AR2390. Road construction to facilitate this logging will occur directly within occupied habitat and remove potential nesting trees, as will yarding activities. AR2393; AR2040, 2141. Contrary to mandatory RMP direction, BLM has blatantly authorized logging well within required murrelet habitat buffers in violation of FLPMA. *See Brong*, 492 F.3d at 1125.

MEMORANDUM IN SUPPORT—18

### 2.    BLM Failed to Survey for Murrelets, in Violation of the RMP.

BLM purports to apply Option 1 for the BWE Project, which requires the agency to "[s]urvey for the marbled murrelet using a protocol with a defined methodology and a resultant probability of detection" if the agency proposes operations within several hundred feet of murrelet habitat. AR2147; AR10909. Again, BLM authorized logging directly adjacent to murrelet habitat and will build roads and yarding corridors that will remove nesting structure. AR2046; AR2393. Despite this, BLM will not conduct murrelet surveys for areas previously documented as occupied, which includes most of the Project area, preventing the detection of "newly discovered" sites. AR2383, 2390. Instead of surveying, BLM assumes that previously occupied areas continue to be occupied. AR2383 (map showing survey extent), 2390.[2] This approach is scientifically sound because of the species' nest site fidelity. *See* AR23866, 23883 ("Murrelets exhibit high nest site fidelity").

However, BLM is not providing required RMP protections for areas it assumes remain occupied: BLM is not properly designating entire stands as occupied and is not applying buffers around occupied stands in existing sites. Rather, BLM has made clear it will *only* designate and protect newly discovered sites. AR2390 ("if surveys result in occupancy, the BLM will designate the occupied murrelet site according to the RMP and modify the proposed action[.]"); AR4493 ("BLM's interpretation is that this direction only included 'newly' delineated occupied sites").

Thus, BLM is not conducting murrelet surveys for areas previously documented as occupied, which includes most of the Project area, preventing the detection of "newly discovered" sites. AR2383, 2390. BLM is then not providing these areas with RMP protections

---

[2] BLM elected to survey some isolated HLB stands that are up to 174 years old and contain old-growth legacy trees even older. *See* AR2355, 2383. These surveys unsurprisingly produced no results, because the murrelet is notoriously difficult to detect. AR2141; AR7468.

MEMORANDUM IN SUPPORT—19

because they are not "newly discovered." AR2390. This does not comport with the RMP's unambiguous direction to conduct surveys if operations will occur in or near murrelet habitat, which *will* occur here. AR10909; AR2046; AR2393. BLM's contrived approach runs counter to the RMP's plain language, in violation of FLPMA. *See Brong*, 492 F.3d at 1125 (citation omitted) ("agency's interpretation 'does not control, where … it is plainly inconsistent with the regulation at issue.'").

### 3.   BLM Failed to Designate Occupied Murrelet Habitat Properly.

If BLM opts to avoid surveying and simply assumes existing sites remain occupied, it must provide the full suite of protections for occupied murrelet habitat. *See* AR10909–10 (outlining Options 1, 2, and 3). This would first require properly designating "occupied stands." AR10909. Under the RMP, "occupied stands" include "all forest stands, regardless of age or structure, within 1/4 mile (1,320 feet) of the location of marbled murrelet behavior indicating occupancy." AR10909. This results in a 125.66-acre circle. AR11761.

Yet for the BWE Project, BLM only designated as occupied "polygons" that are merely a "portion of the stand." AR4494; AR2390 (BLM carved down previously designated occupied stands to eliminate areas it decided were not "older"); *see also* AR573 ("Treatment would only occur in that portion of the stand which does not contain murrelet habitat."). The result of BLM's polygon approach is that the entirety of an "occupied stand" is not recognized; protections are instead only applied to isolated, snaky fragments, contrary to murrelets' ecological needs and the RMP's direction and intention. AR2388; AR10909; AR14120; AR19022, 19027.

BLM's improper designation of occupied stands through the BWE Project will compromise murrelet nesting habitat and risk the species' local extirpation. AR4495–97 (FWS analysis of effects of logging in buffers). If BLM were to appropriately designate 1,320-foot

MEMORANDUM IN SUPPORT—20

circles around previously detected occupied sites, such circles would encompass the entirety of the proposed logging, underscoring the magnitude of BLM's deviation from RMP direction. AR2365. By failing to abide by RMP direction when delineating occupied stands, BLM has violated FLPMA. *See Brong*, 492 F.3d at 1125.

        **B.**        **BLM's Lacks Any Lawful Basis for Its Deviation from Mandatory RMP Direction.**

To justify its novel interpretation of the RMP's direction regarding murrelet buffers, BLM asserted to FWS in 2019 that the requirement to buffer occupied stands by 300 feet only "included 'newly' delineated occupied sites" because during the RMP revision process it modeled HLB logging up to the edge of occupied sites identified pre-2016. AR4493. In response, FWS formally recommended continued application of 300-foot murrelet buffers as outlined in the RMP, but ultimately concluded that BLM's changed approach would not result in jeopardy for murrelets. AR4494.

However, a "no jeopardy" conclusion from FWS, while required by the ESA, has no bearing on whether BLM has conformed the BWE Project to the RMP, as required by FLPMA. *See* 16 U.S.C. § 1536(a)(2); 43 U.S.C. § 1732(a). Further, modeling done by BLM to estimate anticipated timber volume is irrelevant to RMP compliance. AR10943 (RMP modeling "assumptions and estimations [were] solely for analytical purposes," and "do not represent management direction"). BLM previously asserted a similar argument in *Cascadia Wildlands v. Bureau of Land Mgmt* ("*Thurston I*"), which this Court appropriately rejected; *see generally* 410 F. Supp. 3d 1146 (D. Or. 2019).

Furthermore, FWS made clear that when reviewing the 2016 RMP, it "analyzed potential impacts to murrelets with the understanding that a 300-foot buffer would be protected [] adjacent to *all* occupied murrelet habitat, not just adjacent to newly occupied habitat[.]" AR4492.

MEMORANDUM IN SUPPORT—21

"Removing or modifying buffer habitat may adversely affect murrelets" through habitat fragmentation and edge effects, and protection of such buffers was key to FWS's "not likely to adversely affect" determination in the 2016 BiOp. AR4493, 4495.

BLM's new approach runs counter to both agencies' original understanding of RMP direction. When assessing the RMP in its 2016 BiOp, FWS said: "Modify nesting habitat includes affecting adjacent stands that would modify the nesting structures['] wind firmness, microclimate and/or predation risks." AR11759. The RMP itself is designed to protect occupied murrelet sites *and* "adjacent stands" so they "continue[] to support marbled murrelet nesting." AR10876. As such, it explicitly applies 726-foot project boundaries "in consideration of potential edge effects" from logging next to occupied murrelet stands. AR10909. The RMP never differentiates between existing and newly discovered murrelet sites. *See id.*

BLM never disputed the meaning of this RMP direction during the robust 2016 process, and accepted FWS's "no jeopardy" conclusion based on FWS's definition of "modify nesting habitat." *See* 11898–99 (2016 BiOp concluding "no jeopardy" to murrelets in part because RMP "will greatly minimize nest disturbance by applying protective measures …. to allow for undisrupted murrelet nesting."). Moreover, BLM's new interpretation of RMP murrelet direction has never undergone public review through NEPA. Because it is plainly inconsistent with the text of the RMP and definitions understood by both agencies at the time of the RMP's adoption, BLM's new interpretation is not entitled to deference from this Court. *See Brong*, 492 F.3d at 1125 (citation omitted) ("agency's interpretation 'does not control, where … it is plainly inconsistent with the regulation at issue.'"); *see also Thomas Jefferson Univ. v. Shahala*, 512 U.S. 504, 512 (1994) (citations omitted) (no deference due agency interpretation that contradicts regulation's plain language).

MEMORANDUM IN SUPPORT—22

Finally, BLM's attempt to ground its new approach in the RMP's text defies logic. BLM characterized its changed approach as a clarification of its intent for RMP direction regarding murrelets and said, "modifying nesting habitat" now only includes activities that "would remove nesting structure." AR4494. Yet the RMP expressly states that murrelet protections are triggered by "modifying nesting habitat *or* removing nesting structure." AR10909 (emphasis added). BLM's newly clarified intent would thus render the RMP's words "modifying nesting habitat" superfluous. *See Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022) (citations omitted) (courts should avoid statutory interpretations that render any language superfluous). Employing BLM's reading, so long as the agency did not authorize operations directly *within* occupied habitat, it would *never* have to buffer such habitat. AR10909; AR4494 ("requirement to 'assess analysis area for marbled murrelet nesting structure' is not triggered by actions outside of nesting habitat unless the action would remove nesting structure."). BLM's new interpretation would thus circumvent the RMP's murrelet habitat buffer direction and render it superfluous as well.

The BWE Project's impacts on murrelet habitat will be substantial if BLM proceeds without strict adherence to RMP direction: "approximately 681 acres of 38 previously occupied sites are within 150 feet of units proposed for commercial thinning," and "approximately 56 acres of un-surveyed suitable nesting habitat are within relevant buffer distances[.]" AR582. In addition, there are "approximately 57 acres of occupied habitat … within 300 [feet] of proposed regeneration harvest units, spread across three marbled murrelet occupied sites." AR582. This will ultimately impact 40 different murrelet nest sites. AR2141. Nearly half of the logging proposed within the BWE Project area is within areas the RMP directs BLM to buffer to protect nesting murrelets, and the entirety of the 3,608 acres of logging fall within a quarter mile of

MEMORANDUM IN SUPPORT—23

occupied murrelet habitat and should be designated as part of "occupied stands" according to the RMP. AR10909; AR2365 (map showing extent of logging within 0.25 mile buffer).

In short, the RMP requires the protection of occupied murrelet habitat. This includes surveying areas with potential habitat, protecting any "occupied stands," and applying a 300-foot buffer around occupied stands. AR10909. Here, however, BLM has attempted to privately renegotiate drastically reduced murrelet protections with FWS years after the RMP's finalization. AR2134. This is blatantly illegal, arbitrary and capricious, and violates FLPMA. Accordingly, the BWE Project EA, FONSI, and associated timber sale decisions must be set aside.

**III.    BLM Failed to Prepare an EIS for the BWE Project, in Violation of NEPA.**

Under NEPA, an agency must "to the fullest extent possible" prepare an EIS for every "major Federal action[] significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). The EIS requirement is the heart of NEPA. *Pub. Citizen*, 541 U.S. at 757. If an agency decides not to prepare an EIS, it must provide a "convincing statement of reasons" explaining why the proposed project's impacts are not significant. *Blackwood*, 161 F.3d at 1212.

Whether a proposed action "significantly affects" the environment requires consideration of both "context and intensity." 40 C.F.R. § 1508.27. "Context" refers to the geographic scope and scale of impacts. *Id.* § 1508.27(a). "Intensity" refers to "the severity of the impact." *Id.* § 1508.27(b). A plaintiff need not show that significant effects *will* occur, it need only raise "substantial questions" as to whether a project *may* have a significant effect on the environment. *See Greenpeace Action v. Franklin*, 982 F.2d 1342, 1351 (9th Cir. 1992). This is a relatively low standard. *See*, *e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). A single "intensity" factor alone may require preparation of an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citation omitted).

MEMORANDUM IN SUPPORT—24

Here, Plaintiffs have raised glaring, substantial questions regarding the impacts of the BWE Project and the adequacy of BLM's analysis. BLM dismissed multiple issues from detailed consideration, refused to collect key data to inform its analysis, and ignored clearly adverse effects on ESA-listed species and other "intensity" factors that each alone warranted preparation of an EIS for the Project, and most certainly do collectively. *See* AR539–83; *see also* AR433–37; *see also Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1283–84 (D. Or. 2013) (factors might not individually trigger the need for an EIS, but "when considered collectively, they do."). BLM utterly failed to provide a "convincing statement of reasons" that the Project's impacts will be insignificant. *See Blackwood*, 161 F.3d at 1212. BLM's decision not to prepare an EIS here was unreasonable, violated NEPA, and the BWE Project EA, FONSI, and associated timber sale decisions must be set aside.

### A. The BWE Project's Degree of Adverse Effects on ESA-Listed Species Requires Preparation of an EIS.

The degree to which an action may adversely affect ESA-listed species or their critical habitat can trigger the need to prepare an EIS. 40 C.F.R. § 1508.27(b)(9). The BWE Project will adversely affect NSO and marbled murrelets as well as their critical habitat. Yet BLM failed to properly analyze multiple aspects of the Project's impacts on these ESA-listed species and failed to demonstrate the Project's consistency with mandatory RMP direction regarding murrelet habitat. The severity of the BWE Project's impacts on ESA-listed species and critical habitat warrants preparation of an EIS.

### 1. Northern Spotted Owls

Substantial questions exist about the potential significance of the BWE Project's impacts on NSO. FWS's review of the Project concluded that effects on this species and its critical

MEMORANDUM IN SUPPORT—25

habitat will be adverse. AR2129, 2131. Nonetheless, BLM pointed to FWS's "no jeopardy" conclusion regarding NSO to support its contention that the BWE Project did not trigger this "intensity" factor. AR435; *see also* AR2132. However, this Court has already rejected this approach: "A project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect on the environment." *Cascadia Wildlands*, 937 F. Supp. 2d at 1282 (citing *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1080 (E.D. Cal. 2004)).

The NSO's population trajectory is already in a precarious state, with declines only accelerating. *See* 85 Fed. Reg. at 81,145–46. "Short-term" losses of habitat to logging—in this case, decades-long—compound the issues NSO already faces from barred owl competition and wildfire. *See id.* Yet BLM's FONSI ignored that the Project will remove or reduce the function of nearly 400 acres of high-quality NSO habitat, including 75 acres of NRF habitat and 142 acres of RF habitat, impacts FWS described as "likely not insignificant and discountable." AR2113, 2124. Significantly, heavy thinning slated to occur in LSRs—reserves meant to provide NSO habitat—may render them unavailable as such for decades. AR2107. BLM shrugged off this alarming impact as "temporary" and pointed to a purported increase in suitable habitat in 40 years. AR528. But "net long term benefits" do not "relieve the [agency] of its duty to conduct an EIS when the project will have significant environmental impacts." *Klamath-Siskiyou*, 373 F. Supp. 2d at 1086; 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.").

FWS ultimately determined that the BWE Project is "likely to negatively influence the long-term population viability of northern spotted owls in the action area[.]" AR2131. A determination that the Project will adversely affect NSO, as FWS reached here, "[is] 'at a

MEMORANDUM IN SUPPORT—26

minimum,' significant and support[s] the need for an EIS." *See Cascadia Wildlands*, 937 F.

Supp. 2d at 1283 (citing *Klamath-Siskiyou*, 373 F. Supp. 2d at 1081). The severity of the

Project's impacts on NSO and its critical habitat raises substantial significance questions

necessitating the preparation of an EIS. *See Or. Wild v. Bureau of Land Mgmt.*, No. 6:14-cv-110-

AA, 2015 WL 1190131, at *10 (D. Or. March 15, 2015) (when combined with other "intensity"

factors, logging project's degree of adverse effects on NSO required an EIS).

### 2.    Marbled Murrelets

Through commercial logging in LSRs—the reserve designation meant to conserve and

develop NSO and murrelet habitat—and logging adjacent to occupied stands, the BWE Project

will also adversely affect marbled murrelets and critical habitat. AR2153. According to FWS,

"40 occupied sites could be indirectly affected by thinning and/or directly affected by new road

construction or heavy road renovation," and four additional murrelet sites directly border

proposed regeneration harvest units. AR2141. The removal of 230 acres of currently unoccupied

murrelet habitat "may result in the incidental take of eggs or young associated with four marbled

murrelet sites in future years[.]" AR2152. The Project will also adversely affect designated

critical habitat through the removal of 59 acres, *exceeding* the 2016 RMP's projection for the

first decade of implementation. AR2152–53.

Despite all these adverse effects on marbled murrelets and habitat, BLM's FONSI is

completely silent regarding this species; BLM deemed these wildlife issues unworthy of detailed

analysis. *See* AR432–37; *see also* AR474 (issues analyzed in detail). Compounding this

analytical vacuum, BLM refused to complete murrelet surveys and opted not to adhere to buffer

requirements—both mandatory RMP directions—yet still authorized substantial removal and

degradation of murrelet habitat. *See supra*, Argument Part II. Although FWS reached a "no

MEMORANDUM IN SUPPORT—27

jeopardy" conclusion for the murrelet measured at the range-wide scale, the severity of the BWE Project's adverse site-specific effects on the species warrants the preparation of an EIS, especially when considered alongside the Project's adverse effects on NSO. Again, "[a] project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect on the environment." *See Cascadia Wildlands, 937 F. Supp. 2d at 1282* (citing *Klamath-Siskiyou, 373 F. Supp. 2d at 1080*); *see also id. at 1283* (adverse effect on ESA-listed species is "'at a minimum,' significant and support[s] the need for an EIS.").

**B.     The BWE Project Threatens to Violate FLPMA, Requiring an EIS.**

Another "intensity" factor that triggers the need for an EIS here is "[w]hether the action threatens a violation of federal, state, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). BLM contended that the BWE Project would not violate any laws imposed for the protection of the environment. AR436. As explained in detail *supra*, Argument Part II, the BWE Project authorizes habitat modification in murrelet-occupied stand buffers that does not conform to the RMP direction. Actions that do not conform to the relevant RMP violate FLPMA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); *see also Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 965 (9th Cir. 2005)* (project approval violates underlying substantive statute if agency fails to demonstrate plan compliance).

BLM included occupied stand protections in the RMP to protect the environment—*i.e.*, habitat for the imperiled murrelet. AR10909. BLM knows it has authorized a change from this direction but has not provided a rational basis to support its conclusion that the BWE Project nonetheless conforms to the RMP. *See* AR4493–94; *see also Friends of the Wild Swan v. Weber, 767 F.3d 936, 947 (9th Cir. 2014)* (citing *Native Ecosystems Council, 418 F.3d 961–62*) (court "must be able to 'reasonably discern from the record'" that agency complied with relevant plan).

MEMORANDUM IN SUPPORT—28

Overt deviation from the RMP's buffer requirements, regardless of its ultimate legality, most certainly suggests the potential for significant effects and precedential influence going forward. Regardless, Plaintiffs have articulated concrete violations of FLPMA, and even a threatened violation raises a substantial question under NEPA. *See Ctr. for Cmty. Action & Envtl. Justice v. Fed. Aviation Admin.*, 18 F.4th 592, 613 (9th Cir. 2021) (citation omitted). Accordingly, BLM must prepare an EIS.

### C.    Other "Intensity" Factors Further Support Preparation of an EIS.

While the degree of the BWE Project's adverse effects on ESA-listed species and its likelihood of violating FLPMA each warrant preparation of an EIS, several additional "intensity" factors also raise substantial questions regarding the Project's impacts. *See Cascadia Wildlands* 937 F. Supp. 2d at 1283–84 (factors might not individually trigger need for EIS, but "when considered collectively, they do.").

### 1.    The BWE Project May Significantly Impact "Ecologically Critical Areas."

Actions that impact "unique characteristics of the geographic area," including "ecologically critical areas," may also be significant. 40 C.F.R. § 1508.27(b)(3). Here, BLM contended that the BWE Project area contains no such characteristics, yet designated critical habitat for ESA-listed species and reserves constitute "ecologically critical areas." AR434; *see also Envtl. Protection Information Ctr. v. Blackwell*, No. S-04-cv-1027-WBS-GGH, 2005 WL 8176926, at *5 (E.D. Cal. May 5, 2005) (critical habitat is an "ecologically critical area"); *see also Cascadia Wildlands*, 937 F. Supp. 2d at 1283 (Riparian Reserves are "ecologically critical"). The BWE Project will remove 59 acres of designated murrelet critical habitat.

MEMORANDUM IN SUPPORT—29

**SER122**

AR2152–53. It will also remove 45 acres of roosting/foraging habitat and 253 acres of dispersal habitat within designated NSO critical habitat. AR566.

BLM dismissed these impacts from detailed review largely because they "do[] not address the purpose and need and [are] not associated with significant impacts beyond those analyzed in the [2016 EIS] to which this EA tiers." AR564. But whether impacts relate directly to a project's purpose and need or whether they go "beyond" an earlier programmatic analysis are not dispositive of significance, particularly when the earlier analysis did not consider site-specific conditions. See *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) ("action is arbitrary and capricious if the agency fails to consider an important aspect of the problem[.]"); *see also Thurston I*, 410 F. Supp. 3d at 1158 (holding that 2016 EIS "did not analyze site-specific geographic conditions or effects.").

Regardless, the rate of murrelet critical habitat removal caused by the BWE Project would *exceed* the RMP's projection, and commercial thinning in LSRs would render them unavailable as NSO habitat for decades. AR2107, 2152. These impacts—which BLM avoided considering in detail—support the need for preparation of a thorough and searching EIS for the BWE Project. See *Blackwell*, 2005 WL 8176926, at *5 (logging "within NSO critical habitat raises substantial questions about the project's environmental effects.").

**2.    The BWE Project's Effects Are Highly Uncertain and Controversial.**

"Highly uncertain" effects warrant preparation of an EIS "where the collection of [] data may prevent 'speculation on potential … effects.'" 40 C.F.R. § 1508.27(b)(5); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (citations omitted). In comments on the BWE Project, Plaintiffs highlighted uncertainty regarding competitive interactions between barred owls and NSO after logging, and uncertainty regarding undetected

MEMORANDUM IN SUPPORT—30

spotted owls. AR964, 966, 968. FWS's BiOp for the Project reiterated these concerns. AR2060, 2113, 2124. Still, BLM asserted that impacts "are not highly uncertain and do not involve unique or unknown risk" because the type of logging proposed is commonly practiced on BLM lands. AR435. But this rationale completely ignores the site-specific impacts of the Project on species and habitat within *these* lands.

The degree to which an action's impacts "are likely to be highly controversial" can also suggest potential significance. 40 C.F.R. § 1508.27(b)(4). An agency bears "the burden of showing there [is] no legitimate controversy." *Or. Wild*, 2015 WL 1190131, at *8 (citation omitted). A "substantial dispute" about a project's "size, nature, or effect" indicates an action is "highly controversial" and "casts serious doubt upon the reasonableness of an agency's conclusions." *See Native Ecosystems Council*, 428 F.3d at 1240 (citation omitted); *see also In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1069 (9th Cir. 2014) (citation omitted). When an agency "did not engage with [] considerable scientific and expert opinion," but merely "drew general conclusions," a substantial dispute may be shown. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020).

BLM stated that the BWE Project's effects "are not highly controversial" because the agency has been operating under the 2016 RMP for several years and has conducted similar types of logging for decades. AR435. Yet Plaintiffs raised concerns that BLM's assertion that LSR thinning will speed habitat development is controversial. AR974. In particular, the Project authorizes "gaps" (openings akin to clearcuts) up to 4 acres and up to 25% of a stand within LSRs that "are not ecologically justified and are akin to treating the reserves like the HLB." *Id.* Plaintiffs submitted an expert's opinion that quarter-acre openings in stands "are larger than needed to improve small mammal populations (forage species for northern spotted owls) and are

MEMORANDUM IN SUPPORT—31

larger than normal processes would typically create in the course of naturally developing late-successional forest." AR1081–82.

Here, BLM did not engage with the contrary scientific evidence presented by Plaintiffs in the Final EA or FONSI for the BWE Project. Instead, BLM pointed to two "new project design features in the EA … that would help with LSR restoration objectives." AR446. But the new features still allow the same size and percentage of gaps in stands and do not address the underlying concern that such gaps will inhibit rather than speed suitable habitat development. AR613.

In sum, BLM could have resolved uncertainty regarding the BWE Project's effects by preparing a thorough EIS, but it instead improperly relied on a cursory EA and FONSI. Furthermore, BLM has not satisfied its burden to show there is no legitimate controversy regarding the Project's effects. The evidence submitted by Plaintiffs and ignored by BLM casts doubt on the reasonableness of the agency's conclusion, and a substantial dispute exists regarding the Project's potentially significant impacts, indicating a need to prepare an EIS. *See Bark*, 958 F.3d at 871; *see also Cascadia Wildlands*, 937 F. Supp. 2d at 1284 (uncertainty about effect of NSO habitat impacts and dispute about efficacy of thinning to achieve reserve objectives contributed to need for EIS).

### 3.   BLM Failed to Consider the BWE Project's Cumulative Impacts on NSO Together with Other Projects' Impacts.

In determining whether a project will have a "significant" impact, agencies must consider direct, indirect, and *cumulative* impacts. 40 C.F.R. §§ 1508.8, 1508.27(b)(7). Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. A cumulative impacts analysis must evaluate "the incremental impact of the action when added to other past, present, and reasonably foreseeable

MEMORANDUM IN SUPPORT—32

future actions[.]" 40 C.F.R. § 1508.7. An agency's "failure to engage with [] other projects identified by [commenters] leaves open the possibility that several small forest management actions will together result in a loss of suitable owl habitat," raising "substantial questions about whether the action will have a cumulatively significant environmental impact." *Bark*, 958 F.3d at 873.

Here, BLM asserted there are "no other actions related to the action alternatives with individually insignificant but cumulatively significant impacts." AR435. However, BLM completely ignored the potential for cumulative impacts *on NSO* from the earlier Catching and Upper Rock Creek projects and the recently authorized District-wide LSR/RR plan, all of which Plaintiffs raised in their comments. *See* AR490, 494–95, 559 (no discussion of cumulative impacts on NSO); *see also* AR965, 974. FWS determined that, on its *own*, the BWE Project's impacts on NSO are "likely not insignificant and discountable" and would negatively affect NSO viability in the area. AR2113, 2131. Combined with the unexamined cumulative impacts of other projects identified by Plaintiffs, substantial questions exist about whether the BWE Project may significantly affect NSO and their habitat, requiring greater study in an EIS.

**IV.    BLM Violated NEPA by Failing to Take a Hard Look at the BWE Project's Direct, Indirect, and Cumulative Impacts.**

Even if BLM were not required to prepare an EIS, which it is (*see supra* Argument Part III), its NEPA analysis nonetheless fails the requisite "hard look" test. *See Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (citations omitted) ("hard look" mandate requires "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of an action). BLM declined to analyze in detail the BWE Project's effects on murrelets and multiple aspects of NSO habitat. *See* AR564–67, 570, 572, 576–78, 580. This deprived both the public and the agency of the opportunity to provide

MEMORANDUM IN SUPPORT—33

thoughtful consideration and input on the Project, thwarting NEPA's twin goals of informed decision-making and meaningful public participation. *See* 40 C.F.R. § 1500.1(b) (environmental information must be made "available to public officials and citizens *before* decisions are made and *before* actions are taken.") (emphasis added).

To justify its refusal to examine many environmental consequences in detail, BLM repeated that numerous issues were "not relevant to the Purpose and Need" for the BWE Project, "nor is analysis of the issue[s] necessary to determine the significance of impacts because impacts are of the same kind and magnitude of those already disclosed in the [2016 RMPs'] FEIS." *See*, *e.g.*, AR572. These rationales do not pass legal muster. This Court previously rejected BLM attempts to avoid analysis within a project EA by tiering to the 2016 RMP EIS where neither the EIS nor the EA "analyze[d] site-specific geographic conditions or effects on the immediate area[.]" *Thurston I*, 410 F. Supp. 3d at 1158; *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, No. 1:19-cv-1069-CL, 2021 WL 400137, at *5 (D. Or. Jan. 21, 2021) (2016 EIS "fails to contain a site-specific Project area analysis of effects on great gray owls," rendering BLM's attempt to tier to that document unlawful under NEPA).

BLM apparently has not learned from these previous litigation outcomes, and again attempts to avoid required analysis through improper tiering. By choosing not to take a "hard look" at critical resource values, RMP direction, and potentially significant impacts, BLM arbitrarily and capriciously ignored important aspects of the problem before it. *Lands Council, 395 F.3d at 1026* ("[a]n agency's action is arbitrary and capricious if the agency fails to consider an important aspect of the problem"). In so doing, BLM violated NEPA, and its BWE Project EA and FONSI and associated timber sale decisions must be set aside.

MEMORANDUM IN SUPPORT—34

A.    **BLM Failed to Take a Hard Look at Impacts to Imperiled Species and Habitat.**

1.    **Northern Spotted Owls**

BLM examined just two wildlife issues in detail in the BWE Project EA. AR474, 523–37 (analysis of logging impacts on NSO habitat in reserves and nests). BLM eliminated from detailed analysis impacts on NSO critical habitat, competition between barred owls and NSO, and use of HLB by NSO for suitable habitat. AR564, 577, 578. Yet by siloing effects to the species in this way, BLM deprived the public—and itself—of a "full and fair" look at the impacts of the BWE Project as a whole on NSO. *See 350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (citation omitted) ("Federal agencies must undertake a 'full and fair' analysis of the environmental impacts of their activities[.]").

This becomes evident by comparing the BLM's EA and FWS's BiOp for the Project. FWS warned that logging in LSRs could render them unavailable to NSO as habitat for decades. AR2107. BLM brushed this off as merely "temporarily reduc[ing] the function" of currently suitable LSR habitat. AR525. Yet it is in the near to mid-term when NSO most need retention of suitable habitat to coexist with barred owls and survive in the face of accelerating population declines. *See* 85 Fed. Reg. at 81,145–46. FWS further cautioned that the BWE Project's effects on NSO are "likely *not insignificant* and discountable" and are "likely to negatively influence the long-term population viability of [NSO] in the action area[.]" AR2113, 2131 (emphasis added). The EA, meanwhile, is silent on this serious *long-term* effect on NSO viability. BLM failed to take a holistic and hard look at impacts on NSO, in violation of NEPA.

2.    **Marbled Murrelets**

As discussed *supra*, Argument Parts II and III.A.2, the BWE Project will affect marbled murrelets in myriad ways, including through the removal of 229 acres of habitat (including 59

MEMORANDUM IN SUPPORT—35

acres of designated *critical* habitat), negative impacts to 40 occupied sites, and the incidental

take of eggs or young at up to four sites. AR576; AR2141, 2152–53. Yet despite adversely

affecting the species in multiple ways, BLM conspicuously eliminated all concerns regarding

murrelets from detailed analysis. *See* AR564, 570, 576, 580–81. In each instance, BLM

contended that because expected effects are within the scope of those already disclosed in the

2016 RMP EIS, it need not consider the Project's impacts on murrelets any further. *See id.*

Yet here, effects go beyond the those considered in the 2016 RMP EIS. For one, the

amount of critical habitat removal *exceeds* the projected amount during the RMP's first decade

of implementation. AR2153. Furthermore, BLM is deploying a novel and harmful

reinterpretation of the protective buffer requirements described in the 2016 RMP EIS—the

effects of which were not previously considered under NEPA. *See* AR580–81; AR4492–94; *see*

*also S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726

(9th Cir. 2009) (citation omitted) (non-NEPA document "cannot satisfy a federal agency's

obligations under NEPA."). BLM failed to take the required hard look at the BWE Project's

impacts on marbled murrelets, in violation of NEPA.

**B.      BLM Failed to Take a Hard Look at Cumulative Impacts on NSO.**

As explained *supra*, Argument Part III.C.3, BLM failed to consider the cumulative

impacts of the BWE Project on NSO along with other projects identified in Plaintiffs' comments:

the Catching and Upper Rock Creek projects and the District-wide LSR/RR plan. AR965, 974;

*see also* AR1748 (map of Catching Project); AR4980 (map of Upper Rock Creek Project);

AR113 (map of LSR/RR plan area). An agency must consider the impacts of nearby timber sales

to properly evaluate cumulative impacts. *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062,

MEMORANDUM IN SUPPORT—36

1076 (9th Cir. 2002) (faulting BLM for failing to analyze cumulative impacts of other timber sales within Coos Bay District).

Furthermore, a "cumulative impacts analysis must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council, 395 F.3d at 1023*. "[S]ome quantified or detailed information is required" because "[w]ithout such information, neither the courts nor the public … can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998).

Here, BLM's "cumulative impact analysis is insufficient because there is no meaningful analysis of any of the identified projects." *See Bark*, 958 F.3d at 873. Plaintiffs raised concerns about identified projects in their comments, and the agency failed to meaningfully address them. AR965, 974. BLM disclosed no quantified or detailed information regarding these projects as they relate to NSO. *See* AR 490, 494–95, 559. A plaintiff need not show that cumulative impacts will occur, it "must show only the potential for cumulative impact" to demonstrate "that an agency should have analyzed the cumulative impacts of a proposed project along with other projects[.]" *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 605 (9th Cir. 2010) (burden on plaintiff "is not an onerous one."). Plaintiffs have met their burden: Potentially cumulative impacts exist here because the identified projects will each affect NSO, and in combination could significantly undercut the species' viability. Because cumulative impacts on NSO went unanalyzed, BLM failed to take the hard look required by NEPA.

MEMORANDUM IN SUPPORT—37

**RELIEF**

Vacatur is the presumptive remedy under the APA for violations of FLPMA and NEPA. *See* 5 U.S.C. § 706(2) (providing that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). It is the agency's burden to demonstrate that vacatur should not result. *Cal. Cmtys. Against Toxics v. U.S. Envtl. Protection Agency*, 688 F.3d 989, 992 (9th Cir. 2012). Because BLM's errors here were "serious," and because there would be no severe disruptive consequences of vacatur, this Court should apply the presumptive remedy. *See id.* at 994 ("[W]e have only ordered remand without vacatur in limited circumstances.").

**CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully asks this Court to grant their Motion for Summary Judgment, hold unlawful and set aside BLM's EA, FONSI, and associated timber sale decisions issued as part of the BWE Project, and remand to the agency to comply with FLPMA and NEPA.

Respectfully submitted this 2nd day of February, 2024.

*/s/ John S. Persell*
John S. Persell, OSB # 084400
Oregon Wild
5825 N Greeley Ave
Portland, OR 97217
(503) 896-6472
jp@oregonwild.org

MEMORANDUM IN SUPPORT—38

/s/ Nicholas S. Cady
Nicholas S. Cady, OSB # 113463
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
(541) 434-1463
nick@cascwild.org

*Attorneys for Plaintiffs*

MEMORANDUM IN SUPPORT—39

**SER132**

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,998 words, including headings, footnotes, and quotations, but excluding the caption, motion, table of contents, table of authorities, glossary of terms, signature block, and this certificate.

/s/ John S. Persell
John S. Persell

*Attorney for Plaintiffs*

**Wildlife Staff Report**
**Julie Harper, Wildlife Biologist**
**Coos Bay BLM**
**Umpqua Field Office**
**8 January 2024**

**BLM Office:** Coos Bay District, Myrtlewood Field Office

**Tracking No.:** DOI-BLM-ORWA-C040-2024-0002-DNA

**Proposed Action Title/Type:** The BLM Myrtlewood Field Office is proposing to add approximately 0.29 miles of newly constructed roads for the New Yankee Timber Sale (TS). The additional roads consist of 0.13 miles of new road construction within the New Yankee TS unit boundary, 0.04 miles of new road construction in Harvest Land Base (HLB) outside of the timber sale boundary and 0.12 miles of natural surface temporary equipment road to be constructed in the RR. All 0.29 miles of newly constructed roads are planned to be naturally surfaced roads with the possibility that the portion of road within the unit boundary and outside of the RR (0.12 miles) could be rocked for all season haul. All newly constructed roads will be decommissioned after the completion of logging operations.

<u>**NEPA Adequacy Criteria**</u>

**3. Is the existing analysis valid in light of any new information or circumstances (such as, rangeland health standard assessment, recent endangered species listings, updated lists of BLM-sensitive species)? Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?**

Since the BLM published the FONSI, the USFWS published a final revised ruling for spotted owl critical habitat (86 Federal Register 62606-62666). The proposed new roads do not overlap with spotted owl critical habitat. Therefore, the effects as evaluated in the EA would not change with the addition of these roads. The BLM identified that the BWE project area does not overlap the current four extant populations as described in the EA or the proposed critical habitat units (EA pp 72, 106,114-115, 151).

**4. Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?**

The proposed new roads are either within the existing HLB timber sale boundary or through a young (40-year-old) HLB stand (Figure 1). They are not within an owl home range or murrelet suitable or occupied habitat. Figure 2 show the proposed new road construction overlaid with spotted owl and marbled murrelet habitat. The timber sale units were surveyed for marbled murrelets in 2019 and 2020 and the ongoing spotted owl surveys (6-visits 2020, 2021, 2023 and 3-visits 2022) cover the proposed new roads. There have not been any detections of spotted owls or murrelets. The direct, indirect, and cumulative effects of the proposed action is similar to and

1

AR 00023

consistent with those identified and analyzed in the existing BWE EA.

On July 20, 2020, the Level 1 team finalized an agreement regarding when additional consultation would be required for the BLM to add acres (South Coast Level One Team 2020). The 0.04 miles of road outside the HLB timber sale boundary would add a small number of additional acres. In that Memo, we agreed that additional consultation would be required if the modified action:

1. Is proposed within occupied murrelet habitat (presumed or determined by surveys) or within 300 feet of occupied habitat;
2. Increases the total affected nesting, roosting, foraging (NRF / RF) habitat within northern spotted owl cores-use areas (0.5 mile radius) or provincial (1.3 or 1.5 mile radius) home ranges;
3. Affects spotted owl nest patches or other areas of notes modeled as high landscape value (MaxEnt Relative Habitat Suitability (RHS), Glenn et al. 2018) not included in the previous analysis;
4. Increases total acres of NRF/RF, or murrelet suitable habitat removed project-wide
5. Survey results (subsequent to the consultation) and adjustments potentially change conclusions in original analysis.

Since none of those criteria are met, additional consultation with USFWS is not required. On 11/6/2023, a memo the file including an email from USFWS to BLM concurring that no additional consultation is needed for wildlife was added to the project file.

2

AR 00024

**SER135**



Figure 1: Proposed New Yankee additional roads and LiDAR imagery. The roads are either within the timber sale or through a young (40-year-old) stand.

3

AR 00025



Figure 2: Spotted owl RF habitat and suitable murrelet habitat in the proposed project area.

4

AR 00026

**Literature cited:**

South Coast Level One Team. 2020. Process for documenting project modifications after consultation is complete. North Bend, OR.

5

AR 00027

**LSR and RR Acres Analyzed in the BWE EA and Acres in BWE Timber Sales**

| | ** EA Acres | | Timber Sale Acres | | |
|---|---|---|---|---|---|
| | LSR | RR | LSR | RR | Total |
| **Brownson Falls CT** | 536 | 106 | 343 | 60 | 403 |
| **Elk Cr Ridge CT** | 183 | 76 | 140 | 39 | 179 |
| **Jones and Elk CT** | 562 | 60 | 350 | 43 | 393 |
| **\* Lower Frenchie** | 31 | 0 | 28 | 0 | 28 |
| **\* South Elk 23** | 119 | 57 | 57 | 57 | 114 |
| **Total** | **1,431** | **299** | **918** | **199** | **1,117** |

\* These sales have not been laid out yet.
\*\* Acres are Alt 3 prescription 1 and 2 (CT)

AR 00034

**SER139**

**BWE GIS Sliver Discussion - Matt Wells and Carol Aron 11/21/23**

**NSO NRF**

Follow-up from our discussion this morning. There are many slivers where the GIS shows overlap with NRF/RF. All but three of these are far less than 0.01 acre and can be discounted.

We evaluated the three remaining in GIS.

1. The smallest in on the edge of Bear & Elk CT (blue highlighted). This appears to be a mapping error. Furthermore, the area in the sliver is young forest that appears to have been drawn to connect NRF habitat to the North and South. This area is not actually NRF habitat. Therefore, this is a GIS mapping error and does not represent actual impacts to NRF habitat from the proposed project.



AR 00035

2.  The second is in Anderson Brown.  It is 0.049 acres that also appears to be a GIS mapping error that overlaps an area delineated in GIS as NRF/RF that is clearly a younger stand.



0.049 acre sliver overlapping delineated NRF

AR 00036

3. The third is Upper Elk Creek CT, which shows 1 acre of overlap with NRF/RF. Matt and I determined this is an artefact of the way we do layout where the trees on the opposite side of the road are marked so the entire unit up to the road is included in the harvest area. None of the area to the north of the road shown as in NRF/RF would actually be harvested. The sliver to the south of the unit is just a GIS sliver and not representative of the unit on the ground.



**Map Title**

**MAMU CHU**

All of the units that overlapped MAMU CHU have been dropped.

AR 00037

**SER142**

*Question 1: Fix HLB color maps to overlay suitable MAMU habitat within the occupied sites for Map Suites 1 and 2.*

**Map Suite 1:** Show 33 acres of Harvest Land Base (HLB) within 300 feet of NWFP Occupied Marbled Murrelet (MAMU) Habitat. The Sugar Rush Timber Sale (TS) will be harvesting up to the boundary of the NWFP occupied MAMU habitat.



Below Left is a lidar image called Big Trees depicts changes in tree height. Purple top trees are an indicator of the most likely MAMU structure trees and image on the right is the most current ortho photo from 2022.



AR 00038

**SER143**

**Map Suite 2**:  Shows a 300-foot buffer on a newly delineated Occupied Marbled Murrelet Site (2016 RMP Occupied).  Approximately 13 acres of HLB is being set aside to buffer the new site.



Below Left is a lidar image called Big Trees depicts changes in tree height.  Purple top trees are an indicator of the most likely MAMU structure trees and image on the right is the most current ortho photo from 2022.



AR 00039

*Question 2: Provide a similar representative map for LSR thinning adjacent to NWFP-era and a newly discovered MAMU site—it's the same, then one map is probably fine, just note somewhere in the labeling that it is representative for both types of occupied sites.*

**Map Suite 3:**  Shows the 150-foot buffer for NWFP-era Occupied Marbled Murrelet Site adjacent a Late Successional Reserve (LSR) unit.  This buffer distance and placement is also representative for newly delineated MAMU occupied sites (Post-2016 RMP).



Below Left is a lidar image called Big Trees depicts changes in tree height.  Purple top trees are an indicator of the most likely MAMU structure trees and image on the right is the most current ortho photo from 2022.



AR 00040

**SER145**

*Question 3:* *A table showing sales with LSR thinning units, and how much acreage is potentially at stake if a 300-foot buffer were required adjacent to occupied sites (whether NWFP-era or new sites).*

Table 1: Big Weekly Elk LSR units with a 300-foot buffer on NWFP murrelet occupied sites. **With a 300 ft buffer applied, there would be 318 fewer acres available for treatment.**

| Unit Name | LSR Unit Acres as Currently Planned* | LSR Unit Acres with 300 ft buffer |
|---|---|---|
| Brownson Falls CT | 403 | 287 |
| Elk Cr. Ridge CT | 179 | 133 |
| Jones and Elk CT | 393 | 262 |
| Lower Frenchie | 28 | 28 |
| South Elk 23 CT | 114 | 89 |
| **Total** | **1,117** | **799** |

* As described in the EA (p. 147) the BLM applied a 150-foot buffer "unless the biologist reviews the buffer and determines that the proposed treated and occupied or unsuitable surveyed habitat do not interact, for instance due to topography or canopy height (EA p. 147).

The BLM modelled how these stands would develop in 40 years with and without treatment (BA pp. 53-55) and concluded "Without treatment, stand growth would remain stagnant as stands would be left in overly dense conditions, and because trees growing in dense conditions grow in height, but very little in diameter, stand stability will decline (Oliver and Larson 1996b, Tappeiner et al. 2007). As a result of the limited resources for tree growth in the stands, diameter growth will lag behind height growth (O'Hara 2014), and the risk for windthrow will increase over time as height to diameter ratios continue to increase and crown ratios decrease. In dense stands, large trees are unlikely to persist or develop and a stagnant stand is unlikely to develop large diameter snags or down wood. Forest floors would continue accumulating fuel as trees continue to self-prune. Current densities threaten the persistence of minor species composition both directly by fire risk and indirectly by the effects of competition mortality (BA p. 53)." With treatment, stands would develop with reduced stand density resulting in larger diameter trees and increased tree diversity (BA p. 54). While short term windthrow risk would increase, this may "be desirable for wildlife habitat and stand complexity," and the treatments would be designed to remove trees that are most suspectable "such as those with low vigor, poor crown ratios and those with high height:diameter ratios (BA p. 54)."

AR 00041

| Timber Sale Name (FY) | Sale Area | EA | | | LUA HLB | Timber Sale Acres | T&E Surveys Clearance | BLM Actions | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | Unit | Age | Acres | | | | | |
| Sugar Rush TS (2022) | Sugar Rush | 102 | 60 | 79 | MITA | 74 | Yes/No | RMP Regen | Entire area has NSO survey clearance. Partial MaMu survey clearance and where MaMu surveys were not done all MaMu Structure trees were buffered by 300 feet, |
| | | 102 | 70 | 34 | MITA | 20 | Yes/No | RMP Regen | Entire area has NSO survey clearance. Partial MaMu survey clearance and where MaMu surveys were not done all MaMu Structure trees were buffered by 300 feet, |
| | | 102 | 130 | 2 | MITA | 0.04 | Yes/No | RMP Regen | Entire area has NSO survey clearance. Partial MaMu survey clearance and where MaMu surveys were not done all MaMu Structure trees were buffered by 300 feet, |
| New Yankee TS (2024) | New Yankee | 100 | 50 | 23 | MITA | 20 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch/1850 trees will be reserved |
| | | 100 | 80 | 6 | MITA | 1 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch/1850 trees will be reserved |
| | | 100 | 90 | 43 | MITA | 35 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch/1850 trees will be reserved |
| | | 111 | 240 | 20 | MITA | N/A | Yes | * Deferred | Unit was deferred because after BLM marked all the 40-in/1850 trees within the unit as BA retention, the unit would exceed the RMP BA retention maximum for MITA.** |
| King Salmon TS (2026) | King Salmon | 108 | 60 | 18 | MITA | 17 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch and 1850 trees will be reserved. |
| | | 108 | 170 | 13 | MITA | 16 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch and 1850 trees will be reserved. The increase in acreage is from RR inception point verification. Three acres in the RR LUA went to the HLB LUA. |
| | | 109 | 130 | 24 | MITA | 21 | Yes | RMP Regen | Layout Phase, will be regened and all 40 inch and 1850 trees will be reserved. |
| | | 110 | 140 | 9 | MITA | N/A | Yes | * Deferred | After Stream inception points were field verified there were not enough acres left in the HLB to have an economically viable unit. Deferred for economic feasibility. |
| ** Frenchie Belieus TS (2025) | The Belieus | 103 | 160 | 40 | MITA | N/A | Yes | * Deferred | due to number of 40"/1850 trees.** |
| | | 104 | 85 | 70 | MITA | 26 | Yes | RMP Regen | Layout Phase, will be regened and all 40-in/1850 trees will be reserved, Acres Deferred are 43-ac went to new MaMu Occ. Site and 2-ac went to 300ft Buffer, |
| | Lower Frenchie | 105 | 60 | 183 | LITA | 130 | In Progress | RMP Regen | Planning Stage - BLM is starting the Layout Phase, timber sale units and boundaries being established (No decision has been made, and units boundaries and acreages are subject to change) |
| | | 105 | 130 | 10 | LITA | 12 | In Progress | RMP Regen | Planning Stage - BLM is starting the Layout Phase, timber sale units and boundaries being established (No decision has been made, and units boundaries and acreages are subject to change) |
| South Elk 23 TS (2026) | South Elk 23 | 101 | 50 | 34 | MITA | 26 | In Progress | RMP Regen | Planning Stage - BLM is starting the Layout Phase, timber sale units and boundaries being established (No decision has been made, and units boundaries and acreages are subject to change) |
| NA | Rock Slide | 107 | 60 | 13 | LITA | N/A | Yes | * Deferred | Unit was deferred because of access issues, and difficult road building. BLM would have needed to cross a fish bearing stream with a difficult approach in addition to multiple switch backs. |
| | | | 100 | 45 | LITA | N/A | Yes | * Deferred | |

* Deferred - means that it will not be treated at under the Big Weekly Elk EA.

** RMP Basal Area (BA) maximum retention: The RMP management direction allows for a maximum BA retention of 5%-15% in MITA and 15%-30% BA in LITA. The 40" dbh and 1850 Trees retained in a unit per RMP management direction count towards BA retention. It there is a high number of retained 40" and 1850 trees in a unit, this can cause a unit to exceed the RMP maximum on BA retention. EA Unit 111 and 20 acres in EA unit 103 have a high number of 40-in dbh and 1850 trees within the unit boundary, for which retention is required by the RMP, and thereby would cause the regeneration harvest to exceed the RMP maximum retention of 15% BA in the MITA LUA.

*** The Frenchie Belieus TS is a combination of The Belieus and Lower Frenchie. Acres in The Belieus sale area were deferred for the reason listed in comments section above.

AR 00052





# United States Department of the Interior
### BUREAU OF LAND MANAGEMENT
Coos Bay District Office
1300 Airport Lane, North Bend, OR 97459
Web Address: http://www.blm.gov/or/districts/coosbay
E-mail: BLM_OR_CB_Mail@blm.gov

IN REPLY REFER TO

5400/1792 (ORC040)
Jones and Elk CT Timber Sale
ORC04-TS-2023.0031
Big Weekly Elk Forest Management Project Environmental Assessment
DOI-BLM-ORWA-C040-2019-0006-EA
Casey Jones Determination of NEPA Adequacy
DOI-BLM-ORWA-C040-2022-0007-DNA

## DECISION RATIONALE
### For the
### Jones and Elk CT Timber Sale (ORC04-TS-2023.0031)
### Big Weekly Elk Forest Management Project Environmental Assessment

**Background**:

The Myrtlewood Field Office, Coos Bay District Bureau of Land Management (BLM), prepared the Big Weekly Elk Forest Management Project (Big Weekly Elk) Environmental Assessment (EA) (https://eplanning.blm.gov/eplanning-ui/project/123294/510), of which the Jones and Elk Commercial Thin (CT) is a component. The BLM analyzed the effects of conducting regeneration harvest and commercial thinning treatments within the Big Weekly Elk Project Area, as well as analysis of a No Action alternative. The project occurs in Belieu Creek – Middle Fork Coquille River, Elk Creek and Big Creek 6th Field sub-watersheds which are Class I watersheds as defined in the Record of Decision for the Northwestern and Coastal Oregon Resource Management Plan (ROD/RMP, pp. 70–71). On October 21, 2021, the Myrtlewood Field Manager signed a Finding of No Significant Impact (FONSI), which I hereby incorporate by reference (USDI-BLM 2021). In the FONSI, the authorized officer determined that an environmental impact statement (EIS) was not required (FONSI pp. 5–6). Additionally, BLM issued a Determination of NEPA Adequacy (Casey Jones DNA) (DOI-BLM-ORWA-C040-2022-0007-DNA), hereby incorporated by reference, on November 8, 2022, in which the BLM identified an additional 6 acres of adjacent forest stands for treatment and proposed to commercially thin 11 acres of stands analyzed for non-commercial treatment in the EA. The Jones and Elk CT Timber Sale is composed of EA units 31, 32, 33 and a portion of unit 50. The treatments would occur within the Late Successional Reserve (LSR) and Riparian Reserve (RR) land use allocations.

The BLM analyzed the Jones and Elk CT Timber Sale in the Big Weekly Elk EA under two separate timber sale names, Casey Jones and Bear and Elk. The two timber sales have been combined into a single timber sale for multiple reasons including many of the same roads will be used as part of the harvest plan, the proximity of the two timber sales, and the larger combined volume of timber will result in a timber sale that increases the economic viability.

**Proposed Action:**

The BLM will implement commercial timber harvest within the following locations:

AR 00053

T. 28 S, R. 10 W., Sections 19, 29 and 31,
T. 29 S, R. 10 W., Section 6,
T. 29 S, R. 11 W., Sections 13, 23, 24 and 26.

The BLM will implement commercial thinning treatments including modified group selection areas, Best Management Practices (BMPs), and Project Design Features (PDFs) that the BLM proposed under Alternative 3 of the EA, the description of which I hereby incorporate by reference (EA, pp. 119–162). The BMPs and PDFs include actions to reduce sediment delivery to stream channels, seasonal restrictions to prevent disruption to Threatened and Endangered species, and harvest prescription actions that prevent water pollution and degradation of water quality.

The BLM adjusted the harvest unit boundaries due to on the ground and site-specific verification of environmental conditions, such as stream inception point locations, and assessments of silvicultural and wildlife habitat conditions. This resulted in a reduction of treatment acres. Site verification also resulted in the deferral of multiple units due to logging feasibility, and in areas where proposed road construction was determined to be un-economical. This accounts for a reduction in units listed for treatment in Table 1 compared to the units listed for Casey Jones and Bear and Elk timber sale areas analyzed in the BWE EA.

AR 00054

**Table 1.** Summary of the Jones and Elk CT Timber Sale

| Timber Sale Unit | Land Use Allocation | Timber Sale Acres* | Big Weekly Elk EA Unit | Big Weekly Elk EA Acres | Casey Jones DNA Acres | Big Weekly Elk EA Sale Name |
|---|---|---|---|---|---|---|
| 1 | LSR | 82 | 33 | 121 | 5 | Casey Jones |
| 1 | RR | 15 | 33 | 21 | 1 | Casey Jones |
| ROW† | LSR | 3 | 33 | 3 | - | Casey Jones |
| 2 | LSR | 3 | 33 | 5 | - | Casey Jones |
| 2 | RR | 2 | 33 | 3 | - | Casey Jones |
| 3 | LSR | 5 | 33 | 5 | - | Casey Jones |
| 3 | RR | 3 | 33 | 1 | - | Casey Jones |
| 4 | LSR | 50 | 32 and 50 | 53 | 11 | Casey Jones |
| 4 | RR | 8 | 32 and 50 | 17 | 0 | Casey Jones |
| 5 | LSR | 3 | 32 | 9 | - | Casey Jones |
| 5 | RR | 1 | 32 | 0 | - | Casey Jones |
| 6 | LSR | 9 | 31 | 15 | - | Casey Jones |
| 6 | RR | 2 | 31 | 8 | - | Casey Jones |
| 7 | LSR | 35 | 31 | 131 | - | Casey Jones |
| 7 | RR | 5 | 31 | 34 | - | Casey Jones |
| 8 | LSR | 24 | 14 | 30 | - | Bear and Elk |
| 8 | RR | 4 | 14 | 5 | - | Bear and Elk |
| 9 | LSR | 9 | 13 | 13 | - | Bear and Elk |
| 9 | RR | 2 | 13 | 3 | - | Bear and Elk |
| 10 | LSR | 9 | 12 | 17 | - | Bear and Elk |
| 10 | RR | 0 | 12 | 0 | - | Bear and Elk |
| 11 | LSR | 14 | 10 | 14 | - | Bear and Elk |
| 11 | RR | 6 | 10 | 7 | - | Bear and Elk |
| 12 | LSR | 5 | 1 | 6 | - | Bear and Elk |
| 12 | RR | 0 | 1 | 2 | - | Bear and Elk |
| 13 | LSR | 6 | 1 | 9 | - | Bear and Elk |
| 13 | RR | 0 | 1 | 0 | - | Bear and Elk |
| **Subtotal** | LSR | 257 | | 431 | 16 | |
| **Subtotal** | RR | 48 | | 101 | 1 | |
| **Total** | | 305 | | 531 | 17 | |

*These acres include no-treatment skips and non-commercial snag creation treatment areas. The BLM's net harvest acres are shown on the Exhibit A maps.
†The BLM's net harvest acres plus ROW acres are shown on the Exhibit A maps for the Jones and Elk CT Timber Sale.

The Jones and Elk Timber Sale CT treatment areas consist of approximately 256.3 acres of thinning within the Late-Successional Reserve (LSR), and 47.7 acres of thinning within the Outer Zone RR (Table 1). The BLM will harvest a total volume of approximately 5.1 MMBF of timber.

The Jones and Elk CT Timber Sale will construct approximately 0.38 miles of new roads (Table 2), approximately 0.87 miles less than the estimated 1.25 miles in the EA. (Alternative 3; EA Table 28, pp. 256–257). The BLM will not construct roads within the Riparian Reserve. The project will renovate approximately 11.71 miles of existing aggregate and natural surface road, approximately 4.92 miles less than the estimated 16.63 miles in the EA. At the conclusion of the project, the BLM will decommission 3.94 miles of natural-surface and pre-existing rocked roads compared to the EA estimate of 3.29 miles

AR 00055

**SER150**

(Alternative 3; EA Table 28, pp. 256–257). The BLM attributes this difference to site-specific verification, and deferral of road work.

**Table 2.** Comparison of roadwork between the Jones and Elk CT Timber Sale and the EA

| Planning Level | New Road Construction (Miles) | Road Renovation (Miles) | Road Improvement (Miles) | Road Decommissioning (Miles) |
|---|---|---|---|---|
| BWE EA | 1.25 | 16.63 | 0.49 | 3.29 |
| Jones and Elk CT Timber Sale | 0.38 | 11.67 | 0.52 | 3.94 |
| Casey Jones DNA | 0 | 0.04 | 0.04 | 0 |

Descriptions of the treatments are as follows:

**Thinning Prescription(s)**
- The BLM will thin stands within the LSR using thinning from below to leave trees equivalent to an average of 80–140 ft.$^2$ basal area (BA) per acre or 20-40 relative density (RD) including modified group selections (EA, p. 13, pp. 147–148; Table 57 and 58, p. 307).
- The BLM will thin stands within the Outer Zone RR using variable-density thinning to leave trees equivalent to an average of 120–140 ft$^2$ BA per acre or 30–40 RD (EA, Table 58, p. 307).

**Yarding**
- The BLM will implement ground-based and cable yarding BMPs and PDFs (Jones and Elk CT Exhibit A; EA Map Alt 3 Map Area 17, 27, 29, 36 and 37; pp. 222, 232, 234, 241 and 242; BMPs pp. 136–139; PDFs pp. 145–154).

**Legacy Structures**
- The BLM will retain existing snags ≥ 6 inches DBH and down material ≥ 6 inches in diameter at the large end and ≥ 20 feet in length, except for safety, operational or fuels reduction reasons. The BLM will retain snags ≥ 6 inches DBH cut for safety or operational reasons as down woody material, unless they also pose a safety hazard as down woody material (ROD/RMP pp. 65, 69; EA p. 14).
- The BLM will meet management direction for snag creation through a variety of methods (EA p. 14).

**Haul**
- The BLM will monitor road conditions during winter use to prevent rutting of the rock surface and delivery of fine sediment to stream networks (EA pp. 87–89, BMPs pp. 135–136).
- Hauling on natural-surface roads will be prohibited during the wet season, generally mid-October through May (EA p. 150)
- The BLM will implement BMPs, and PDFs related to road use (EA BMPs pp. 119–145, PDFs, pp. 145–162).

**Special Status Species**
- The BLM will require contractors to secure or remove food, food trash, and garbage generated by workers in project areas to minimize attraction of (murrelet) predators, specifically corvids (EA p. 116).

AR 00056

- The BLM will require that equipment operations be subject to seasonal and daily timing restrictions to minimize disruption to occupied or suitable murrelet habitat (EA PDFs pp. 145–153) in some cases.
- The BLM will require that if a Botany Special Status Species is found after the contract has been awarded, the contractor will be required to follow management guidelines to protect the species (EA p. 154).

**Fuels Reduction Treatments**
The BLM will use a combination of prescribed fire and mechanical treatments to reduce hazardous fuel loadings from the proposed actions at landings, along property lines and roadsides, and within timber harvest units (EA p. 11 and p. 153). Fuel reduction treatments will include the following:
- lop and scatter,
- hand or machine piling,
- covering and burning,
- hand or machine piling and leaving.

## Wildlife:

Spotted Owls
BLM surveys did not detect spotted owls from 2019–2022; therefore, spotted owl breeding season restrictions are not required. Surveys will continue until completion of the proposed timber sale (PDF 40, EA p. 151). If surveys document movement of an owl site center, a change in occupancy status, or a new owl site, the BLM will implement PDF 12 (seasonal restrictions) according to guidelines on Table 22 (EA p. 147), and implement PDFs 40, 41, and 44 which include survey and consultation requirement (EA pp. 151–152). Should future spotted owl surveys or spot checks determine that the Bear Pen and Elk Loop spotted owl home ranges that overlap the Jones and Elk CT units is occupied, the BLM will implement PDF 42 (EA pp. 151–152). Timing restrictions will apply to areas outside of the core within the disruption distance of the core during the critical breeding season.

Marbled Murrelet
The BLM will implement breeding season and daily timing restrictions (no work related noise or disturbance above ambient conditions from April 1 – August 5, no work from two hours before sunset to two hours after sunrise from August 6 – September 15) for marbled murrelets on portions of Jones and Elk CT Timber Sale Units 1–13 within 110 yards (330 feet) of occupied or un-surveyed suitable nesting murrelet habitat. Implementing seasonal restrictions in these units will apply only to portions of the treatment areas (for activities that cause noise or activity above ambient conditions such as chainsaw, heavy equipment, and new construction and heavy renovation roadwork activities) within the disruption distance (Jones and Elk CT Exhibit As; EA PDFs 10 and 12, and Table 21, pp. 145–152).

## Compliance and Conformance:
My decision to offer the Jones and Elk CT Timber Sale complies with all Federal, State, and local laws, regulations and policies imposed for the protection of the environment. This includes the Endangered Species Act (ESA), Magnuson-Stevens Fisheries Conservation and Management Act, The Clean Water Act, the Coastal Zone Management Act, the Clean Air Act, the Special Status Species program, and the Oregon Smoke Management Rules (2008 OAR 629-048).

My decision is in conformance with the 2016 ROD/RMP.

The BLM wildlife staff submitted proposed activities that may affect listed wildlife species within the project area for consultation with the U.S. Fish and Wildlife Service (USFWS), in accordance with 7 (A)(2) of the Endangered Species Act of 1973 [16 U.S.C. 1536 (A)(2) and (A)(4) as amended]. The BLM

AR 00057

received a biological opinion (BO) (USFWS TAILS# 01EOFW00-2020-F-553) on December 20, 2020, that refers extensively to the biological assessment (BA) that the BLM developed for this project.

The forest management activities proposed in the Big Weekly Elk EA comply with the National Marine Fisheries Biological Opinion for the Programmatic Forest Management Program for Western Oregon (WCR-2017-7574).

This project area does not contain any designated Wilderness, Wild and Scenic Rivers, or prime or unique farmlands. There were no concerns identified regarding Areas of Critical Environmental Concern, Cultural Resource Values, Native American Religious Concerns or Environmental Justice issues. The Big Weekly Elk EA resulted in a FONSI; thus, development of an Environmental Impact Statement (EIS) is not required.

## Public Involvement
Initial 30-day public scoping for the BWE EA was from June 7, 2019, to July 8, 2019. The BLM provided direct notification to adjacent landowners and interested parties on the District NEPA mailing list and posted a scoping letter to the BLM's ePlanning website. Comments were received and incorporated into project planning.

On July 21, 2021, the BLM published the BWE EA and preliminary finding of no significant impact (FONSI) on the BLM's ePlanning website. At the same time, the BLM informed those included on the Coos Bay District NEPA mailing list of the availability of the BWE EA and FONSI for review and comment. The BLM emailed this notification and website address to interested parties, agencies, and organizations. These documents were available for review and comment until August 27, 2021. The BLM received seven comment letters from individuals, and 78 comments signed by individuals but originated from an environmental group's website (autofill form). All substantive comments are addressed as an appendix in the signed FONSI.

The authorized officer signed the FONSI on October 21, 2021. The BLM published the EA and signed FONSI on November 4, 2021, on the BLM's ePlanning website. The BLM notified the public of updated project documents by email using the Coos Bay District's NEPA mailing list on November 4, 2021.

## Rationale for the Decision
I am choosing Alternative 3 of the Big Weekly Elk EA project area to be sold as the Jones and Elk CT Timber Sale. This is because this alternative will best address the purpose and need for action (EA pp. 5–8) and will contribute to resource management direction identified in the ROD/RMP (pp. 59–63).

The Jones and Elk CT Timber Sale will:
1. Promote the development of nesting-roosting habitat for the spotted owl in stands that do not currently support spotted owl nesting and roosting (ROD/RMP p. 64).
2. Promote the development of nesting habitat for murrelet in stands that do not currently meet nesting habitat criteria (ROD/RMP p. 64); and
3. Ensure stands are able to provide trees that will function as stable wood in the stream (ROD/RMP p. 68).

## Administrative Remedies
This forest management decision is effective July 21, 2023, in accordance with 43 CFR § 5003.1.

A person adversely affected by this forest management decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals.

AR 00058

**SER153**

Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4. The BLM has provided the attached Form 1842-1 as a courtesy to assist a member of the public who chooses to appeal this decision. However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Valerie Lenhartzen, Myrtlewood Field Manager, 1300 Airport Lane, North Bend, Or, 97459. It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board. If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed. A copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs must also be filed with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR 97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision. A petition for stay, if any, must accompany the notice of appeal, and be served upon the deciding official and the Office of the Regional Solicitor. For more information the BLM has included Form 1842-1 (Information On Taking Appeals to the Interior Board of Land Appeals) on the Big Weekly Elk eplanning webpage under the documents section located here: https://eplanning.blm.gov/eplanning-ui/project/123294/570.

The BLM has revised the forest management regulations at 43 CFR 5000, and those revised regulations became effective on January 19, 2021. The Final Rule was published in the Federal Register on December 18, 2020 (85 FR 82359). In the Final Rule, the BLM eliminated the administrative protest provisions formerly found at 43 C.F.R. § 5003.3; accordingly, there is no opportunity to administratively protest this forest management decision.

For further information contact Teresa Sue, 1300 Airport Lane, North Bend, OR 97459; by phone at 541-756-0100; or by email at BLM_OR_CB_Mail@blm.gov, Attn: Teresa Sue.

**Decision Approved by:**

VALERIE
LENHARTZEN

Digitally signed by VALERIE
LENHARTZEN
Date: 2023.07.21 10:10:14 -07'00'

Myrtlewood Field Manager                          Date
Valerie Lenhartzen

Attachments:   Timber Sale Prospectus maps (Exhibit A and A-1–6; 7 pages)

AR 00059

**SER154**



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29, & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24 & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A-1
Page 1
Jones and Elk CT

**SER155**

AR 00060

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29 & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24, & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 1 of 6
Jones and Elk CT



THINNING
| UNIT 1 | 97 ACRES |
|---|---|
| UNIT 2 | 5 ACRES |
| UNIT 3 | 8 ACRES |
| UNIT 4 | 58 ACRES |
| UNIT 5 | 4 ACRES |
| UNIT 6 | 11 ACRES |
| UNIT 7 | 39 ACRES |
| UNIT 8 | 28 ACRES |
| UNIT 9 | 11 ACRES |
| UNIT 10 | 9 ACRES |
| UNIT 11 | 20 ACRES |
| UNIT 12 | 5 ACRES |
| UNIT 13 | 6 ACRES |
| ROW | 3 ACRES |

Total _____ 304 ACRES

Total Reserve Area ____ 1,289 ACRES
Total Contract Area ____ 1,593 ACRES

Legend:
- ● Corner Found
- ⊗ Proposed Landing
- —— 100' Contour
- ⊶ Gate
- ⊂⊃ Existing Road
- Road to be Constructed
- Road to be Improved
- Road to be Renovated
- Seasonal Timing Restriction
- Ground-based Yarding Area (42 acres)
- Road Right-of-Way
- Dominant Tree Retention Area
- Group Selection Area
- Snag Creation Area
- Partial Cutting Area
- → Stream Channel
- Reserve Area
- Contract Area

Scale 1 inch = 1,000 feet
0   500   1,000   2,000   feet

AR 00061

**SER156**

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29 & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24, & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 2 of 6
Jones and Elk CT



Gate
Corner Found
Proposed Landing
Existing Road
Road to be Improved
Road to be Constructed
Road to be Renovated
Seasonal Timing Restriction
Stream Channel
Ground-based Yarding Area (42 acres)
100' Contour
Group Selection Area
Snag Creation Area
Dominant Tree Retention Area
Partial Cutting Area
Contract Area
Reserve Area

Scale 1 inch = 1,000 feet

| THINNING | |
|---|---|
| UNIT 1 | 97 ACRES |
| UNIT 2 | 5 ACRES |
| UNIT 3 | 8 ACRES |
| UNIT 4 | 58 ACRES |
| UNIT 5 | 4 ACRES |
| UNIT 6 | 11 ACRES |
| UNIT 7 | 39 ACRES |
| UNIT 8 | 28 ACRES |
| UNIT 9 | 11 ACRES |
| UNIT 10 | 9 ACRES |
| UNIT 11 | 20 ACRES |
| UNIT 12 | 5 ACRES |
| UNIT 13 | 6 ACRES |
| ROW | 3 ACRES |
| Total | 304 ACRES |

Total Reserve Area ____ 1,289 ACRES
Total Contract Area ____ 1,593 ACRES

AR 00062

**SER157**

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29 & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24, & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 3 of 6
Jones and Elk CT

THINNING
UNIT 1 _____ 97 ACRES
UNIT 2 _____ 5 ACRES
UNIT 3 _____ 8 ACRES
UNIT 4 _____ 58 ACRES
UNIT 5 _____ 4 ACRES
UNIT 6 _____ 11 ACRES
UNIT 7 _____ 39 ACRES
UNIT 8 _____ 28 ACRES
UNIT 9 _____ 11 ACRES
UNIT 10 _____ 9 ACRES
UNIT 1 1 _____ 20 ACRES
UNIT 12 _____ 5 ACRES
UNIT 13 _____ 6 ACRES
ROW _____ 3 ACRES

Total _____ 304 ACRES
Total Reserve Area ___ 1,289 ACRES
Total Contract Area ___ 1,593 ACRES



● Corner Found
⊗ Proposed Landing
Existing Road
Road to be Improved
Road to be Constructed
Road to be Renovated
Seasonal Timing Restriction
→ Stream Channel
Ground-based Yarding Area (42 acres)
100' Contour
Group Selection Area
Dominant Tree Retention Area
Partial Cutting Area
Contract Area
Reserve Area

Scale 1 inch = 1,000 feet

0   500   1,000   2,000 feet

AR 00063

**SER158**

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29, & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24 & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 4 of 6
Jones and Elk CT



THINNING

| UNIT 1 | 97 ACRES |
|---|---|
| UNIT 2 | 5 ACRES |
| UNIT 3 | 8 ACRES |
| UNIT 4 | 58 ACRES |
| UNIT 5 | 4 ACRES |
| UNIT 6 | 11 ACRES |
| UNIT 7 | 39 ACRES |
| UNIT 8 | 28 ACRES |
| UNIT 9 | 11 ACRES |
| UNIT 10 | 9 ACRES |
| UNIT 1 1 | 20 ACRES |
| UNIT 12 | 5 ACRES |
| UNIT 13 | 6 ACRES |
| ROW | 3 ACRES |

Total  304 ACRES

Total Reserve Area  1,289 ACRES
Total Contract Area  1,593 ACRES

⊗ Proposed Landing
● Corner Found
▭ Existing Road
▭ Road to be Constructed
▭ Road to be Improved
▭ Road to be Renovated
— 100' Contour
▨ Seasonal Timing Restriction
▦ Ground-based Yarding Area (42 acres)
▨ Dominant Tree Retention Area
▮ Group Selection Area
⁺⁺⁺ Snag Creation Area
▭ Partial Cutting Area
←— Stream Channel
▨ Reserve Area
▭ Contract Area
▭ Section

feet
0   500   1,000   2,000

Scale 1 inch = 1,000 feet

AR 00064

**SER159**

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29, & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Secs. 13, 23, 24, & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 5 of 6
Jones and Elk CT



**Legend**

- ● Corner Found
- ⊗ Proposed Landing
- Existing Road
- Road to be Constructed
- Road to be Improved
- Road to be Renovated
- 20' Contour
- Seasonal Timing Restriction
- Groundbased Yarding Area (42 acres)
- Dominant Tree Retention Area
- Group Selection Area
- Partial Cutting Area
- Stream Channel
- Reserve Area
- Contract Area

Scale 1 inch = 500 feet
0   250   500   1,000 feet

THINNING

| | |
|---|---|
| UNIT 1 | 97 ACRES |
| UNIT 2 | 5 ACRES |
| UNIT 3 | 8 ACRES |
| UNIT 4 | 58 ACRES |
| UNIT 5 | 4 ACRES |
| UNIT 6 | 11 ACRES |
| UNIT 7 | 39 ACRES |
| UNIT 8 | 28 ACRES |
| UNIT 9 | 11 ACRES |
| UNIT 10 | 9 ACRES |
| UNIT 11 | 20 ACRES |
| UNIT 12 | 5 ACRES |
| UNIT 13 | 6 ACRES |
| ROW | 3 ACRES |
| Total | 304 ACRES |

Total Reserve Area ___ 1,289 ACRES
Total Contract Area ___ 1,593 ACRES

AR 00065

**SER160**

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 10 W., Secs. 19, 29, & 31 Will. Mer.
T. 29 S., R. 10 W., Sec. 6 Will. Mer.
T. 29 S., R. 11 W., Sec. 13, 23, 24, & 26 Will. Mer.

SALE NO. ORC04-TS-2023-0031
EXHIBIT A
Page 6 of 6
Jones and Elk CT

**Legend**

- ● Corner Found
- ⊗ Proposed Landing
- Existing Road
- Road to be Constructed
- Road to be Improved
- Road to be Renovated
- Seasonal Timing Restriction
- Groundbased Yarding Area (42 acres)
- Dominant Tree Retention Area
- Group Selection Area
- Partial Cutting Area
- 20' Contour
- Stream Channel
- Reserve Area
- Contract Area

Scale 1 inch = 500 feet

| THINNING | |
|---|---|
| UNIT 1 | 97 ACRES |
| UNIT 2 | 5 ACRES |
| UNIT 3 | 8 ACRES |
| UNIT 4 | 58 ACRES |
| UNIT 5 | 4 ACRES |
| UNIT 6 | 11 ACRES |
| UNIT 7 | 39 ACRES |
| UNIT 8 | 28 ACRES |
| UNIT 9 | 11 ACRES |
| UNIT 10 | 9 ACRES |
| UNIT 11 | 20 ACRES |
| UNIT 12 | 5 ACRES |
| UNIT 13 | 6 ACRES |
| ROW | 3 ACRES |
| Total | 304 ACRES |

Total Reserve Area ___ 1,289 ACRES
Total Contract Area ___ 1,593 ACRES

AR 00066

**SER161**



## United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Coos Bay District Office
1300 Airport Lane, North Bend, OR 97459
Web Address: http://www.blm.gov/or/districts/coosbay
E-mail: BLM_OR_CB_Mail@blm.gov

IN REPLY REFER TO

5400/1792 (ORC040)
Brownson Falls CT Timber Sale
ORC04-TS-2023.0032
Big Weekly Elk Forest Management Project Environmental Assessment
DOI-BLM-ORWA-C040-2019-0006-EA

**DECISION RATIONALE**
**For the**
**Brownson Falls CT Timber Sale (ORC04-TS-2023.0032)**
**Big Weekly Elk Forest Management Project Environmental Assessment**

**Background**:

The Myrtlewood Field Office, Coos Bay District Bureau of Land Management (BLM), prepared the Big Weekly Elk Forest Management Project (Big Weekly Elk) Environmental Assessment (EA) (https://eplanning.blm.gov/eplanning-ui/project/123294/510), of which the Brownson Falls Commercial Thin (CT) Timber Sale is a component. The BLM analyzed the effects of conducting regeneration harvest and commercial thinning treatments within the Big Weekly Elk Project Area and analyzed a No Action alternative. The project occurs in Yankee Run-East Fork Coquille River and Elk Creek 6th Field sub-watersheds which are Class I watersheds as defined in the Record of Decision for the Northwestern and Coastal Oregon Resource Management Plan (ROD/RMP, pp. 70–71). The BLM is deciding to conduct stand treatments through commercial thinning within the Late Successional Reserve (LSR) and Riparian Reserve (RR) land use allocations. On October 21, 2021, the Myrtlewood Field Manager signed a Finding of No Significant Impact (FONSI), which I hereby incorporate by reference (USDI-BLM 2021). In the FONSI, the authorized officer determined that an environmental impact statement (EIS) was not required (pp. 5-6) because, based on the analysis contained in the Big Weekly Elk EA (BWE EA), the proposed action alternatives would not have a significant impact on the human environment.

The Brownson Falls CT Timber Sale is part of the analysis under the Big Weekly Elk EA under two separate timber sale names, Anderson Brown and Weekend Falls. The two timber sales have been combined into a single timber sale for multiple reasons including that many of the same roads will be used as part of the harvest plan, the close proximity of the two timber sales, and the larger combined volume of timber to be harvested would result in a timber sale that is more economically viable than as two individual timber sales.

**Proposed Action:**

The BLM will implement commercial timber harvest within the following legal locations:

> T. 28 S., R. 10 W., Sections 31, WM.,
> T. 29 S., R. 11 W., Sections 1, 2, 9, 10, 11, 15, & 21, WM

AR 00067

**SER162**

2

The BLM will implement the Brownson Falls CT Timber Sale using commercial thinning (CT) treatments including modified group selection areas following Best Management Practices (BMPs), and Project Design Features (PDFs) that the BLM proposed under Alternative 3 of the EA, the description of which I hereby incorporate by reference (EA, pp. 119–162). These measures include but are not limited to actions to reduce sediment delivery to stream channels, seasonal restrictions to prevent disruption to T&E species, and harvest prescription actions that prevent water pollution and degradation of water quality.

**Table 1.** Comparison of the Brownson Falls CT Timber Sale acreages between the EA and final design.

| Brownson Falls CT Timber Sale Unit | Land Use Allocation | Brownson Falls CT Timber Sale Acres* | Big Weekly Elk EA Unit | Big Weekly Elk EA Acres | Big Weekly Elk EA Sale Name |
|---|---|---|---|---|---|
| 1 | LSR | 27.5 | 30 | 30.0 | Anderson Brown |
| 1 | RR | 3.7 | 30 | 11.3 | Anderson Brown |
| 2 | LSR | 51.9 | 20 | 71.0 | Anderson Brown |
| 2 | RR | 16.1 | 20 | 19.6 | Anderson Brown |
| 3 | LSR | 36.7 | 19 | 59.0 | Anderson Brown |
| 3 | RR | 2.1 | 19 | 2.7 | Anderson Brown |
| 4 | LSR | 19.6 | 37 | 42.0 | Anderson Brown |
| 4 | RR | 0.0 | 37 | 0.0 | Anderson Brown |
| 5 | LSR | 4.1 | 17 | 87.0 – LSR | Anderson Brown |
| 5 | RR | 2.4 | 17 | 87.0 – LSR | Anderson Brown |
| 6 | LSR | 15.7 | 17 | 87.0 – LSR | Anderson Brown |
| 6 | RR | 2.8 | 17 | 87.0 – LSR | Anderson Brown |
| 7 | LSR | 6.0 | 17 | 28.4 – RR | Anderson Brown |
| 7 | RR | 0.6 | 17 | 28.4 – RR | Anderson Brown |
| 8 | LSR | 48.5 | 17 | 28.4 – RR | Anderson Brown |
| 8 | RR | 11.6 | 17 | 28.4 – RR | Anderson Brown |
| 9 | LSR | 32.0 | 16 | 33.0 | Anderson Brown |
| 9 | RR | 7.3 | 16 | 7.2 | Anderson Brown |
| 10 | LSR | 7.6 | 21 | 11.0 | Weekend Falls |
| 10 | RR | 0.0 | 21 | 0.0 | Weekend Falls |
| 11 | LSR | 28.0 | 22 | 35.0 | Weekend Falls |
| 11 | RR | 4.6 | 22 | 6.7 | Weekend Falls |
| 12 | LSR | 12.6 | 24 | 64.0 – LSR | Weekend Falls |
| 12 | RR | 2.1 | 24 | 64.0 – LSR | Weekend Falls |
| 13 | LSR | 17.4 | 24 | 64.0 – LSR | Weekend Falls |
| 13 | RR | 0.0 | 24 | 14.5 – RR | Weekend Falls |
| 14 | LSR | 16.6 | 24 | 14.5 – RR | Weekend Falls |
| 14 | RR | 4.6 | 24 | 14.5 – RR | Weekend Falls |
| Sub-Totals | LSR | 324.1 | | 432.0 | |
| Sub-Totals | RR | 57.9 | | 90.4 | |
| **Total** | | **382.0** | | **522.4** | |

*These acres include no-treatment skips and non-commercial snag creation treatment areas. The BLM's net harvest acres are shown on the Exhibit A maps.

The BLM adjusted the harvest unit boundaries due to on the ground and site-specific verification of environmental conditions, such as stream inception point locations, and assessments of silvicultural and wildlife habitat conditions. This resulted in a reduction of treatment acres. Site verification also resulted in the deferral of multiple units due to logging feasibility, and in areas where proposed road construction was determined to be un-economical. This accounts for a reduction in units listed for treatment in Table 1 compared to the units listed for the Anderson Brown and Weekend Falls timber sale areas analyzed in the BWE EA.

AR 00068

3

The Brownson Falls Timber Sale CT treatment areas consist of approximately 324.1 acres of thinning within the LSR, and 57.9 acres of thinning within the Outer Zone RR (Table 1). The BLM would harvest a total volume of approximately 6.9 MMBF of timber under this decision.

Road construction as part of the Brownson Falls CT Timber Sale will include approximately 0.65 miles of new roads, approximately 0.53 miles less than the estimated 1.18 miles in the EA (Alternative 3; EA Table 28, pp. 256–260). The BLM will not construct roads within the Riparian Reserve. The project will renovate approximately 13.0 miles of existing aggregate and natural surface road, approximately 4.3 miles less than the estimated 17.3 miles in the EA. Road improvement activities to existing roads will raise the level of design to a higher standard and will occur on approximately 0.7 miles of existing road which is 0.2 mile less than the 0.9 miles in the EA. At the conclusion of the project, the BLM will decommission 1.41 miles of natural-surface and pre-existing rocked roads which is the same as the estimate analyzed in the EA (Alternative 3; EA Table 28, pp. 256–260). The BLM attributes this difference to site-specific verification and deferral of road work.

**Table 3.** Comparison of roadwork between the Brownson Falls CT Timber Sale and the EA.

| Planning Level | New Road Construction (Miles) | Road Renovation (Miles) | Road Improvement (Miles) | Road Decommissioning (Miles) |
|---|---|---|---|---|
| BWE EA | 1.18 | 17.3 | 0.9 | 1.41 |
| Brownson Falls CT Timber Sale | 0.65 | 13.0 | 0.7 | 1.41 |

* The timber sale shows less road construction than what was analyzed in the EA. For this timber sale the BLM was able to drop 0.16 mile of new construction due to efficiency in logging systems.

Implementation of this timber sale will include Best Management Practices (BMPs) (EA pp. 119–145) and Project Design Features (PDFs) (EA pp. 145–162), which are measures to avoid and minimize effects on resources. The BLM will implement all BMPs and PDFs necessary as part of the proposed action.

Descriptions of the treatments are as follows:

**Thinning Prescription(s)**
- The BLM will thin stands within the LSR using thinning from below to leave trees equivalent to an average of 80–120 ft.$^2$ basal area (BA) per acre or 20–30 relative density (RD) including modified group selections (EA, p. 13; Table 57, p. 307).
- The BLM will thin stands within the Outer Zone RR using variable-density thinning to leave trees equivalent to an average of 120–140 ft$^2$ BA per acre or 30–40 RD (EA, Table 58, p. 307).

**Yarding**
- The BLM will implement ground-based and cable yarding BMPs and PDFs (Brownson Falls CT Exhibits A; EA Map Alt 3 Map Area 19, 22, 25 and 28, pp. 224, 227, 230, 233, BMPs pp. 136–139, PDFs pp. 145–154).

**Legacy Structures**
- The BLM will retain existing snags ≥ six inches DBH and down material ≥ six inches in diameter at the large end and ≥ 20 feet in length, except for safety, operational or fuels reduction reasons. The BLM would retain snags ≥ six inches DBH cut for safety or operational reasons as down woody material, unless they also pose a safety hazard as down woody material (ROD/RMP pp. 65, 69; EA p. 14).

AR 00069

4

- The BLM will create snags in commercially harvested LSR stands with less than 64 snags per acre >10 inches DBH and in stands with less than 19 snags per acre >20 inches DBH within one year of completion of yarding the timber. Snag creation levels will be met as an average at the scale of the harvest unit according to management direction. (EA p. 14).

## Haul
- The BLM will monitor road conditions during winter use to prevent rutting of the rock surface and delivery of fine sediment to stream networks (EA pp. 135–136).
- Hauling on natural-surface roads would be prohibited during the wet season, generally mid-October through May (EA p. 150)
- The BLM will implement BMPs and PDFs related to road use (EA pp. 119–145, pp. 145–162).

## Special Status Species
- The BLM will require contractors to secure or remove food, food trash, and garbage generated by workers in project areas to minimize attraction of (murrelet) predators, specifically corvids (EA p. 116, p. 145).
- The BLM will require that equipment operations be subject to seasonal and daily timing restrictions to minimize disruption to occupied or suitable murrelet habitat (EA pp. 145– 52). In some cases.
- The BLM will require that if a Special Status Species is found after the contract has been awarded, the contractor will be required to follow management guidelines to protect the species (EA p. 154).

## Fuels Reduction Treatments
- The BLM will use a combination of prescribed fire and mechanical treatments to reduce hazardous fuel loadings from the proposed actions at landings, along property lines and roadsides, and within timber harvest units.

## Wildlife:

Spotted Owls
1. The BLM did not detect spotted owls during surveys from 2019–2022; therefore, spotted owl breeding season restrictions are not required for the timber sale. Should future spotted owl surveys or spot checks determine the Bear Pen or Brownson Headwaters spotted owl home ranges that overlaps the Brownson Falls is occupied, the BLM would implement PDF 42 (EA pp. 151–152) "the BLM would not go forward with the proposed actions within the core unless two years of additional 6-visit surveys found the site to be unoccupied in the future. Outside of the core, the BLM would implement timing restrictions within the disruption distance of the core during the critical breeding season." If surveys determine spotted owl occupancy at a new location, the BLM will implement PDF 41 (EA p. 151): "If a new or moved spotted owl site becomes occupied, the BLM will consult with the USFWS to ensure compliance with section 7 consultation before implementing the proposed actions in this document."

Marbled Murrelet
The BLM will implement breeding season restrictions for marbled murrelets on portions of Brownson Falls CT Timber Sale Units 1, 3, 4–7, 11–14 because these treatment areas are within 110 yards (330 feet) of occupied or suitable nesting murrelet habitat. Implementing seasonal restrictions in these units will apply only to portions of the treatment areas (for chainsaw, heavy equipment, and roadwork activities) within the disruption distance (Brownson Falls CT Exhibit A's; EA PDFs pp. 145–152).

## Compliance and Conformance
My decision to offer the Brownson Falls CT Timber Sale complies with all Federal, State, and local laws, regulations and policies imposed for the protection of the environment. This includes the Endangered Species Act (ESA), Magnuson-Stevens Fisheries Conservation and Management Act, The Clean Water

AR 00070

5

Act, the Coastal Zone Management Act, the Clean Air Act, the Special Status Species program, and the Oregon Smoke Management Rules (2008 OAR 629-048).

My decision is in conformance with the 2016 ROD/RMP.

The BLM wildlife staff submitted proposed activities that may affect listed wildlife species within the project area for consultation in a Biological Assessment (BA) with the U.S. Fish and Wildlife Service (USFWS), in accordance with 7 (A)(2) of the Endangered Species Act of 1973 [16 U.S.C. 1536 (A)(2) and (A)(4) as amended]. The BLM received a biological opinion (USFWS TAILS# 01EOFW00-2020-F-553) that refers extensively to this BA.

The forest management activities the BLM proposed in the BWE EA comply with the National Marine Fisheries Biological Opinion for the Programmatic Forest Management Program for Western Oregon (WCR-2017-7574).

This project area does not contain any designated Wilderness, Wild and Scenic Rivers, or prime or unique farmlands. There were no concerns identified regarding Areas of Critical Environmental Concern, cultural resource values, Native American religious concerns or Environmental Justice issues. The BWE EA, (https://eplanning.blm.gov/eplanning-ui/project/123294/510) resulted in a FONSI; thus, development of an EIS is not required.

**Public Involvement**
Initial 30-day public scoping for the BWE EA was from June 7 to July 8, 2019. The BLM provided direct notification to adjacent landowners and interested parties on the District NEPA mailing list and posted a scoping letter to the local Coos Bay District the BLM's ePlanning website. Comments were received and incorporated into project planning.

On July 21, 2021, the BLM published the BWE EA and preliminary finding of no significant impact (FONSI) on the BLM's ePlanning website. At the same time, the BLM informed those included on the Coos Bay District NEPA mailing list of the availability of the BWE EA and preliminary FONSI for review and comment. The BLM emailed this notification and website address to interested parties, agencies, and organizations. The EA and preliminary FONSI were available for review and comment until August 27, 2021. The BLM received seven comment letters from individuals, and 78 comments signed by individuals but originated from an environmental group's website (autofill form). The "Appendix: Response to Comments" attached to the final FONSI for the BWE EA addresses all substantive comments.

The authorized officer signed the FONSI on October 21, 2021. The BLM published the EA and final FONSI on November 4, 2021, on the BLM's ePlanning website. The BLM notified the public of updated project documents by email using the Coos Bay District's NEPA mailing list on November 4, 2021.

**Rationale for the Decision**
I am choosing Alternative 3 of the BWE EA project area to be sold as the Brownson Falls CT Timber Sale. This is because this alternative will best address the purpose and need for action (EA pp. 5-8) and will comply with resource management direction identified in the ROD/RMP (pp. 59-63).

The Brownson Falls CT Timber Sale will:
1. Promote the development of nesting-roosting habitat for the spotted owl in stands that do not currently support spotted owl nesting and roosting (ROD/RMP p. 64).
2. Promote the development of nesting habitat for murrelet in stands that do not currently meet nesting habitat criteria (ROD/RMP p. 64); and

AR 00071

6

3.  Ensure stands are able to provide trees that would function as stable wood in the stream (ROD/RMP p. 68).

**Administrative Remedies**

This forest management decision is effective May 10, 2023, in accordance with 43 CFR § 5003.1.

A person adversely affected by this forest management decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals. Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4. The BLM has provided the attached Form 1842-1 as a courtesy to assist a member of the public who chooses to appeal this decision. However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Valerie Lenhartzen, Myrtlewood Field Manager, 1300 Airport Lane, North Bend, Or, 97459. It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board. If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed. A copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs must also be filed with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR 97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision. A petition for stay, if any, must accompany the notice of appeal, and be served upon the deciding official and the Office of the Regional Solicitor. For more information the BLM has included Form 1842-1 (Information On Taking Appeals to the Interior Board of Land Appeals) on the Big Weekly Elk Eplanning webpage under the documents section located here:  https://eplanning.blm.gov/eplanning-ui/project/123294/510

The BLM has revised the forest management regulations at 43 CFR 5000, and those revised regulations became effective on January 19, 2021. The Final Rule was published in the Federal Register on December 18, 2020 (85 FR 82359). In the Final Rule, the BLM eliminated the administrative protest provisions formerly found at 43 C.F.R. § 5003.3; accordingly, there is no opportunity to administratively protest this forest management decision.

For further information contact Teresa Sue, 1300 Airport Lane, North Bend, OR 97459; by phone at 541-756-0100; or by email at BLM_OR_CB_Mail@blm.gov, Attn: Teresa Sue.

**Decision Approved by:**

VALERIE
LENHARTZEN
Digitally signed by VALERIE LENHARTZEN
Date: 2023.05.09 17:09:32 -07'00'

Myrtlewood Field Manager
Valerie Lenhartzen

Attachments:    Timber Sale Prospectus maps (Exhibit A; 9 pages)

AR 00072

**SER167**



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Coos Bay District Office
1300 Airport Lane, North Bend, OR 97459
Web Address: http://www.blm.gov/or/districts/coosbay
E-mail: BLM_OR_CB_Mail@blm.gov



IN REPLY REFER TO:

5400/1792 (ORC040)
Elk Creek Ridge CT Timber Sale
ORC04-TS-2023.0030
Big Weekly Elk Forest Management Project Environmental Assessment
DOI-BLM-ORWA-C040-2019-0006-EA

## DECISION RATIONALE
### For the
### Elk Creek Ridge CT Timber Sale (ORC04-TS-2023.0030)
### Big Weekly Elk Forest Management Project Environmental Assessment

**Background**:

The Myrtlewood Field Office, Coos Bay District Bureau of Land Management (BLM), prepared the Big Weekly Elk Forest Management Project (Big Weekly Elk) Environmental Assessment (EA) (https://eplanning.blm.gov/eplanning-ui/project/123294/510), of which the Elk Creek Ridge CT Timber Sale is a component. The EA contained analysis of the effects of conducting regeneration harvest and commercial thinning treatments within the Big Weekly Elk Project Area, as well as analysis of a No Action alternative. The project occurs in Yankee Run-East Fork Coquille River and Elk Creek 6th Field sub-watersheds which are Class I watersheds as defined in the Record of Decision for the Northwestern and Coastal Oregon Resource Management Plan (ROD/RMP, pp. 70-71). On October 21, 2021, the Myrtlewood Field Manager signed a Finding of No Significant Impact (FONSI), which I hereby incorporate by reference (USDI-BLM 2021). In the FONSI, the authorized officer determined that an environmental impact statement (EIS) was not required (FONSI pp. 6-7)

**Proposed Action:**

The BLM will implement commercial timber harvest within the following locations:

      T. 28 S., R. 11 W., Sections 29 & 34, WM.,
      T. 29 S., R. 11 W., Sections 3, 32, & 33, WM.

The BLM will implement the Elk Creek Ridge CT Timber Sale using commercial thinning (CT) treatments including modified group selection areas, Best Management Practices (BMPs), and Project Design Features (PDFs) that the BLM proposed under Alternative 3 of the EA, the description of which I hereby incorporate by reference (EA, pp. 119-162).

AR 00318

**SER168**

2

**Table 1.** Summary of the Elk Creek Ridge CT Timber Sale

| Elk Creek CT Timber Sale Unit | Elk Creek CT Timber Sale Acres[1] | Big Weekly Elk EA Unit | Big Weekly Elk EA Acres | Land Use Allocation | Treatment |
|---|---|---|---|---|---|
| 1 | 20 | 28 | 24 | LSR | Commercial Thinning |
| | 4 | | 8 | RR | |
| 2 | 24 | 29 | 26 | LSR | Commercial Thinning |
| | 10 | | 12 | RR | |
| 3 | 76 | 3 | 68 | LSR | Commercial Thinning |
| | 6 | | 34 | RR | |
| 4 | 31 | 2 | 34 | LSR | Commercial Thinning |
| | 5 | | 12 | RR | |
| - | - | 4 | 7 | LSR | Treatment Deferred |
| | | | 9 | RR | |
| - | - | 41 | 24 | LSR | Treatment Deferred |
| Totals | 176 | | 258 | | |

[1.] These acres include no-treatment skips and non-commercial snag creation treatment areas. The BLM's net harvest acres are shown on the Exhibit A maps for the Elk Creek CT Timber Sale.

The BLM's reduction in acres between those analyzed in the Big Weekly Elk EA and those treated under the Elk Creek Ridge CT Timber Sale is due to the deferral of two proposed units. The BLM deferred these Units because of the presence of marbled murrelet nest trees and associated buffers, the delineation of riparian reserves (RR), and the elimination of proposed road construction determined to be un-economical.

The Elk Creek Ridge Timber Sale CT treatment areas consist of approximately 151 acres of thinning (EA Table 4, p. 15) within the Late-Successional Reserve (LSR), and 25 acres of thinning within the Outer Zone RR (EA Table 6, p. 18). The BLM adjusted the CT harvest unit boundaries due to on the ground and site-specific verification of environmental conditions, such as stream inception point locations, and assessments of silvicultural and wildlife habitat conditions. The BLM would harvest a total volume of approximately 1.7 MMBF of timber.

The Elk Creek Ridge CT Timber Sale will construct approximately 0.16 miles of new roads, approximately 0.54 miles less than the estimated 0.70 miles in the EA. (Alternative 3; EA Table 28, pp. 257–258). The BLM will not construct roads within the Riparian Reserve. The project will renovate approximately 3.05 miles of existing aggregate and natural surface road, approximately 2.03 miles less than the estimated 5.08 miles in the EA. At the conclusion of the project, the BLM will decommission 0.58 miles of natural-surface and pre-existing rocked roads compared to the EA estimate of 1.85 miles (Alternative 3; EA Table 28, pp. 257–258). The BLM attributes this difference to site-specific verification, and deferral of road work.

**Table 3.** Comparison of roadwork between the Elk Creek Ridge CT Timber Sale and the EA

| Planning Level | New Road Construction (Miles) | Road Renovation (Miles) | Road Improvement (Miles) | Road Decommissioning (Miles) |
|---|---|---|---|---|
| BWE EA | 0.70 | 5.08 | 0.00 | 1.85 |
| Elk Creek Ridge CT Timber Sale | 0.16 | 3.05 | 0.00 | 0.58 |

AR 00319

3

Implementation of this timber sale will include Best Management Practices (BMPs) (EA pp. 119–145) and Project Design Features (PDFs) (EA pp. 145–162), which are measures to avoid and minimize effects on resources. The BLM will initiate all BMPs and PDFs necessary as part of the proposed action.

Descriptions of the treatments are as follows:

**Thinning Prescription(s)**
- The BLM will thin stands within the LSR using thinning from below to leave trees equivalent to an average of 80–120 ft.$^2$ basal area (BA) per acre or 20-30 relative density (RD) including modified group selections (EA, p. 13, pp. 147-148; Table 57, p. 307).
- The BLM will thin stands within the Outer Zone RR using variable-density thinning to leave trees equivalent to an average of 120-140 ft$^2$ BA per acre or 30-40 RD (EA, Table 58, p. 307).

**Yarding**
- The BLM will implement ground-based and cable yarding BMPs and PDFs (Elk Creek Ridge CT Exhibits A; EA Map Alt 3 Map Area 12-14, pp. 217-219, BMP's pp. 136-139, PDFs pp. 145-154).

**Legacy Structures**
- The BLM will retain existing snags ≥ six inches DBH and down material ≥ six inches in diameter at the large end and ≥ 20 feet in length, except for safety, operational or fuels reduction reasons. The BLM would retain snags ≥ six inches DBH cut for safety or operational reasons as down woody material, unless they also pose a safety hazard as down woody material (ROD/RMP pp. 65, 69; EA p. 14).
- The BLM will meet management direction for snag creation through a variety of methods (EA p. 14).

**Haul**
- The BLM will monitor road conditions during winter use to prevent rutting of the rock surface and delivery of fine sediment to stream networks (EA pp. 87, BMPs pp. 135-136).
- Hauling on natural-surface roads would be prohibited during the wet season, generally mid-October through May (EA p. 150)
- The BLM will implement BMPs, and PDFs related to road use (EA BMPs pp. 119–145, PDFs, pp. 145-162).

**Special Status Species**
- The BLM will require contractors to secure or remove food, food trash, and garbage generated by workers in project areas to minimize attraction of (murrelet) predators, specifically corvids (EA p. 116).
- The BLM will require that equipment operations be subject to seasonal and daily timing restrictions to minimize disruption to occupied or suitable murrelet habitat (EA PDFs pp. 145 – 152). In some cases.
- The BLM will require that if a Special Status Species is found after the contract has been awarded, the contractor will be required to follow management guidelines to protect the species (EA p. 154).

**Fuels Reduction Treatments**
- The BLM will use a combination of prescribed fire and mechanical treatments to reduce hazardous fuel loadings from the proposed actions at landings, along property lines and roadsides, and within timber harvest units. Fuel reduction treatments will include the following:
  • lop and scatter,
  • hand or machine piling,
  • covering and burning,

AR 00320

**SER170**

4

- hand or machine piling and leaving. (EA p. 11).

**Wildlife:**

Spotted Owls
1. The BLM did not detect spotted owls during in surveys from 2019-2022; therefore, spotted owl breeding season restrictions are not required. Should future spotted owl surveys or spot checks determine that the Brownson Headwaters spotted owl home range that overlaps the Elk Creek Ridge Unit is occupied, the BLM would implement PDF 42 (EA pp. 150-151) "the BLM would not go forward with the proposed actions within the core unless two years of additional 6-visit surveys found the site to be unoccupied in the future. Outside of the core, the BLM would implement timing restrictions within the disruption distance of the core during the critical breeding season." If surveys determine spotted owl occupancy at a new location, the BLM would implement PDF 41 (EA p. 150): "If a new or moved spotted owl site becomes occupied, the BLM will consult with the USFWS to ensure compliance with section 7 consultation before implementing the proposed actions in this document."

Marbled Murrelet
The BLM will implement breeding season restrictions for marbled murrelets on portions of Elk Creek Ridge CT Timber Sale Units 1–4 because these treatment areas are within 110 yards (330 feet) of occupied or suitable nesting murrelet habitat. Implementing seasonal restrictions in these units will apply only to portions of the treatment areas (for chainsaw, heavy equipment, and roadwork activities) within the disruption distance (Elk Creek Ridge CT Exhibit A's; EA PDFs pp. 145-152).

**Compliance and Conformance**
My decision to offer the Elk Creek Ridge CT Timber Sale complies with all Federal, State, and local laws, regulations and policies imposed for the protection of the environment. This includes the Endangered Species Act (ESA), Magnuson-Stevens Fisheries Conservation and Management Act, The Clean Water Act, the Coastal Zone Management Act, the Clean Air Act, the Special Status Species program, and the Oregon Smoke Management Rules (2008 OAR 629-048).

The BLM OR/WA State Director signed a Record of Decision approving the ROD/RMP on August 5, 2016, and my decision is in conformance with the 2016 ROD/RMP.

The BLM wildlife staff submitted proposed activities that may affect listed wildlife species within the project area for consultation with the U.S. Fish and Wildlife Service (USFWS), in accordance with 7 (A)(2) of the Endangered Species Act of 1973 [16 U.S.C. 1536 (A)(2) and (A)(4) as amended]. The BLM received a biological opinion (BO) (USFWS TAILS# 01EOFW00-2020-F-553) that refers extensively to the biological assessment (BA). The BLM developed the BA for this consultation (Biological Assessment for the Big Weekly Elk EA) (EA, p. 72).

The forest management activities proposed in the Big Weekly Elk EA comply with the National Marine Fisheries Biological Opinion for the Programmatic Forest Management Program for Western Oregon (WCR-2017-7574).

This project area does not contain any designated Wilderness, Wild and Scenic Rivers, or prime or unique farmlands. There were no concerns identified regarding Areas of Critical Environmental Concern, Cultural Resource Values, Native American Religious Concerns or Environmental Justice issues. The Big Weekly Elk EA, (https://eplanning.blm.gov/eplanning-ui/project/123294/510) resulted in a FONSI; thus, development of an Environmental Impact Statement (EIS) is not required.

AR 00321

**Public Involvement**

Initial 30-day public scoping for the BWE EA was from June 7, 2019, to July 8, 2019. The BLM provided direct notification to adjacent landowners and interested parties on the District NEPA mailing list and posted a scoping letter to the local Coos Bay District the BLM's ePlanning website. Comments were received and incorporated into project planning.

On July 21, 2021, the BLM published the BWE EA and preliminary finding of no significant impact (FONSI) on the BLM's ePlanning website. At the same time, the BLM informed those included on the Coos Bay District NEPA mailing list of the availability of the BWE EA and preliminary FONSI for review and comment. The BLM emailed this notification and website address to interested parties, agencies, and organizations. The EA and preliminary FONSI were available for review and comment until August 27, 2021. The BLM received seven comment letters from individuals, and 78 comments signed by individuals but originated from an environmental group's website (autofill form). All substantive comments are addressed as an appendix in the final FONSI.

The authorized officer signed the FONSI on October 21, 2021. The BLM published the EA and final FONSI on November 4, 2021, on the BLM's ePlanning website. The BLM notified the public of updated project documents by email using the Coos Bay District's NEPA mailing list on November 4, 2021.

**Rationale for the Decision**

I am choosing Alternative 3 of the Big Weekly Elk EA project area to be sold as the Elk Creek Ridge CT Timber Sale. This is because this alternative will best address the purpose and need for action (EA pp. 5-8) and will contribute to resource management direction identified in the ROD/RMP (pp. 59-63).

The Elk Creek Ridge CT Timber Sale will:
1. Promote the development of nesting-roosting habitat for the spotted owl in stands that do not currently support spotted owl nesting and roosting (ROD/RMP p. 64).
2. Promote the development of nesting habitat for murrelet in stands that do not currently meet nesting habitat criteria (ROD/RMP p. 64); and
3. Ensure stands are able to provide trees that would function as stable wood in the stream (ROD/RMP p. 68).

**Administrative Remedies**

This forest management decision is effective September 01, 2022, in accordance with 43 CFR § 5003.1.

A person adversely affected by this forest management decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals. Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4. The BLM has provided the attached Form 1842-1 as a courtesy to assist a member of the public who chooses to appeal this decision. However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Eric S. Baxter, Acting Myrtlewood Field Manager, 1300 Airport Lane, North Bend, Or, 97459. It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board. If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed. A copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs must also be filed

AR 00322

6

with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR 97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision. A petition for stay, if any, must accompany the notice of appeal, and be served upon the deciding official and the Office of the Regional Solicitor. For more information the BLM has included Form 1842-1 (Information On Taking Appeals to the Interior Board of Land Appeals) on the Big Weekly Elk Eplanning webpage under the documents section located here: https://eplanning.blm.gov/eplanning-ui/project/123294/570.

The BLM has revised the forest management regulations at 43 CFR 5000, and those revised regulations became effective on January 19, 2021. The Final Rule was published in the Federal Register on December 18, 2020 (85 FR 82359). In the Final Rule, the BLM eliminated the administrative protest provisions formerly found at 43 C.F.R. § 5003.3; accordingly, there is no opportunity to administratively protest this forest management decision.

For further information contact Ryan Desliu, 1300 Airport Lane, North Bend, OR 97459; by phone at 541-756-0100; or by email at BLM_OR_CB_Mail@blm.gov, Attn: Ryan Desliu.

**Decision Approved by:**

SCOTT HOEFS
Digitally signed by SCOTT HOEFS
Date: 2022.08.30 12:11:19 -07'00'

_____          _____

Acting Myrtlewood Field Manager          Date
Scott W. Hoefs

AR 00323



Attachments:   Timber Sale Prospectus maps (Exhibit A; 4 pages)

AR 00324

8



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 11 W., Secs. 29, 32, 33 & 34 Will. Mer.
T. 29 S., R. 11 W., Sec. 3 Will. Mer.

SALE NO. ORC04-TS-2022.0031
EXHIBIT A-1
Page 1
Elk Creek Ridge CT

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

AR 00325

9



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 11 W., Secs. 29, 32, 33 & 34 Will. Mer.
T. 29 S., R. 11 W., Sec. 3 Will. Mer.

SALE NO. ORC04-TS-2022.0031
EXHIBIT A
Page 1 of 3
Elk Creek Ridge CT

THINNING
UNIT 1 _____ 20 ACRES
UNIT 2 _____ 26 ACRES
UNIT 3 _____ 64 ACRES
UNIT 4 _____ 22 ACRES

Total _____ 132 ACRES

Total Reserve Area _____ 571 ACRES
Total Contract Area _____ 703 ACRES

Truck Turnaround
Road Segment Break
Corner Found
Proposed Landing
100' Contour
Existing Road
Road to be Constructed
Road to be Renovated
Ground-based Yarding Area (23 acres)
Dominant Tree Retention Area
Group Selection Area
Snag Creation Area
Seasonal Timing Restriction
Partial Cutting Area
Stream Channel
Reserve Area
Contract Area

feet
0    375    750    1,500

Scale 1 inch = 750 feet

Acreage data was collected using a Trimble R1 Global Positioning
System receiver. Acreage was calculated based on Global
Positioning System traverse procedures including differential
correction.

No warranty is made by the Bureau of Land Management as to the
accuracy, reliability, or completeness of these data for individual or
aggregate use with other data. Original data were compiled from
various sources and may be updated without notification.

AR 00326

**SER176**

10

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 11 W., Secs. 29, 32, 33 & 34 Will. Mer.
T. 29 S., R. 11 W., Sec. 3 Will. Mer.

SALE NO. ORC04-TS-2022.0031
EXHIBIT A
Page 2 of 3
Elk Creek Ridge CT

THINNING
UNIT 1 _____ 20 ACRES
UNIT 2 _____ 26 ACRES
UNIT 3 _____ 64 ACRES
UNIT 4 _____ 22 ACRES

Total _____ 132 ACRES

Total Reserve Area _____ 571 ACRES
Total Contract Area _____ 703 ACRES





⊗    Proposed Landing

———    100' Contour

═══    Existing Road

▭▭▭    Road to be Constructed

═══    Road to be Renovated

▦    Ground-based Yarding Area (23 acres)

▨    Dominant Tree Retention Area

▨    Group Selection Area

✦    Snag Creation Area

   Seasonal Timing Restriction

▭    Partial Cutting Area

➤    Stream Channel

▭    Reserve Area

⌐    Contract Area

●    Corner Found

Acreage data was collected using a Trimble R1 Global Positioning System receiver. Acreage was calculated based on Global Positioning System traverse procedures including differential correction.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

Scale 1 inch = 1,000 feet

0    500    1,000      2,000 feet

AR 00327

**SER177**

11



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 28 S., R. 11 W., Secs. 29, 32, 33 & 34 Will. Mer.
T. 29 S., R. 11 W., Sec. 3 Will. Mer.

SALE NO. ORC04-TS-2022.0031
EXHIBIT A
Page 3 of 3
Elk Creek Ridge CT

THINNING
UNIT 1 _____ 20 ACRES
UNIT 2 _____ 26 ACRES
UNIT 3 _____ 64 ACRES
UNIT 4 _____ 22 ACRES

Total _____ 132 ACRES

Total Reserve Area _____ 571 ACRES
Total Contract Area _____ 703 ACRES

**Legend:**

● Corner Found
⊗ Proposed Landing
── 100' Contour
═══ County Road
═══ Existing Road
╌╌╌ Road to be Constructed
═══ Road to be Renovated
▦ Ground-based Yarding Area (23 acres)
▨ Dominant Tree Retention Area
▧ Group Selection Area
⁺⁺⁺ Snag Creation Area
▫ Seasonal Timing Restriction
☐ Partial Cutting Area
→ Stream Channel
▨ Reserve Area
⌐ Contract Area

Scale 1 inch = 750 feet

feet
0   375   750   1,500

Acreage data was collected using a Trimble R1 Global Positioning System receiver. Acreage was calculated based on Global Positioning System traverse procedures including differential correction.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

AR 00328

**SER178**

Wildlife Review by: Jennifer Kirkland

Date: 5/26/22; *revised 5/31/22*

BWE Units: Weekend Falls, EA units #22, 24

Subject: Wildlife review of murrelet buffers and New Construction roads/road renovation changes, in response to email from Meredith Desliu (acting timber planner).

BWE EA units 22 and 24

- Murrelet buffers- due to the treatment units being under age 70 (FOI 10 year age class), the individual trees were buffered with 150ft. no treatment buffers, as stated in the PDFs.
- The new construction and heavy road renovation are within the analysis of the roads for the BWE BA. The PDFs explain that roads can occur adjacent to murrelet trees, however, these roads will be seasonally restricted to outside the full breeding season (April 1-Sept. 15).
  - It is appreciated that we are utilizing an existing road and reducing new construction as much as possible.
- The murrelet no treatment buffers should be retained as much as possible, however, as the biologist I have reviewed the map below and have provided comments. The buffer surrounding the occupied habitat does have a topographic break due to the location at the top of a hill, and a stand break due to the canopy heights between a 60 year old stand and 170 year old.
  - The buffer on the right side of the map below could be limited at the current road and not extend past, if needed to treat unit #22.
- I have reviewed the proposed landings within the no treatment buffer, and there is one landing within occupied ~~that will be moved, see map below for suggestions.~~ ~~The alternative locations are ranked 1, 2, and 3.~~
  - In discussion with Meredith Deslieu on 5/31/22, we discussed that the occupied along the road was snapped to the FOI stand edge. She verified that the FOI will be corrected to edit out the sliver of occupied that is on the North side of the road, and contains only alder. With the changes to the FOI, the on-the-ground verification of habitat, the landings may stay in their current locations as marked on the map.
- Unit #24 has a single murrelet tree along a mainline road and new construction road, the buffer for this tree will be just the sliver between the two roads, so the portion that is North of the new construction road will not need to be buffered for the murrelet tree. The tree is located on a ridge with a topographic break from the stand, between two roads, and along a mainline road. The remaining buffer will keep the murrelet tree, and all buddy trees. The proposed treatment on the North side of the road is thinning.
- Unit #24 has a large contiguous stand of occupied murrelet stand to the West of the treatment unit. While the heavy renovation road may occur within the murrelet buffer, the stand treatment will remain outside of the buffer area (as colored in light red on the map). The road will not remove murrelet trees, and avoid trees with interlocking branches.

AR 00335



AR 00336



*Figure 1. Map with Lidar tree heights, purple triangles are GPS'ed murrelet trees. The red circle indicates the area requesting if murrelet buffer needs to be applied or limit at the current road. The stand ages and canopy heights do not intersect, and the location onto of the ridge have a topographic break; for these reasons the murrelet buffer could be limited at the road for operational purposes.*

Screen Shots of BWE BA PDFs

### Road Management

25. All currently open roads or roads planned for light renovation would not be seasonally restricted since vehicles can currently pass on these roads.

26. When possible, new roads will be designed to avoid removal of remnant trees, trees with platforms for murrelets, or with large cavities that may support spotted owl nesting. Should a tree with murrelet nesting structure, or an adjacent tree with interlocking branches need to be removed, the following restrictions would apply:
    a. Removal would be restricted to outside the full breeding season (April 1- Sept 15) unless protocol surveys have determined the stand to be unoccupied.
    b. The stand with nesting habitat would continue to support future murrelet nesting.

27. Seasonal restrictions are required for construction activities and haul on new roads or roads that received heavy renovation through murrelet occupied or unsurveyed suitable habitat as described in Section 1.6.

AR 00337

**Standards Common to All Late Successional and Riparian Reserve Commercial Harvest Activities**

12. A biologist will field review all units prior to layout to verify on-the-ground conditions and ensure that treatments occur in stands that meet model descriptions and will benefit from thinning.

13. Application of no-treatment buffers adjacent to (within 150 feet of) murrelet nesting structures, either inside or outside the harvest unit boundary:

    a. Adjacent to occupied (either previous or current surveys) or unsurveyed nesting structures: No timber harvest will occur within 150 ft of murrelet nesting structure, unless the biologist reviews the buffer and determines that the proposed treated and occupied or unsuitable surveyed habitat do not interact, for instance due to topography or canopy height.

    b. Adjacent to occupied (either previous or current surveys) or unsurveyed suitable habitat, proposed harvest units with an FOI age of 70 or older: a 150 foot buffer will be applied based on the actual location of the suitable occupied stand edge based on a LiDAR analysis and field verification. A no treatment buffer will be placed within 150 ft of occupied (either previous or current surveys) or unsurveyed suitable murrelet nesting

AR 00338

**SER182**



# United States Department of the Interior
BUREAU OF LAND MANAGEMENT
Coos Bay District Office
1300 Airport Lane, North Bend, OR 97459
Web Address: http://www.blm.gov/or/districts/coosbay
E-mail: BLM_OR_CB_Mail@blm.gov



IN REPLY REFER TO:

5400/1792 (ORC040)
Sugar Rush Timber Sale
ORC04-TS-2022.0030
Big Weekly Elk Forest Management Project Environmental Assessment
DOI-BLM-ORWA-C040-2019-0006-EA

## DECISION RATIONALE
### For the
### Sugar Rush Timber Sale (ORC04-TS-2022.0030)
### Big Weekly Elk Forest Management Project Environmental Assessment

**Background**:
The Myrtlewood Field Office, Coos Bay District Bureau of Land Management (BLM), previously prepared the Big Weekly Elk Forest Management Project (Big Weekly Elk) Environmental Assessment (EA), (DOI-BLM-ORWA-C040-2019-0006-EA), which contained analysis of the effects of conducting regeneration harvest and commercial thinning treatments within the Big Weekly Elk Project Area, as well as analysis of a No Action alternative. The project occurs in Indian Creek-Middle Fork Coquille River 6th Field sub watershed of the Middle Fork Coquille River 5th Field Watershed. The Indian Creek-Middle Fork Coquille River sub watershed is a Class I watershed as defined in the *Northwestern and Coastal Oregon Resource Management Plan* (ROD/RMP, pp. 70-71).

This EA identified Sugar Rush Timber Sale (EA UNIT_102) (EA, pp. 19-20). As outlined in Table 7, Alternative 3 the Sugar Rush Timber Sale consists of a total 114 acres of proposed regeneration harvest (EA, p. 20).

**Proposed Action:**
The Sugar Rush Timber Sale consists of 94 acres of regeneration harvest in the Harvest Land Base (HLB) in Moderate Intensity Timber Area (MITA) land use allocation as defined in the ROD/RMP (p.63). Road work in the Sugar Rush Timber Sale consists of 6.63 miles of existing road renovation, 0.49 miles of road improvement, and 0.12 miles of new road construction. Following the completion of harvesting activities, 0.56 miles of roads will be decommissioned.

The following table (Table 1-1) shows the timber sale unit number and the corresponding EA unit number for clarification. Table 1-1 also includes the timber sale final acreage and the EA estimated acreage.

AR 00399

**SER183**

2

**Table 1-1 Comparison of the final timber sale numbers and EA estimates for units and final acreage.**

| | | | | Totals (acres) |
|---|---|---|---|---|
| **Big Weekly Elk EA** | EA Unit # | | 102 | |
| | EA Timber Sale Name | | Sugar Rush | |
| | Est. Acreage | | 114 acres | 114 |
| **Final Sugar Rush Timber Sale** | Unit # | | 1 | |
| | Acreage | | 94 acres | 94 |
| | Right of Way Clearing | | 1 acre | 95 |

The difference (20 acres decrease) between the acres proposed in the EA and the acres included in the Sugar Rush Timber Sale is due to the amount of existing roads within the boundary, subtle changes in the final timber sale boundaries, unsurveyed Marbled Murrelet (MM) tree buffers, basal area retention requirements, and 1-acre associated with right-of-way clearing (ROW). The EA unit acres do not include existing roads acres (2.5 rounded up to 3 acres) removed. Roughly 0.6 miles of existing roads within the unit boundary with an average 32-foot width yields 3 acres of roadway within the unit. Changes were made to the final timber sale boundary (6-acres) due to timber stocking capability, harvesting feasibility and ground truthing of Forest Operations Inventory (FOI) and Land Use Allocations (LUA).

BLM Foresters identified two changes in the timber sale boundary with the inclusion of two FOI delineated stands not previously identified in the EA. One stand is immediately adjacent to the northeast part of the sale area (2-acres) and the other is in the interior of the southern portion of the sale area (2.8-acres). It was determined by BLM during timber sale layout that these two stands were incorrectly excluded from the initial EA unit pool. The FOI layer was used to delineate the stand boundaries in the EA. When BLM foresters took a closer look at the stand metrics, ortho photos and site visits they found that these two FOI stands were similar to that of the stands proposed for harvest in the EA. The combined 4.8-acres are in the same age classes (60-70-year age classes) of the analyzed stands, had similar stand metrics (basal area, Quadratic Mean Diameter (QMD), heights, etc.) and appeared in ortho photos be part of proposed EA stands. The BLM evaluated these newly identified stands and completed a Determination of NEPA Adequacy (DNA) was completed (DOI-BLM-ORWA-C040-2022-0001-DNA).

During layout unsurveyed MM trees were located within and adjacent to the proposed stand and 300-foot no-treatment buffers (20-acres) were placed around these trees). Approximately, 11-acres of HLB was retained in aggregate reserve areas to meet the basal area retention requirement in the 2016 ROD/RMP.

The following table (Table 1-2) shows the comparison between the EA, and the final timber sale roadwork. The EA numbers were derived from Appendix C: Proposed Road Activities by timber sale area for the Sugar Rush Timber Sale area.

AR 00400

3

Table 1-2 Comparison of roadwork between the timber sale and the EA.

|  | New Road Construction (Miles) | Road Renovation (Miles) | Road Improvement (Miles) | Road Decommissioning (Miles) |
|---|---|---|---|---|
| Big Weekly Elk EA | 0.31 | 6.32 | 1.00 | 0.93 |
| Final *Big Weekly Elk* Timber Sale | 0.12 | 6.63 | 0.49 | 0.56 |

The 0.31-mile increase in road renovation between the EA and the timber sale is the result of including the use of BLM Road No. 29-12-24.0 Segment A (0.28 miles) and the difference between GIS road mileages and the actual road lengths as measured on the ground. The 0.51-mile reduction in road improvement between the EA and the timber sale is the result of eliminating the use and improvement EA Road RENO-102-1 and the difference between GIS road mileages and the actual road lengths as measured on the ground. The 0.19-mile reduction in new construct roads between the EA and the timber sale is a result of eliminating the need for EA roads NC-102-1, NC-102-2 and NC-102-3 and is the difference between GIS road mileages and the actual road lengths as measured on the ground. The 0.37-mile decrease in road decommissioning between the EA and the timber sale is directly proportional to mentioned improved and new construct roads above that BLM chose not to use or construct.

The BLM included a complete list of Best Management Practices (BMPs) and Project Design Features (PDFs) (Appendix B, pp. 119-162) in the EA, which are measures to avoid, minimize, or rectify impacts on resources and are included as part of the proposed action. These BMPs and PDFs and description of the proposed action are hereby incorporated by reference. The following is a summary of some of these design features (BMP's and PDF's):

- One-end log suspension required during yarding.
- Harvest activities will use a combination of skyline cable and ground-based equipment.
- If surveys are not conducted on individual murrelet trees (that will not be removed) or groups of six or less murrelet trees within a 5-acre portion of the stand, a 300-ft no treatment buffer around regeneration harvest and 150 ft. no-treatment buffer around commercial thinning will be maintained. Seasonal and daily timing seasonal restrictions would be required. Snags and down wood will be reserved from harvest and protected from damage during operations to the extent possible. Snags will only be felled for safety reasons (EA, p. 19).
- All road-related activities will use applicable BMPs, and PDFs as described in Appendix B of the EA (pp. 61-92).
- Equipment washing prior to entry of BLM lands to prevent the spread of noxious weeds.

## Compliance and Conformance

My decision to offer the Sugar Rush Timber Sale complies with all Federal, State, and local laws, regulations and policies imposed for the protection of the environment. This includes the Endangered Species Act (ESA), Magnuson-Stevens Fisheries Conservation and Management Act, The Clean Water Act, the Coastal Zone Management Act, the Clean Air Act, the Special Status Species program, and the Oregon Smoke Management Rules (2008 OAR 629-048).

AR 00401

4

The BLM OR/WA State Director signed a Record of Decision approving the ROD/RMP on August 5, 2016, and my decision is in conformance with the 2016 ROD/RMP.

The BLM wildlife staff submitted proposed activities that may affect listed wildlife species within the project area for consultation with the U.S. Fish and Wildlife Service (USFWS), in accordance with 7 (A)(2) of the Endangered Species Act of 1973 [16 U.S.C. 1536 (A)(2) and (A)(4) as amended]. The BLM received a biological opinion (BO) (USFWS TAILS# 01EOFW00-2020-F-553) that refers extensively to the biological assessment (BA). The BLM developed the BA for this consultation (Biological Assessment for the Big Weekly Elk EA) (EA, p. 72).

The forest management activities proposed in the Big Weekly Elk EA comply with the National Marine Fisheries Biological Opinion for the Programmatic Forest Management Program for Western Oregon (WCR-2017-7574).

This project area does not contain any designated Wilderness, Wild and Scenic Rivers, or prime or unique farmlands. There were no concerns identified regarding Areas of Critical Environmental Concern, Cultural Resource Values, Native American Religious Concerns or Environmental Justice issues. The Big Weekly Elk EA, (https://eplanning.blm.gov/eplanning-ui/project/123294/510) resulted in a FONSI; thus, development of an Environmental Impact Statement (EIS) is not required.

## Public Involvement

Initial 30-day public scoping for the BWE EA was from June 7, 2019, to July 8, 2019. The BLM provided direct notification to adjacent landowners and interested parties on the District NEPA mailing list and posted a scoping letter to the local Coos Bay District the BLM's ePlanning website. Comments were received and incorporated into project planning.

On July 21, 2021, the BLM published the BWE EA and preliminary finding of no significant impact (FONSI) on the BLM's ePlanning website. At the same time, the BLM informed those included on the Coos Bay District NEPA mailing list of the availability of the BWE EA and preliminary FONSI for review and comment. The BLM emailed this notification and website address to interested parties, agencies, and organizations.

The EA and preliminary FONSI were available for review and comment until August 27, 2021. The BLM received seven comment letters from individuals, and 78 comments signed by individuals but originated from an environmental group's website (autofill form). All substantive comments are addressed as an appendix in the final FONSI.

I signed the FONSI on October 21, 2021. The BLM published the EA and final FONSI on November 4, 2021, on the BLM's ePlanning website. The BLM notified the public of updated project documents by email using the Coos Bay District's NEPA mailing list on November 4, 2021.

AR 00402

5

**Rationale for the Decision**

I am choosing Alternative 3 of the Big Weekly Elk EA project area to be sold as the Sugar Rush Timber Sale. This is because this will address the purpose and need for action (EA pp. 5-8) and will contribute to resource management direction identified in the ROD/RMP (pp. 59-63).

The Sugar Rush Timber Sale will:
1. Produce timber to contribute to the attainment of the declared Allowable Sale Quantity (2016 ROD/RMP p. 59).
2. Adjust the age class distribution in each sustained-yield unit (2016 ROD/RMP p. 59); and
3. Avoid Northern spotted owl territorial pairs or resident singles.

**Administrative Remedies**

This forest management decision is effective December 14, 2021 in accordance with 43 CFR § 5003.1.

A person adversely affected by this forest management decision may appeal the decision to the Interior Board of Land Appeals (Board), within the Office of the Secretary, Office of Hearings and Appeals. Appeals to the Board are governed by the Department's regulations at 43 CFR Part 4. The BLM has provided the attached Form 1842-1 as a courtesy to assist a member of the public who chooses to appeal this decision. However, the appellant (the person filing the appeal) bears the responsibility to know, understand, and comply with the appeals regulations.

To appeal this decision, the appellant or designated representative (see 43 CFR § 1.3) must file a notice of appeal within thirty (30) calendar days of the date of this decision in this office, addressed to the deciding official, Jeffrey K. Davis, Myrtlewood Field Manager, 1300 Airport Lane, North Bend, Or, 97459. It is the responsibility of the deciding official to promptly transmit a notice of appeal to the Board. If the notice of appeal does not include a statement of reasons, the appellant must file the statement of reasons with the Board and the BLM within thirty (30) calendar days after the notice of appeal is filed. A copy of the notice of appeal, any statement of reasons, any written arguments, and any briefs must also be filed with the Office of the Regional Solicitor, Pacific Northwest Region, U.S. Department of the Interior, 601 SW 2nd Ave, Suite 1950, Portland, OR 97204-3172.

An appellant has the right to petition the Board to stay implementation of the decision. A petition for stay, if any, must accompany the notice of appeal, and be served upon the deciding official and the Office of the Regional Solicitor.

The BLM has revised the forest management regulations at 43 CFR 5000, and those revised regulations became effective on January 19, 2021. The Final Rule was published in the Federal Register on December 18, 2020 (85 FR 82359). In the Final Rule, the BLM eliminated the administrative protest provisions formerly found at 43 C.F.R. § 5003.3; accordingly, there is no opportunity to administratively protest this forest management decision.

For further information contact Ryan Desliu, 1300 Airport Lane, North Bend, OR 97459; by phone at 541-756-0100; or by email at BLM_OR_CB_Mail@blm.gov, Attn: Ryan Desliu.

AR 00403

6

**Decision Approved by:**

JEFFREY DAVIS  Digitally signed by JEFFREY
DAVIS
Date: 2021.12.13 12:53:56 -08'00'

Jeffrey K. Davis                                      Date
Myrtlewood Field Manager


Attachments:  Timber Sale Prospectus maps (Exhibit A;  3 pages)
              Form 1842-1

AR 00404

7

TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 29 S., R. 12 W., Sec. 23 Will. Mer.

SALE NO. ORC04-TS-2022-30
EXHIBIT A1
Page 1 of 1
SUGAR RUSH

HARVEST AREA
UNIT 1 _____ 94 ACRES
ROW _____ 1 ACRE

Total _____ 95 ACRES

Total Reserve Area _____ 185 ACRES
Total Contract Area _____ 280 ACRES



Scale 1 inch = 1 mile

Miles
0    0.5    1         2

Acreage data was collected using a Trimble R1 Global Positioning
System receiver. Acreage was calculated based on Global
Positioning System traverse procedures including differential
correction.

No warranty is made by the Bureau of Land Management as to the
accuracy, reliability, or completeness of these data for individual or
aggregate use with other data. Original data were compiled from
various sources and may be updated without notification.

AR 00405

**SER189**

8



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 29 S., R. 12 W., Sec. 23 Will. Mer.

SALE NO. ORC04-TS-2022-30
EXHIBIT A
Page 1 of 2
SUGAR RUSH

HARVEST AREA
UNIT 1 _____ 94 ACRES
ROW _____ 1 ACRE
Total _____ 95 ACRES
Total Reserve Area _____ 185 ACRES
Total Contract Area _____ 280 ACRES

| | |
|---|---|
| W | Waste Site |
| ● | Corner Found |
| ⊗ | Proposed Landing |
| ⋯ | Road to be Constructed |
| ▬ | Road to be Improved |
| ▭ | Road to be Renovated |
| ▭ | Existing Road |
| → | Streams |
| — | 100' Contour |
| ▦ | Seasonal Restriction |
| ▦ | Ground-Based Yarding Area (10 Acres) |
| ▭ | Harvest Boundary Unit |
| ▦ | Reserve Area - Basal Area Retention |
| ⌐ | ContractArea |
| ▬ | Reserve Area |

Scale 1 inch = 1,000 feet

feet
0   500   1,000   2,000

N

Acreage data was collected using a Trimble R1 Global Positioning System receiver. Acreage was calculated based on Global Positioning System traverse procedures including differential correction.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

AR 00406

**SER190**

9



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 29 S., R. 12 W., Sec. 23 Will. Mer.

SALE NO. ORC04-TS-2022-30
EXHIBIT A
Page 2 of 2
SUGAR RUSH

HARVEST AREA
UNIT 1 _____ 94 ACRES
ROW _____ 1 ACRE

Total _____ 95 ACRES

Total Reserve Area _____ 185 ACRES
Total Contract Area _____ 280 ACRES

Approximate Location and Number of Individual Trees to be Reserved

Waste Site

Corner Found

Proposed Landing

Road to be Constructed

Road to be Improved

Road to be Renovated

Existing Road

Streams

100' Contour

Harvest Boundary Unit

Reserve Area - Basal Area Retention

ContractArea

Reserve Area

Unit 1

feet
0    500    1,000    2,000

Scale 1 inch = 1,000 feet

N

Acreage data was collected using a Trimble R1 Global Positioning System receiver. Acreage was calculated based on Global Positioning System traverse procedures including differential correction.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

AR 00407

SER191

10

Form 1842-1
(September 2020)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**INFORMATION ON TAKING APPEALS TO THE INTERIOR BOARD OF LAND APPEALS**

DO NOT APPEAL UNLESS
1. This decision is adverse to you,
AND
2. You believe it is incorrect
IF YOU APPEAL, THE FOLLOWING PROCEDURES MUST BE FOLLOWED

| | |
|---|---|
| **1. NOTICE OF APPEAL**.................................. | A person who wishes to appeal to the Interior Board of Land Appeals must file in the office of the officer who made the decision (not the Interior Board of Land Appeals) a notice that they wish to appeal. A person served with the decision being appealed must transmit the *Notice of Appeal* in time for it to be filed in the office where it is required to be filed within 30 days after the date of service. If a decision is published in the FEDERAL REGISTER, a person not served with the decision must transmit a *Notice of Appeal* in time for it to be filed within 30 days after the date of publication (43 CFR 4.41 I and 4.413). |
| **2. WHERE TO FILE**<br><br>NOTICE OF APPEAL......... | Jeff Davis, Myrtlewood Field Manager,<br>Myrtlewood Field Office - Coos Bay<br>District, 1300 Airport Lane, North Bend,<br>Oregon, 97459 |
| WITH COPY TO<br>SOLICITOR........................ | Office of the Regional Solicitor - Pacific Northwest Region<br>US Department of the Interior<br>601 SW 2nd Ave, Suite 1950<br>Portland, Oregon, 97204 |
| **3. STATEMENT OF REASONS** | Within 30 days after filing the *Notice of Appeal*, file a complete statement of the reasons why you are appealing. This must be filed with the United States Department of the Interior, Office of Hearings and Appeals, Interior Board of Land Appeals, 801 N. Quincy Street, MS 300-QC, Arlington, Virginia 22203. If you fully stated your reasons for appealing when filing the *Notice of Appeal*, no additional statement is necessary (43 CFR 4.412 and 4.413). |
| WITH COPY TO<br>SOLICITOR........................ | Office of the Regional Solicitor - Pacific Northwest Region<br>US Department of the Interior<br>601 SW 2nd Ave, Suite 1950<br>Portland, Oregon, 97204 |
| **4. SERVICE OF DOCUMENTS** | A party that files any document under 43 CFR Subpart 4, must serve a copy of it concurrently on the appropriate official of the Office of the Solicitor under 43 CFR 4.413(c) and 4.413(d). For a notice of appeal and statement of reasons, a copy must be served on each person named in the decision under appeal and for all other documents, a copy must be served on each party to the appeal (including intervenors). Service on a person or party known to be represented by counsel or other designated representative must be made on the representative. Service must be made at the last address of record of the person or party (if unrepresented) or the representative, unless the person, party or representative has notified the serving party of a subsequent change of address. |
| **5. METHOD OF SERVICE....** | If the document being served is a notice of appeal, service may be made by (a) Personal delivery; (b) Registered or certified mail, return receipt requested; (c) Delivery service, delivery receipt requested, if the last address of record is not a post office box; or (d) Electronic means such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. All other documents may be served by (a) Personal delivery; (b) Mail; (c) Delivery service, if the last address of record is not a post office box; or (d) Electronic means, such as electronic mail or facsimile, if the person to be served has previously consented to that means in writing. |
| **6. REQUEST FOR STAY.............** | Except where program-specific regulations place this decision in full force and effect or provide for an automatic stay, the decision becomes effective upon the expiration of the time allowed for filing an appeal unless a petition for a stay is timely filed together with a Notice of Appeal (43 CFR 4.21). If you wish to file a petition for a stay of the effectiveness of this decision during the time that your appeal is being reviewed by the Interior Board of Land Appeals, the petition for a stay must accompany your Notice of Appeal (43 CFR 4.21 or 43 CFR 2801.10 or 43 CFR 2881.10). A petition for a stay is required to show sufficient justification based on the standards listed below. Copies of the Notice of Appeal and Petition for a Stay must also be submitted to each party named in this decision and to the Interior Board of Land Appeals and to the appropriate Office of the Solicitor (43 CFR 4.413) at the same time the original documents are filed with this office. If you request a stay, you have the burden of proof to demonstrate that a stay should be granted.<br>Standards for Obtaining a Stay. Except as otherwise provided by law or other pertinent regulations, a petition for a stay of a decision pending appeal shall show sufficient justification based on the following standards: (1) the relative harm to the parties if the stay is granted or denied, (2) the likelihood of the appellant's success on the merits, (3) the likelihood of immediate and irreparable harm if the stay is not granted, and (4) whether the public interest favors granting the stay. |

Unless these procedures are followed, your appeal will be subject to dismissal (43 CFR 4.402). Be certain that **all** communications are identified by serial number of the case being appealed.

**NOTE:** A document is not filed until it is actually received in the proper office (43 CFR 4.401(a)). See 43 CFR Part 4, Subpart B for general rules relating to procedures and practice involving appeals.

(Continued on page 2)

AR 00408

11

**43 CFR SUBPART 1821-GENERAL INFORMATION**

Sec. 1821.10 Where are BLM offices located? (a) In addition to the Headquarters Office in Grand Junction, CO and seven national level support and service centers, BLM operates 12 State Offices each having several subsidiary offices called Field Offices. The addresses of the State Offices can be found in the most recent edition of 43 CFR 1821.10. The State Office geographical areas of jurisdiction are as follows:

STATE OFFICES AND AREAS OF JURISDICTION:

Alaska State Office ---------- Alaska
Arizona State Office ------------ Arizona
California State Office --------- California
Colorado State Office ---------- Colorado
Eastern States Office ----------- Arkansas, Iowa, Louisiana, Minnesota, Missouri
                                   and, all States east of the Mississippi River
Idaho State Office -------------- Idaho
Montana State Office --------- Montana, North Dakota, and South Dakota
Nevada State Office------------- Nevada
New Mexico State Office ------ New Mexico, Kansas, Oklahoma, and Texas
Oregon State Office ------------ Oregon and Washington
Utah State Office -------------- Utah
Wyoming State Office --------- Wyoming and Nebraska

(b) A list of the names, addresses, and geographical areas of jurisdiction of all Field Offices of the Bureau of Land Management can be obtained at the above addresses or any office of the Bureau of Land Management, including the Headquarters Office, Bureau of Land Management, 760 Horizon Drive, Grand Junction, CO 81506.

(Form 1842-1, September 2020)

AR 00409

**Wildlife Review for Sugar Rush TS under BWE EA**

Date: October 27, 2021

Reviewer: Jennifer Kirkland, Wildlife

Sugar Rush TS was reviewed on the ground by multiple wildlife and forestry staff. This unit was reviewed to confirm it is in compliance with wildlife PDFs as written in the EA and BA for BWE. I completed this review in the field, with GIS, and in partnership with other staff from forestry and wildlife. This review is paired with the emails and/or PDFs submitted by forestry of the prescription/layout for the specific unit.

Part of Sugar Rush was surveyed to the murrelet protocol (see gray area in map 1) in 2019 and 2020, as a result the trees with platforms in the survey area do no require buffers and could be removed. It is preferred that these trees be retained as wildlife trees. The areas that were surveyed do not require seasonal restrictions if they are outside of the disruption distance of occupied habitat (110 yards).

All murrelet trees outside of the survey area will retain a 300 ft no harvest buffer and require seasonal restrictions.

Part of Sugar Rush will be seasonally restriction for the entire murrelet breeding season ( April 1-September 15) due to the adjacent or bordering occupied murrelet habitat, that was established before the 2016 RMP, within the disruption distance. See table 21 in BWE EA for disruption distances and PDF #12.

Roads that require heavy renovation (are not drivable now) will be seasonally restricted. Roads that are currently drivable do not require seasonal restrictions. In map 1 and 2 roads symbolized with orange and white will have no seasonal restrictions. All other roads will be seasonally restricted for the entire breeding season due to disruption for murrelets (April 1-September 15).

**Clip 1:** Snapshot from BWE EA page 146,

12. Seasonal and daily timing restrictions are required as described in Table 21 and Table 22, for all work that may cause disruption of an occupied spotted owl nest patch, occupied murrelet nesting habitat, or unsurveyed murrelet or spotted owl nesting habitat.

Table 21. Disturbance and disruption distances for marbled murrelets during the breeding period*

| Disturbance or Disruption Activity (known or potential components of proposed action) | Disturbance Distance | Disruption Distance‡ | | |
|---|---|---|---|---|
| | Entire Breeding Period (April 1 – September 15) | Critical Breeding Period (April 1 – August 5) | Late Breeding Period (When activity occurs from two before sunset to two hours after sunrise) (August 6 – September 15) | Late Breeding Period⁑ With DTR (August 6 – September 15) |
| Timber haul and renovation of open roads† | 0.25 mile | NA | NA | NA |
| Renovation and new construction on closed roads‡ | 0.25 mile | 110 yards | 110 yards | NA |
| Chainsaw and heavy equipment operation for large culvert replacements, yarding, mechanical harvest, etc. | 0.25 mile | 110 yards | 110 yards | NA |
| Pile Burning | 1 mile | 0.25 mile | 0.25 | NA |
| Blasting | 1 mile | 0.25 mile | 0.25 mile (NO DTR permitted) | 0.25 mile |

AR 00428

**Map 1:** Sugar rush regen sale is symbolized with blue polygon, gray is murrelet protocol survey sites, pink camo is occupied murrelet, and purple triangles are GPS'ed murrelet trees.



AR 00429

**SER195**

**Map 2:** The map below shows the disruption distance of 110 yards, solid pink polygon, outward from occupied murrelet habitat. See table 21 in BWE EA for disruption distances and PDF #12.



AR 00430

**Ex. A as of 10/25/21**



TIMBER SALE CONTRACT MAP
USDI-BLM COOS BAY DISTRICT
T. 29 S., R. 12 W., Sec. 23 Will. Mer.

SALE NO. ORC04-TS-2022-30
EXHIBIT A DRAFT
Page 1 of 1
SUGAR RUSH

HARVEST AREA
UNIT 1 _____94 ACRES
ROW _____1 ACRE

Total_____95 ACRES

Total Reserve Area ____185 ACRES
Total Contract Area ____280 ACRES

DRAFT

Corner Found
Proposed Landing
Road to be Constructed
Road to be Improved
Road to be Renovated
Existing Road
Streams
100' Contour
Harvest Boundary Unit
Reserve Area - Basal Area Retention
Contract Area
Reserve Area

Unit 1

feet
0    500    1,000    2,000

Scale 1 inch = 1,000 feet

Acreage data was collected using a Trimble R1 Global Positioning System receiver. Acreage was calculated based on Global Positioning System traverse procedures including differential correction.

No warranty is made by the Bureau of Land Management as to the accuracy, reliability, or completeness of these data for individual or aggregate use with other data. Original data were compiled from various sources and may be updated without notification.

AR 00431

**SER197**



# United States Department of the Interior



BUREAU OF LAND MANAGEMENT
Oregon State Office
P.O. Box 2965
Portland, Oregon 97208
http://blm.gov/or

AUG 08 2016

IN REPLY REFER TO:
1610 (OR933) I

EMS TRANSMISSION 08/08/2016
Information Bulletin No. OR-2016-059

To:      Western Oregon District Managers, Associate District Managers, District Planning
and Environmental Compliance Specialists

From:    Kathryn J. Stangl
Deputy State Director for Resource Planning, Use and Protection
Oregon/Washington

Subject:  Oregon State Office Implementation Core Team for Western
Oregon Resource Management Plans

The Bureau of Land Management (BLM) released the Proposed Resource Management Plan and
Final Environmental Impact Statement for the Resource Management Plans in western Oregon
on April 15, 2016. The Records of Decision and Approved Resource Management Plans (2016
RODS/RMPs) were approved on August 5, 2016. The Oregon State Office (OSO) has created
an RMP implementation core team to support the districts as they implement the new RMPs and
to ensure consistent interpretation and clarification of land use allocations and management
direction. A coordinated process for addressing RMP interpretation and clarification will
provide for effective communication across all districts, tracking of issues, and comprehensive
responses. Ultimately, this will benefit the districts as they begin to implement the 2016
RODS/RMPs.

**Background:** As the districts begin to implement the new RMPs, there may be questions about
how to implement management direction and land use allocations. Some questions are
appropriate for district interpretation and some need to be addressed across the west-side districts
or by ROD/RMP area.

An RMP implementation core team has been identified to address west-side or ROD-wide
questions, provide responses, and write supplemental guidance as needed. The core team will:
1. Be led by OSO western Oregon planners (Anne Boeder and Richard Hardt),

AR 08698

**SER198**

2

2. Include the following OSO program leads: O&C Forester, State T&E Wildlife Biologist, Interagency Special Status Species Conservation Biologist, State Fish Biologist, and Water/Riparian Program Lead, and
3. Include other program leads (e.g. recreation) as needed to respond to specific questions.

The core team will strive to answer district questions within 10 working days and will share this information with all districts via email and the Western Oregon RMPs Implementation Share Point site http://teamspace/or/sites/rmpwoimp/SitePages/Home.aspx.

The following process is available to the districts and the OSO for interpretation or clarification of RMP management direction or land use allocations:

1. An initial conversation should occur between the district planner(s) and the appropriate district program lead(s) to review and investigate the RMP implementation question and determine if additional clarification is needed from the OSO.
   a. Determine if the issue is pertinent to only one district, one RMP, or both RMPs.
   b. At any time, the district should contact an OSO program lead(s) if needed to help inform this discussion.
2. The District Manager (or Field Manager for the Klamath Falls Field Office) should review the issue and potential request.
3. If a question needs OSO review, the district planner should fill out a request worksheet (see attachment) and upload the request worksheet and supporting documents to the Western Oregon RMPs Implementation Share Point (http://teamspace/or/sites/rmpwoimp/SitePages/Home.aspx). Send an email confirmation to Richard Hardt and Anne Boeder once the files are uploaded. Relevant questions for the OSO Core Team would include:
   a. Interpretation of RMP management direction that may affect more than one district (i.e. there is a need for consistency across districts).
   b. The district has attempted to resolve the question but is unable to do so because of multiple reasonable interpretations of RMP direction. More than one district may benefit from clarification.
   c. Successful implementation of RMP direction requires specific program guidance and more than one district may benefit.
4. The core team will initially meet once a week to review and respond to questions. The core team will coordinate with district and OSO staffs as needed, resolve the issue, and document answers in a question and answer (Q&A) log and post it along with supporting documents to Western Oregon RMPs Implementation Share Point (http://teamspace/or/sites/rmpwoimp/SitePages/Home.aspx). The OSO Western Oregon Planner will notify district planners of updated documents; schedule follow-up conference calls; and coordinate with the West-side Steering Committee and the Deputy State Director for Resource Planning, Use, and Protection to create additional guidance as needed. Guidance may be informal (emails) or formal (Information Memorandum, Information Bulletins).

AR 08699

3

Instruction memorandums (IMs) transmit new policies, procedures, and direction; information bulletins (IBs) disseminate information and/or calls attention to existing policies or procedures.

**Contact:** Please direct any questions concerning this IB to Oregon State Office Planner Anne Boeder at (503) 808-6628.

**Districts with unions** are reminded to notify their unions of this information bulletin and satisfy any bargaining obligations before implementation. Your servicing Human Resources Office or Labor Relations Specialist can provide you with assistance in this matter.

Signed by                                                          Authenticated by
Kathryn J. Stangl                                              K. Wentworth
Deputy State Director for                               Records Section
Resource Planning, Use and Protection

Attachment
    1- RMP Interpretation/Clarification Request Worksheet (1p.)

Distribution
WO 210
OR 930 (Cathy Harris)
OR931 (Jeannette Griese)
OR 934 (Jeff Fedrizzi)
OR 932 (Lee Folliard)
OR936 (Leslie Frewing)

AR 08700

**SER200**

## RMP Interpretation/Clarification Request Worksheet

| |
|---|
| **1.   Name of the ROD/ARMP:** |
| ☐ Northwestern and Coastal Oregon RMP        ☐ Southwestern Oregon RMP |
| **2.   What is the section of the RMP that needs interpretation or clarification? Provide text and page citation.** |
| |
| **3.   Describe why the existing RMP language needs interpretation or clarification?** |
| |
| **4.   Why is this appropriate for OSO review?** |
| *Select an item.*<br><br>Explain: |
| **5.   What is your proposed fix/clarification?** |
| Explain: |
| **6.   With whom have you coordinated/discussed this with on the district? Include the name of the manager who reviewed the request.** |
| Explain: |

### OSO Core Team Discussion/Resolution

| | |
|---|---|
| **OSO Reviewers:** | |
| **Resolution:** | |
| **Notes:** | |

Attachment 1 of 1

AR 08701

**SER201**